IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES L. KOPECKY, RECEIVER          )
FOR BRAD A. WEAVER AND              )
BETA ASSET MANAGEMENT, INC.,        )    Case No. 08 C 3135
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Honorable Blanche M. Manning
                                    )
MARK VEHSLAGE, HEATHER LENGYEL,     )
AND RICHARD SCHRIPSEMA,             )
                                    )
            Defendants.             )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO RULE 12(b)

Defendants Mark Vehslage and Heather Lengyel, who are husband and wife (the "Vehslages" or "Defendants"), through their undersigned attorneys, submit this Memorandum of Law in support of their motion to dismiss with prejudice Plaintiff's Amended Complaint (the "Complaint"), and respectfully state as follows:

### BACKGROUND

On December 23, 2004, the Securities Exchange Commission (the "SEC") filed a civil action against Brad A. Weaver ("Weaver") and Beta Asset Management, Inc. ("Beta"), Case No. 04 CV 8279 ("*SEC v. Weaver*"), in the United States District Court for the Northern District of Illinois (the "Court"). Compl. ¶ 5. In *SEC v. Weaver*, the SEC accused Weaver and Beta of perpetrating a Ponzi scheme and violating federal securities law. Compl. ¶ 12. The Court appointed James L. Kopecky as the receiver (the "Receiver") for Weaver and Beta. Compl. ¶ 5.

In May 2007, the Receiver filed a lawsuit in this Court against Lakewood Properties, Ltd. ("Lakewood") to recover the alleged payments received by Lakewood from Beta, Case No. 07 C 2863 (the "Lakewood Case"). Compl. ¶ 17. The Receiver filed this instant lawsuit against three individuals, including the Vehslages, seeking to recover more than $3 million.

The Complaint asserts three Counts, the exact three counts that the Receiver originally asserted in the Lakewood Case. Count I is a claim for "Disgorgement of Funds Acquired through Weaver's and Beta's Violation of the Securities Act and the Exchange Act and Rule 10b-5 Thereunder." Compl. ¶¶ 15-19. Count II is a claim for "Unjust Enrichment." Compl. ¶¶ 20-23. Count III is a claim under the Illinois Uniform Fraudulent Transfer Act (the "Illinois UFTA"). Compl. ¶¶ 24-27.

On August 23, 2007, Lakewood moved to dismiss Counts I and II of the Receiver's complaint against Lakewood. On October 19, 2007, Judge Pallmeyer granted Lakewood's motion dismissing the Receciver's Count I, disgorgement, with prejudice, but denied Lakewood's motion dismissing the unjust enrichment claim.

## SUMMARY OF ARGUMENT

This Court must dismiss Count I for failure to state a claim because disgorgement is merely a remedy, not a cause of action in itself. Count II must be dismissed because the Receiver lacks standing to bring the unjust enrichment claim against the Vehslages, who have no direct relationship with the receivership entities. Count III fails to state a claim because its allegations are too ambiguous and insufficient to inform Defendants of Plaintiff's basis for relief and because the material factual allegations in Count III contradicts the Complaint's exhibits and the Receiver's averments in the related Lakewood Case.

**ARGUMENT**

I.     **The legal standard of motion to dismiss.**

Under the Federal Rules of Civil Procedure, a complaint should be be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (citation omitted).  Under this standard, Plaintiff must give Defendants fair notice of the nature of his claims and the grounds upon which they rest. *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

A courts should not accept mere legal conclusions either alleged or inferred from the pleaded facts.  *Mescall v. Burrus*, 603 F.2d 1266 (7th Cir. 1979).  Conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss.  *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981).

II.    **This Court Must Dismiss Count I Because Disgorgement Is A Mere Remedy, Not A Cause Of Action In Itself.**

Count I of the Complaint must be dismissed because disgorgement is a mere remedy and cannot independently support a cause of action.  The Supreme Court long ago established that a remedy is distinguishable from a cause of action. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 69 (1992).  Then, in *SEC v. First Jersey*, the Second Circuit stated in unambiguous terms that: "[d]isgorgement is permissible relief for a valid claim of violation of the securities laws;  but disgorgement is not a claim in itself."  101 F.3d 1450, 1478 (2d Cir. 1996).  Because disgorgement is not a independent cause of action, Judge Pallmeyer has dismissed the exactly same disgorgement claim that the Receiver originally asserted against Lakewood in the Lakewood Case.

Moreover, other courts have held that disgorgement is not a cause of action in itself upon which a receiver can rely to recover from the investors in a Ponzi scheme. *E.g., In re Wiand*, 2007 WL 963162, at *15 (M.D. Fla. 2007) (a copy is attached hereto as **Exhibit A**). In *Wiand*, the SEC brought an action against the perpetrators of a Ponzi scheme and a federal receiver was appointed. *Id.* at *2. The receiver then brought approximately eighty lawsuits against the perpetrators' former victims to recover money received from the Ponzi scheme. *Id.* at *3. One count of the receiver's complaint was disgorgement based on the perpetrators' violation of federal securities law. *Id.* Upon the investors' motion to dismiss, the court agreed that disgorgement is not an independent cause of action, although it may be a remedy for a viable cause of action. *Id.* at 15.

Precedents in the Seventh Circuit are consistent with the holdings in *First Jersey* and *Wiand*, which mandates that a disgorgement claim must be dismissed for not stating an independent cause of action. In *SEC v. Lipson*, the Seventh Circuit stated that: "[d]isgorgement is a form of restitution, ... and restitution ... is both a legal and an equitable remedy." 278 F.3d 656, 663 (7th Cir. 2002) (quotations omitted). In *Lipson*, the defendant was found guilty of insider trading and, on appeal, the defendant objected to the disgorgement remedy ordered by the district court. *Id.* at 659. The Seventh Circuit reasoned that disgorgement was the proper equitable remedy because insider trading is a breach of corporate fiduciary duty. *Id.* at 663. This reasoning has in effect classified disgorgement as a remedy, not an independent cause of action.

Although, in securities enforcement actions, the SEC has requested disgorgement as appropriate remedy against a "relief defendant" who is not accused of wrongdoing, *e.g., SEC v. Cavanaugh*, 445 F.3d 105 (2d Cir. 2006), this case is not an enforcement action. Here, the

Vehslages are not "nominal" or "relief" defendants in the SEC securities enforcement action, *SEC v. Weaver*. The instant case and *SEC v. Weaver*, although related, are two separate cases.

The Receiver in Count I attempts to plead the language of securities law, which he cannot enforce, with a remedy of disgorgement. Such artful pleading techniques, however, cannot mask the fact that disgorgement cannot stand alone as a cause of action.

In short, Count I merely seeks a remedy without alleging a legally cognizable cause of action. This Court, therefore, must dismiss Count I for failure to state a claim upon which relief can be granted.

> **II.    This Court Must Dismiss Count II Because The Receiver Lacks Standing To Bring An Unjust Enrichment Claim Against The Vehslages.**

Count II must be dismissed because the Receiver lacks standing to bring an unjust enrichment claim against the Vehslages. Specifically, Count II fails to allege that the Vehslages received a benefit to the detriment of the receivership entities.

A federal receiver "may sue only to redress injuries to the entities in receivership." *Scholes v. Lehmann*, 65 F.3d 750, 753 (7th Cir. 1995) (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)). In fact, the Receiver is only authorized to "marshal, conserve, protect, hold funds, operate, and with the approval of the Court, dispose of all assets of any nature ... in which *[Weaver] and [Beta]* have a legal, equitable or beneficial interest." (emphasis added). Compl. ¶ 5. Accordingly, the Receiver cannot bring claims that can only be brought by the investors of the Ponzi scheme. *Freeman v. First Union* Nat'l, 329 F.3d 1231, 1235 (11th Cir. 2003).

The doctrine of unjust enrichment requires three elements: (1) the defendant receives a benefit, (2) to the plaintiff's detriment, and (3) the defendant's retention of that benefit violates the principles of justice, equity, and good conscience. *HPI Health Care Services, Inc v. Mt*

*Vernon Hospital*, *Inc.*, 131 Ill.2d 145, 160 (1989).  In simple terms, the Vehslages' retention of the funds that Plaintiff seeks to recover is unjust only if the Receiver had a better claim in equity to the funds than the Vehslages.  *See id*. at 162 (citation omitted).  For example, the retention is unjust if the Vehslages committed some wrong acts or if a third party mistakenly gave the Vehslages the funds that should have been given to the *plaintiff*.  *See id.*

Furthermore, under *HPI Health Care Services*, unjust enrichment is a claim personal to the party who should have received the benefit but did not, and, thus, involves a fairness consideration of equity to effect a redistribution of property.  *Scholes v. Ames*, 850 F.Supp. 707, 712 (N.D. Ill. 1994).  For this reason, Plaintiff in Count II essentially asks this Court to step in to balance the equities between the Vehslages and the Weaver/Beta entities.

Here, the Receiver alleges neither any wrong acts of the Vehslages nor any third party mistakes.  Weaver and Beta are the parties who committed fraud.  If there is anyone who deserves equity and might have a better claim than the Vehslages to the funds, it is the *other investors*, not the Receiver or his receivership entities, who are the least deserving entities in equity.  *Scholes v. Ames*, 850 F.Supp. at 712.  Knowing that the balance of equity will not tilt in favor of Plaintiff, the Receiver asserts that the retention of the funds by the Vehslages is to the detriment of *other investors.*  Compl. ¶¶ 30-31.  But the Receiver cannot assert the claims that can be only brought by the investors.  *See Freeman*, 329 F.3d at 1235.  Because Count II does not allege any personal damages to the Receiver *himself or his receivership entities*, as required by *HPI Health Care Services*, this Court must dismiss Count II for Plaintiff's lack of standing.

Plaintiff lacks standing to bring the unjust enrichment claim against the Vehslages, notwithstanding that Judge Pallmeyer denied Lakewood's motion to dismiss the unjust enrichment claim in the Lakewood Case.  First, other courts have dismissed the receiver's unjust

enrichment claims for lack of standing in Ponzi scheme cases. *E.g., Jonson v. Studholme*, 619 F.Supp. 1347, 1350 (D. Colo. 1985), *aff'd sub nom, Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987) (dismissing the receiver's unjust enrichment claim for lack of standing).

Second, Plaintiff's claim against the Vehslages is distinguishable from the one in the Lakewood Case. Here, Plaintiff alleges that Mark Vehslage and Richard Schripsema formed Lakewood, and that all the funds that Plaintiff seeks to recover were first transferred from Beta and then passed on to the Defendants. Compl. ¶¶ 11, 13. In other words, the Vehslages did not receive the funds directly from Beta and/or Weaver and were one-step removed from the receivership entities.

Because the purported detriment to the Receiver or the receivership entities, if any, is not directly linked to the transfer from Lakewood to Beta, the Receiver here has no standing to ask this Court to apply the equity principles of unjust enrichment. *See Muehlbauer v. General Motors Corp.*, 431 F.Supp.2d 847, 853 (N.D. Ill. 2006) (citation omitted) (unjust enrichment requires the central inquiry of "whether the plaintiff's detriment is directly related to the defendant's benefit"). Moreover, if this Court allow the Receiver to recover the funds directly from the Vehslages for a debt allegedly owing from Lakewood to Beta, this Court essentially will be elevating the Receivers claim against Lakewood into a super priority status, which is inequitable to other creditors of Lakewood. For these reasons, Plaintiff's unjust enrichment claim against the Vehslages must be dismissed.

### III.    This Court Must Dismiss Count III Because The Receiver Failed To Allege A Cognizable Claim To Which Defendants Are Able To Respond And The Receiver Alleges Contradictory Facts In Related Lawsuits Before The Court.

This Court must also dismiss Plaintiff's claim under the Illinois UFTA because Plaintiff failed to allege a cognizable claim to which the Vehslages are able to respond. Moreover, the

material factual allegations in the Complaint directly contradicts the exhibits to the Complaint and Plaintiff's material factual allegations in the Lakewood Case.

The Receiver alleges that "[t]he transfer of funds from Beta to Lakewood to Defendant Vehslage's personal account and used for the benefit of all Defendants constitutes either direct fraudulent conveyances or a subsequent fraudulent conveyance for no reasonably equivalent value." Complaint ¶ 33. This hodgepodge of allegations fails to give the Vehslages a fair notice of the grounds upon which Plaintiff is entitled to relief. Similarly, Plaintiff makes vague and ambiguous allegations that "[t]he transfer of funds from Beta to and for the benefit of Lakewood Properties, Ltd. and the Defendants personally" was done "with actual intent to hinder ... " or "without Beta receiving reasonably equivalent value ....." Complaint ¶¶ 34, 35.

First, the above vague allegations fail to inform the Vehslages as to which one of the following situations matches Plaintiff's factual assertion: (1) Beta transferred funds to Lakewood; (2) Beta transferred funds to Defendants personally; (3) Beta transferred funds to Lakewood for the benefit of Defendants; or (4) Beta transferred funds to Defendants for the benefit of Lakewood. Second, the ambiguous hodgepodge fails to allege which one of the following grounds upon which Plaintiff clams he is entitled to relief under the Illinois UFTA: (1) the transfers from Beta to Lakewood, if any, were fraudulent; (2) the transfers from Beta to the Vehslages personally, if any, were fraudulent; (3) the transfers from Lakewood to the Vehslages personally, if any, were fraudulent; or (4) the transfers from Beta to Lakewood, if any, were fraudulent and the Vehslages were the subsequent transferees.

Plaintiff wishes to throw everything into his Complaint, which approach only results in a mishmash of vague and ambiguous allegations. Because the allegations in Count III are vague and ambiguous, it fails to inform the Vehslages of Plaintiff's basis for relief. Accordingly, this

Court should not infer from the Receiver's ambiguous allegations or accept mere conclusions in his Complaint.  Rather, this Court must dismiss Count III because it fails to inform Defendants of the basis upon which Plaintiff is entitled to relief.

In addition, this Court must dismiss Count III because the material factual allegations in Count III are contradictory.  In the related Lakewood Case,  the Receiver avers that Lakewood used the $2.6 million wired from Beta to pay Citibank to retire a mortgage on a multi-unit condominium building located at 855-859 LaSalle Street, Chicago, Illinois.  *See* Docket No. 74, the Receiver's Statement of Undisputed Facts, at 10 ¶ 41, Case No. 07 C 02863, a copy of which is attached hereto as **<u>Exhibit B</u>**.  Contrary to his averment there, the Receiver here alleges that the $2.6 million were "wired in turn to an account at Northern Trust Company."  Complaint ¶ 20. If the funds went to Lakewood and were used to pay off a mortgage, as the Receiver has admitted in the Lakewood Case, then no fraudulent conveyance claim can lie for that transfer.

Moreover, the fourth page of the Exhibit B to the Complaint, Escrow Account Inquiry from Chicago Title, indicates that the $2.6 million was in fact used to payoff the mortgage.  For purposes of motion to dismiss, courts may rely on exhibits to the complaint whenever the allegations of the complaint are materially inconsistent with those exhibits.  *Thompson v. Illinois Dept. of Prof. Regulation,* 300 F.3d 750, 754 (7th Cir. 2002).  Here, the material factual allegations in the Complaint contradict Plaintiff's averments in the related Lakewood Case and what shows in the exhibit to the Complaint.  Accordingly, this Court must dismiss Count III where material factual allegations are contradictory.

## CONCLUSION

For the foregoing reasons, the Vehslages request that this Court dismiss Plaintiff's Complaint in its entirety.

July 21, 2008                          Respectfully Submitted by
                                       Mark Vehslage and Heather Lengyel

                                       /s/       Zhiyuan Xu
                                       One of their Attorneys

                                       Eugene J. Geekie, Jr.
                                       Matthew C. Crowl
                                       Zhiyuan "Mike" Xu
                                       SCHIFF HARDIN LLP
                                       6600 Sears Tower
                                       233 South Wacker Drive
                                       Chicago, IL  60606
                                       Telephone: (312) 258-5500
                                       Facsimile: (312) 258-5600
                                       egeekie@schiffhardin.com
                                       mcrowl@schiffhardin.com
                                       mxu@schiffhardin.com


## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on July 21, 2008, copies of the foregoing **Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint** were caused to be served upon the party listed below in the manner identified below.


**Via the ECF System**
James L. Kopecky
James L. Kopecky, P.C.
190 S. LaSalle St., Ste. 850-A
Chicago, Illinois 60610
Phone (312)-527-3966
Fax (312)-527-3968
jim@jlkopecky.com
*Counsel for Plaintiff*

                                                    /s/       Zhiyuan Xu

# Exhibit A

*Westlaw.*

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

▶In re Wiand
M.D.Fla.,2007.
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.
In re Burton WIAND Receivership Cases Pending in
the Tampa Division of the Middle District of Florida.
**Nos. 8:05-cv-1856-T-27MSS, et al.**

Jan. 12, 2007.

Carl Richard Nelson, Maya M. Lockwood, Fowler
White Boggs Banker P.A., Nicole Alicia Lebeau, Tate,
Lazarini, Brady & Guerra, PLC, Tampa, FL, for
Plaintiff.
Douglas Jules Titus, Jr., George & Titus, P.A., Tampa,
FL, Christopher E. Martin, Securities & Exchange
Commission, Miami, FL, for Defendants.

*REPORT AND RECOMMENDATION*

MARY S. SCRIVEN, United States Magistrate Judge.
**\*1     THIS CAUSE** comes before the Court on
motions to dismiss filed on or before August 17, 2006
(the "Motions"), by Defendants in fourteen of the
approximately eighty cases consolidated to the
Undersigned by omnibus order.[FN1] On August 17,
2006, the Court directed the Receiver to respond in an
extended global response to the Motions by
September 15, 2006, and Defendants were given leave
to reply.[FN2]The remaining cases were stayed pending
resolution of the Motions. On November 17, 2006, the
Motions were considered on oral argument, at which
time supplemental authority was submitted for
consideration by several of the parties. The transcript
of the hearing was filed on December 18, 2006.

> FN1. All pretrial matters in the cases were
> referred to the Undersigned for resolution by
> order or by report and recommendation as
> dictated by law.

> FN2. The Receiver filed his responses to the
> motions to dismiss filed in *Wiand v.
> Waxenberg,*   8:05-cv-1856-T-27MSS,   on
> April 17, 2006, and June 30, 2006.

**I. STANDARD OF REVIEW**

The threshold for surviving a motion to dismiss for
failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a
low one. *Quality Foods de Centro Am., S.A. v. Latin
Am. Agribusiness Dev. Corp., S.A., et al.,* 711 F.2d
989, 995 (11th Cir.1983). Such a motion will not be
granted unless it "appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief."*Id.* (citing
Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2
L.Ed.2d 80 (1957)). In evaluating the sufficiency of a
complaint in light of a motion to dismiss, the pleaded
facts must be accepted as true and construed in the
light most favorable to the plaintiff. *Quality Foods,*
711 F.2d at 994-95. However, the court should not
assume that the plaintiff can prove facts that were not
alleged. *Id.* Further, conclusory allegations are not
accepted as true. *Gersten v. Rundle,* 833 F.Supp. 906,
910 (S.D.Fla.1993)(citing *Assoc. Builders, Inc. v.
Alabama Power Co.,* 505 F.2d 97, 100 (5th
Cir.1974)).[FN3]

> FN3. Generally in conducting this analysis,
> the Court is also confined to the four corners
> of the complaint and its incorporated exhibits.
> *Brooks v. Blue Cross & Blue Shield of Fla.,
> Inc.,* 116 F.3d 1364, 1368 (11th Cir.1997).
> The Court is permitted, however, to consider
> certain documents referred to in the
> complaint by the plaintiff when those
> documents are central to the plaintiff's claim.
> *Id.* at 1369.

While the law favors resolution of cases on their
merits after full litigation, dismissal is mandated
where the defendant can show that the law plainly
precludes the relief that is sought or precludes the
plaintiff from obtaining the relief that is sought: the
former being preclusion based on the content of the
law raised as grounds for the relief and the latter being
preclusion due to the plaintiff's standing as the
putative recipient of said relief. Even if the law
permits the type of action to proceed and permits the
plaintiff to proceed, the complaint must allege
sufficient facts to place the defendant on notice of the
claim being asserted and permit a reasoned response.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

With respect to general allegations of liability this standard is slight; however, where fraud is alleged, the underlying facts must be pled with particularity and the complaint must include:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

(2) the time and place of each statement and the person responsible for making, or not making, the same, and

(3) the content of such statements and the manner in which they misled the plaintiff, and

(4) what the defendants obtained as a consequence of the fraud.

**\*2** *Brooks,* 116 F.3d at 1371.

Finally, if an action is dismissed it should generally be dismissed without prejudice unless it is so clearly established that the plaintiff cannot, with leave to amend, cure the legal defects that warranted the dismissal. *Stevens v. Premier Cruises, Inc.,* 215 F.3d 1237, 1239-40 (11th Cir.2000). A district court ordinarily "must give a plaintiff one opportunity to amend the complaint and to cure the pleading defect."*Id.* Leave to amend, however, "need not be granted where amendment would be futile."*Id.*

To place these legal precepts in proper context in the cases underlying the Motions addressed by this Report and Recommendation, a review of the facts, the procedural history, the order of receivership and the substance of the counts of the complaints is necessary.

## II. FACTUAL BACKGROUND AS ALLEGED

Beginning in at least 1990 through May 2005, Howard Waxenberg ("Waxenberg") collected over $130 million by purporting to offer and sell securities to approximately two hundred investors.[FN4] In fact, through various entities Waxenberg established a classic "Ponzi" scheme.[FN5] He pooled all of the investors' funds into a common account held in the names of Howard Waxenberg Trading, LLC, HKW Trading, LLC, HKW Trading Fund I, LLC, Downing & Associates Technical Analysis (n/k/a the Estate of Howard Waxenberg) and the Estate of Howard

Waxenberg (collectively referred to as the "Receivership Entities"). He purported to charge the individuals a management fee and fraudulently represented to them that their funds were being invested in options and futures that were returning approximately 20% annually.

> FN4. The "investors" in Waxenberg's scheme consisted of individuals, couples and corporations. The Undersigned will refer to these "investors" as either "investors," "individuals" or "victims" throughout this Report and Recommendation.

> FN5. The expression 'Ponzi scheme' [describes] fraudulent investment plans in which funds taken from later investors are paid to early investors to create the false appearance that investment activities are generating high returns. The expression takes its name from Charles Ponzi, a famous Boston swindler. Beginning with just $150 in capital in late 1919, Ponzi initiated an investment scheme in which he promised 150% returns on 90-day promissory notes. Ponzi claimed that revenue from the notes would be used to finance profitable investments in the international trade of postal coupons. In fact, Ponzi never invested the funds at all and simply used revenues from new investors to pay off notes purchased by earlier investors, including himself. In only eight months, Ponzi had collected close to $10 million from the scheme.

> *Wolff v. Cash 4 Titles,* 351 F.3d 1348, 1350 n. 2 (11th Cir.2003) (citing *Cunningham v. Brown,* 265 U.S. 1, 7-9, 44 S.Ct. 424, 68 L.Ed. 873 (1924)) (detailing Ponzi's fraud scheme)).

Waxenberg falsely represented to the individuals that their "investments" were performing positively and had generated no losses. To support this assertion, Waxenberg regularly mailed fictitious statements and invoices to the victims that illustrated the positive performance of their "investments." These statements and invoices also portrayed that the individuals were being paid "interest" based on the high returns

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

generated. In actuality, the distributions made to the victims did not consist of any "interest" based on their returns, but were derived almost exclusively from the capital contributions from new or existing victims. Aside from making inducement distributions, Waxenberg used the money he obtained to cover his personal expenses.

Between February 2005 and May 2005, Waxenberg, through the Receivership Entities, began making payments to approximately sixty-three victims of his scheme, including each Defendant in these cases. The other one hundred twenty-five victims did not receive these payments. The amount the Receiver has alleged was received by each Defendant and the alleged source of the payment is listed in Appendix A. Waxenberg committed suicide on May 15, 2005.

### III. PROCEDURAL HISTORY

Following Waxenberg's suicide, the Securities and Exchange Commission (the "SEC") began an investigation into Waxenberg and the Receivership Entities. As an outgrowth of that investigation, the SEC brought an enforcement action against the Receivership Entities alleging against each of them violations of the federal securities laws. The SEC simultaneously filed an *ex parte* emergency motion for the appointment of a receiver to oversee the assets of Howard Waxenberg Trading, LLC, HKW Trading, LLC and HKW Trading Fund I, LLC. The Court appointed Burton Wiand as the Receiver for these three entities on June 9, 2005. On September 13, 2005, the Court expanded the scope of the receivership to include the Estate of Howard Waxenberg and Downing & Associates Technical Analysis. Under the terms of the Court's orders appointing receiver, the Receiver was to investigate the affairs of the Receivership Entities and institute actions and legal proceedings,

**\*3** for the benefit and on behalf of the [Receivership Entities] and their investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the [Receivership Entities] ... provided such actions may involve, but not be limited to,

seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, et seq., or otherwise, ... and such orders from this Court as may be necessary to enforce this [o]rder.

*SEC v. HKW Trading, LLC, et al,* 8:05-cv-1076-T-24MSS, Dkt. 75 (M.D.Fla. February 22, 2006), http://ecf.flmd.circ11.dcn. (the "SEC action")

Subsequently, because the Receiver's deadline to pursue certain claims was about to expire, the SEC moved for reappointment of the Receiver. On February 22, 2006, the Court reappointed Burton Wiand as the Receiver for all Receivership Entities as dictated by the Court's June 2005 and September 2005 orders. Within ten days of the order reappointing receiver, copies of the complaint in the SEC action and copies of the order reappointing receiver were filed in the United States District Courts for the various districts where Defendants reside. On April 25, 2006, on stipulation of the SEC and the Receiver on behalf of all of the Receivership Entities, including the Estate of Waxenberg, the Court entered an order of permanent injunction against all of the Receivership Entities. *HKW Trading, LLC,* 8:05-cv-1076-T-24MSS, Dkt. 81. Additionally, the Court dismissed the SEC's monetary claims for disgorgement and civil penalties *with prejudice. Id.*

### IV. THE RECEIVER'S COMPLAINTS

Subsequent to the order reappointing receiver in February 2006, the Receiver instituted approximately eighty actions against Waxenberg's former victims who received money immediately prior to his death. In his complaints, the Receiver seeks the return of any "inequitable distributions" these individuals received from Waxenberg and the Receivership Entities in the months preceding Waxenberg's death. The Receiver contends these payments were made to the detriment of other similarly situated victims who did not receive such payments. Upon return of the money to the Receivership Entities, the Receiver contends without specifics that he will "equitably redistribute" the funds in an "appropriate manner." The recovery sought by the Receiver is detailed in Appendix B.

Each complaint alleges virtually identical causes of action against each Defendant.[FN6] The Receiver's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

complaints allege the following theories of liability:[FN7]

> **FN6.** Defendant Zelda Waxenberg is the widow of Howard Waxenberg. The Receiver asserts a fourth claim for relief in the amended complaint filed in the case against Mrs. Waxenberg, *Wiand v. Waxenberg,* 8:05-cv-1856-T-27MSS, Dkt. 20 (M.D.Fla. February 27, 2006), http://ecf.flmd.circ11.dcn. The Receiver requests an "equitable accounting" to assist him in discovering other potential transfers made to Mrs. Waxenberg and her Trust. The Undersigned will address this issue in a separate report and recommendation.

> **FN7.** As virtually all complaints filed in these cases are identical, when quoting language from the complaints, the Undersigned will refrain from citing to a specific complaint unless that complaint presents a novel allegation.

**1. Fraudulent transfers under the Florida Uniform Fraudulent Transfers Act ("FUFTA"), Fla. Stat. § 726.101, et seq.**

**\*4** i. In his first claim for relief, the Receiver contends the transfers from Waxenberg and the Receivership Entities to Defendants were inherently fraudulent because they were made as a part of the Ponzi scheme. The Receiver contends Waxenberg's intent in making the transfers was to "hinder, delay, or defraud the creditors and/or investors of the Receivership Entities."

ii. The Receiver alleges that the transfers were made without valid consideration because the Receivership Entities did not receive "reasonably equivalent value" from Defendants in exchange for the transfer.

iii. Further, the Receiver alleges the Receivership Entities did not directly or indirectly benefit from the transfers to Defendants as the entities were insolvent throughout the course of the Ponzi scheme.

**2. Unjust Enrichment**

i. This claim is asserted as an alternative assuming

"the statutory remedy in [FUFTA] Section 726, Florida Statutes (2006), does not provide an adequate remedy at law."

ii. The Receiver contends Defendants "knowingly and voluntarily" accepted and retained a benefit of the funds of the Receivership Entities. The Receiver contends Defendants' retention of those benefits is inequitable unless Defendants pay the Receiver the value of the benefits received.

**3. Disgorgement of Unlawful Profits**

i. This claim is also asserted as an alternative assuming "the statutory remedy in [FUFTA] Section 726, Florida Statutes (2006), does not provide an adequate remedy at law."

ii. The Receiver contends Defendants failed to provide consideration for the monies transferred by Waxenberg and the Receivership Entities. The Receiver contends the monies transferred to Defendants belonged to the Receivership Entities and the other investors in the Receivership Entities and continue to be wrongfully retained by Defendants. As such, the Receiver contends the Receivership Entities are entitled to disgorgement of those monies from Defendants.

**V. THE MOTIONS**

Against this factual and procedural backdrop, Defendants each contend the complaints filed in these actions must be dismissed for the following reasons: (1) the Receiver lacks constitutional and prudential standing to pursue his FUFTA claim; (2) the Receiver failed to allege fraud under FUFTA with particularity in accordance with Fed.R.Civ.P. 9(b); (3) the Receiver failed to state a claim for unjust enrichment; and, (4) the Receiver cannot assert a claim for disgorgement of profits.[FN8]

> **FN8.** While some Defendants raise matters peculiar to their cases, each of the common issues raised by Defendants is addressed in this Report and Recommendation. All other bases for dismissal that have been raised will be addressed by a separate report and recommendation to be filed only in the case to which the separate issue(s) relate(s).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

For the reasons that follow, the Undersigned **REPORTS** and **RECOMMENDS** that Defendants' Motions be **GRANTED**.

**VI. DISCUSSION**

*Statutory Claim*

**A. Whether the Receiver Lacks Constitutional and Prudential Standing to Pursue His FUFTA Claim.**

Standing is a threshold issue that must be addressed at the onset of the Court's review of the Receiver's claim. *E.F. Hutton v. Hadley,* 901 F.2d 979, 984 (11th Cir.1990). To analyze whether a plaintiff has standing, the court must consider both the constitutional and prudential implications of the plaintiff's claims. *See Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To satisfy the constitutional component of standing, the party asserting standing must establish (1) an actual or threatened injury, (2) that the injury is fairly traceable to the alleged unlawful conduct and (3) that the injury will likely be redressed by the relief requested. *Hadley,* 901 F.2d at 984 (citing *Valley Forge Christian College,* 454 U.S. at 472). If the constitutional standing requirements are met, the court must next consider whether it is prudent to permit the claims to proceed as asserted. The three prudential considerations which will discourage judicial review of a claim include (1) the assertion of a third party's rights, (2) allegation of a generalized grievance rather than an injury particular to the litigant and (3) assertion of an injury outside the zone of interests of the relevant statute or constitutional provision. *Id.* at 985.

**\*5** In their Motions, Defendants rely on *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) and *Hadley* to contend the Receiver lacks standing to pursue his claims standing in the shoes of the investors because the Receiver has not alleged the Receivership Entities suffered any injuries. Defendants contend the only injuries alleged are the injuries suffered by the victims who did not receive a payment from Waxenberg and the entities and for whom Wiand was not appointed receiver. *See Caplin,* 406 U.S. at 416 (holding that a trustee of a corporation in reorganization did not have

standing under the Bankruptcy Act to assert claims on behalf of debenture holders); *Hadley,* 901 F.2d at 979 (holding that a bankruptcy trustee did not have standing to assert tort claims on behalf of a portion of the customer creditors).[FN9] Thus, the Receivership Entities are asserting injuries sustained by the individuals who did not receive a payment.

> [FN9]. The *Hadley* court expressly limited its holding to the specific facts of that case. 901 F.2d at 985.

Further, Defendants assert the Receivership Entities cannot redress any injuries as the complaints allege they perpetrated the scheme which they now seek to remedy. Thus, they acted in concert with or as the alter ego of Waxenberg and are barred by the doctrine of *in pari delicto. See O'Halloran v. First Union Nat'l Bank of Fla.,* 350 F.3d 1197, 1204 (11 th Cir.2003) (stating that a corporate entity that is merely the "alter ego" of the wrongdoer lacks standing to pursue claims for injuries resulting from a Ponzi scheme as the wrongdoer could not injure himself. However, the court noted that if the corporation possessed "a significant membership and a governing body" it cannot be said to be the wrongdoer's alter ego); *Freeman v. Dean Witter Reynolds, Inc.,* 865 So.2d 543, 551 (Fla. 2d DCA 2003) (finding that *in pari delicto* barred a receiver's claims when the corporation was created by the wrongdoer to "dupe the customers").

Additionally, Defendants contend the Receiver lacks standing because he cannot meet the prerequisites for pursuing a claim under FUFTA. Specifically, Defendants contend the Receiver lacks standing under FUFTA because FUFTA provides recovery only for creditors. *See Friedman v. Heart Institute of Port St. Lucie,* 863 So.2d 189, 192 (Fla.2003). Defendants assert, under the plain language of the statute and as interpreted by the Florida Supreme Court, there is no recovery under the statute for a debtor, a receiver, or any other person or entity who is not a creditor.

In response to Defendants' challenges to his standing, the Receiver relies principally on the language in the Court's order, that he prepared and submitted *ex parte,* which reappointed him receiver. (Tr. 29) In his complaints, the Receiver contends the language he submitted in the order authorizes the action he has brought because it states that he could institute actions and legal proceedings,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

Page 6

for the benefit and on behalf of the Receivership Entities and their investors and other creditors against individuals or entities which the Receiver claims have wrongfully or improperly received funds or other proceeds directly or indirectly traceable from investors in the Receivership Entities, *including but not limited to* actions seeking constructive trusts; disgorgement of profits; recovery and avoidance of fraudulent transfers under Florida Statute § 726.101, et seq., or otherwise.

**\*6** (Receiver's Compl. (emphasis added)).

Further, while acknowledging that a receiver acts on behalf of receivership entities rather than investors or creditors in those entities, the Receiver contends he has standing to bring ancillary actions to recover the Receivership Entities' assets which were fraudulently transferred to investors in the Waxenberg Ponzi scheme. (Pl. Br. at 11)

Next, the Receiver asserts that the doctrine of *in pari delicto* is inapplicable to the present case because once Waxenberg was removed from control over the Receivership Entities, the entities were "cleansed" of their wrongdoing and entitled to sue to redress their injuries. *See Scholes v. Lehmann ("Scholes"), 56 F.3d 750, 754-55 (7th Cir.1995).* Further, the Receiver contends Defendants' reliance on *Caplin* and *Hadley* is misplaced. In *Caplin* and *Hadley,* the courts resolved the question of whether a trustee in *bankruptcy* had standing to pursue claims on behalf of investors. The Receiver notes that the Eleventh Circuit has limited the application of *Hadley* to the specific facts of that case and at least one judge in the Middle District of Florida has concluded that because *Caplin* and *Hadley* arose in the context of bankruptcy those cases were not controlling precedent on the issue of the standing of an equity receiver. *See Obermaier v. Arnett, No.2:02CV111 FTM29DN F, 2002 WL 31654535, at \*3 (M.D.Fla. Nov.20, 2002).*

**i. The Receiver's Standing Generally**

As a preliminary matter, the Court rejects the Receiver's assertion that the Court's order appointing him receiver authorized him to pursue any and all claims on behalf of the Receivership Entities. The Court's order could only have permitted the Receiver to pursue claims he was authorized to pursue under the

United States Constitution and the applicable federal and state statutes. Specifically, the Court granted the Receiver the power to institute legal proceedings for the benefit of the Receivership Entities, "their investors and other creditors." *HKW Trading, LLC,* 8:05-cv-1076-T-24MSS, Dkt. 75. On close reading, it did not authorize specific causes of action; rather it provided that "such actions *may* involve, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, et seq., or otherwise."*Id.* (emphasis added). As the Receiver conceded at the hearing, the Court did not purport to confer standing on the Receiver which would be contrary to constitutional and statutory law. (Tr. 75-76); *See Scholes v. Schroeder ("Schroeder"), 744 F.Supp. 1419, 1421 (N.D.Ill.1990)* (stating that "the appointment of a receiver is inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction"). Conformance with the specific requirements of the law underlying the distinct claims asserted is required before the Court may permit the action to proceed. For example, if the Receiver sought to bring a Title VII action or sought to pursue a claim barred by an applicable statute of limitations, the existence of the order appointing him receiver and authorizing him to pursue ancillary claims would not remove the prerequisites or barriers to the actions sought to be asserted. If the action the Receiver attempts to assert does not conform to the requirements of the law, it cannot be sustained on the basis of the existence of the order.

**\*7** Similarly, the Court rejects the Receiver's argument that his standing to bring this action under FUFTA is expressly authorized by his general power to "bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme."*Obermaier, 2002 WL 31654535, at \*3* (citing *Commodity Futures Trading Commission v. American Commodity Group Corp., 753 F.2d 862, 866 n. 6 (11th Cir.1984)* and *Commodity Futures Trading Commission v. Chilcott Portfolio Mgmt., Inc., et al., 713 F.2d 1477 (10th Cir.1983)*). In each cited case, the courts acknowledged a receiver's right to bring claims on behalf of receivership entities, a right which is undisputed in this case. A receiver's actions, however, cannot be sustained unless the receiver meets the statutory and constitutional prerequisites to pursue such "ancillary actions" for the benefit of the receivership entities. Neither case cited by the court in *Obermaier* addressed the right to bring a FUFTA

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

claim, the question presented here, nor did they excuse the Receiver from the duty to plead and prove each element of the claims asserted pursuant to this ancillary authority. Having the power to initiate suit is a separate issue from having standing to pursue the claims or the ability to meet the required proof. *See Chilcott Portfolio Mgmt., Inc.,* 713 F.2d at 1482-83. Thus, the Court must evaluate separately the Receiver's standing to pursue his FUFTA claim.

### ii. The Receiver's FUFTA Claim

The Florida Uniform Fraudulent Transfers Act was promulgated to prevent an insolvent debtor from transferring assets out of the reach of its creditors when the debtor's intent is to hinder, delay, or defraud any of its creditors. *See* Fla. Stat. § 726.105(1) (2006). Put simply, if a creditor has a claim, has brought a claim or evinced an intent to bring a claim, the debtor cannot vitiate the claim by secreting assets available to satisfy the claim. Thus, the statute provides that any transfer made or obligation incurred by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation to hinder or defraud the creditor or without receiving "reasonably equivalent value in exchange for the transfer or obligation." Fla. Stat. § 726.105(1). Pursuant to the statute, for a cause of action to exist the creditor-plaintiff must allege (1) there was a creditor sought to be defrauded, (2) a debtor intending fraud, and (3) a conveyance of property which could have been available to satisfy the debt due. *Nationsbank, N.A. v. Coastal Utils. Inc.,* 814 So.2d 1227, 1229 (Fla. 4th DCA 2002) (citing *Huntsman Packaging Corp. v. Kerry Packaging Corp.,* 992 F.Supp. 1439, 1446 (M.D.Fla.1998)). In *Friedman v. Heart Institute of Port St. Lucie,* the Florida Supreme Court defined a creditor as one who possesses a "claim" under FUFTA and, thus, may seek a variety of remedies to prevent the fraudulent transfer of assets. 863 So.2d at 191. A "claim" means a right to payment, whether or not it is reduced to judgment. *Id.* The court, based on the plain language of the statute, stated that a plaintiff suing under FUFTA must show he has a "claim" which qualifies him as a "creditor" of the entity or individual who is transferring or attempting to transfer funds to thwart the creditors' attachment. *Id.;* Fla. Sta. § 726.105(1).

**\*8** In this regard, Florida's Second District Court of Appeals has held that an equity receiver may not pursue claims that are owned by creditors of the receivership entities. *See Freeman,* 865 So.2d at 550. In *Freeman,* the court stated that in such ancillary actions an equity receiver can bring actions previously owned by the entities in receivership, he cannot pursue claims owned directly by the creditors of the entities. *Id.* As the court explained, "[a]lthough a receivership is typically created to protect the rights of creditors, *the receiver is not the class representative for creditors* and receives no general assignment of rights from the creditors."*Id.* (emphasis added). Significantly, the Receiver acknowledged at the hearing that he was not delegated any authority by the victims, which include Defendants in these cases,[FN10] to pursue claims *for their benefit.*(Tr. 100)

> [FN10.] The Receiver contends he is pursuing these actions to recover "assets" of the Receivership Entities in order to equitably redistribute the funds among all of the investors, including Defendants.

It is, of course, commonplace for bankruptcy trustees/receivers to pursue claims under various states' Uniform Fraudulent Transfer Acts. *See In re Schaefer,* 331 B.R. 401, 415-223 (Bankr.N.D.Iowa 2005) (finding that a bankruptcy trustee suing a corporation could avoid fraudulent real property transfers made by the corporate principals to the corporation under the Bankruptcy Code and Iowa's UFTA); *In re Emerson,* 244 B.R. 1, 38-40 (Bankr.D.N.H.1999) (finding that a bankruptcy trustee suing the transferee could avoid fraudulent transfers made by the debtor-transferor under the Bankruptcy Code and New Hampshire's UFTA). This authority is expressly granted in 11 U.S.C. § 544 which gives bankruptcy trustees status as judicial lien creditors over the assets of the estates over which they preside and preempts state statutes to the contrary.[FN11]Congress did not grant similar authority in the statute relied upon by the SEC for the appointment of the Receiver. *See HKW Trading, LLC,* 8:05-cv-1076-T-24MSS, Dkt. 5 (citing 15 U.S.C. § 77v(a) (2006)). Thus, no such common law or statutory "creditor" status is conferred upon SEC equity receivers. Rather, their status under FUFTA is defined by their relationship to the transferor.

> [FN11.] Even with this statutory grant of authority to pursue such claims "on behalf of creditors," the bankruptcy trustee's ability to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

pursue claims directly owned by creditors has been challenged. *See Feltman v. Prudential Bache Sec.,* 122 B.R. 466 (Bankr.S.D.Fla.1990).

Paramount to the issue of whether the Receiver has standing to pursue his FUFTA claim, then, is the need to clarify in whose shoes the Receiver purports to stand. In the complaints, the Receiver states that he brings the action "on behalf of the Receivership Entities *and their investors* to recover the distribution(s) made to the Defendants."(emphasis added) In his global response to the Motions, however, the Receiver acknowledged that he does not have authority to redress injuries on behalf of the investors, who are actual or potential creditors of the Receivership Entities. (Pl. Br. at 11) Because the Receiver has conceded that he is not standing in the shoes of the defrauded investors, the Court need not address whether *Hadley* or *Caplin,* both of which were decided in the context of bankruptcy, are controlling precedent on the issue of whether an equity receiver has standing to pursue claims on behalf of investors.

**\*9** The Receiver's only legal authority for his assertion that he may, as a receiver for the Receivership Entities, pursue a claim under FUFTA, are the Seventh Circuit's decision in *Scholes* and the court's decision in *Obermaier.*In *Scholes,* the corporate principal, Michael Douglas, operated a Ponzi scheme using three of his corporations. 56 F.3d at 752. The receiver appointed to represent Douglas and the corporate entities brought suit on behalf of the under the Illinois law of fraudulent conveyances as it stood in 1989 seeking to recoup money transferred in the course of the Ponzi scheme from Douglas' corporations to one victim who received more than his initial contribution, Douglas' ex-wife and six religious corporate entities. *Id.* at 753.The Seventh Circuit determined that the receiver had standing to bring suit against the defendants under the statute.

In *Obermaier,* David Mobley, Sr. orchestrated a Ponzi scheme through twelve corporate entities which derived their income from the Ponzi scheme. 2002 WL 31654535, at \*1. The receiver, Obermaier, brought an action under FUFTA on behalf of the receivership entities against investors in the entities who received "false profits" from Mobley. *Id.* at \*2. In the complaint, the receiver alleged that Mobley was the active perpetrator of the fraud. *Id.* After a general

statement that "[t]he facts which are pled in the [c]omplaint ... adequately allege causes of action under Florida law which can be prosecuted by the [r]eceivership [e]ntities," the court concluded that the receiver had standing to pursue a claim under FUFTA. *Id.* at 4.

*Scholes,* having been decided by the Seventh Circuit, is not binding authority in this Circuit. In any event, the Court finds *Scholes* and its progeny to be distinguishable from the instant case because, among other reasons, the *Scholes* court analyzed the receiver's standing to pursue a fraudulent transfer claim under the Illinois law of fraudulent conveyances, Ill.Rev.Stat. ch. 59, ¶ 4 (1987), which predated the Illinois Uniform Fraudulent Transfers Act, 740 ILCS 160. The 1989 version of the Illinois law provided that " 'every gift ... or transfer ... made with the intent to disturb, delay, hinder or defraud creditors *or other persons* ... shall be void as against such creditors ...*and other persons.*' " *Scholes,* 56 F.3d at 753 (quoting Ill.Rev.Stat. ch. 59, ¶ 4 (1987)) (emphasis added); *See Stenger v. World Harvest Church, Inc.,* No. Civ. A.1:04CV00151-RW, 2006 WL 870310, at \*4 n. 6 (N.D.Ga. March 31, 2006) (stating that the "and others" language in Georgia's fraudulent conveyance statute, O.C.G.A. § 18-2-22 (repealed 2002), precluded any argument that suit under the statute may be brought only by "creditors"). The statute at issue in the instant case, FUFTA, does not include the broad language permitting standing to *other* persons. FUFTA provides that:

[a] transfer made or obligation incurred by a debtor is fraudulent *as to a creditor,* ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud *any creditor* of the debtor; or ... [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation....

**\*10** Fla. Stat. § 726.105(1) (2006) (emphasis added).

Simply put, the Florida Supreme Court has made clear that the Florida statute provides relief only to creditors of the debtor-transferor. *See Friedman,* 863 So.2d at 191;Fla. Stat. § 726.108 (2006); *See also Freeman v. First Union Nat'l Bank,* 865 So.2d 1272, 1277 (Fla.2004) (refusing to expand FUFTA beyond the plain language of the statute to create a cause of action against non-transferee aiders and abettors of

Not Reported in F.Supp.2d                                                                                                        Page 9
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

fraudulent transfers). As discussed *supra,* creditors are those persons or entities who have claims against Waxenberg and the Receivership Entities, the recovery of which has been hindered by the disbursement of funds via fraudulent transfers.

In the case *sub judice,* the debtor-transferors are alleged to be Waxenberg and the Receivership Entities as they are claimed by the Receiver to have fraudulently conveyed funds to others. Consistent with *Friedman,* then, in order to utilize the protections of FUFTA the Receiver would have to allege that he, as receiver for the Receivership Entities, is a creditor or has a claim against these debtor-transferors. In this regard, at the onset of the hearing on the Motions, the Receiver conceded categorically that neither he nor the Receivership Entities are creditors. (Tr. 9-10) At the end of the hearing, the Receiver attempted to retract that concession, suggesting that the Court broadly construe the term "creditor." (Tr. 79) The Receiver, however, failed to provide the Court with any legal authority to support a broader interpretation of the term "creditor" than provided in *Friedman* to permit the recovery of funds under FUFTA by anyone other than one who has a claim against the debtor-transferor. *See Dillon v. Axxsys Int'l, Inc.,* 185 Fed. Appx. 823, 829-30 (11th Cir.2006) (acknowledging that the term creditor is extremely broad but recognizing that it is nevertheless limited to persons with claims against the debtor-transferors).

Further, while the court in *Obermaier* permitted the receiver to pursue a claim under FUFTA, the court made that determination without addressing the status of the receiver as a creditor. However, the receiver in *Obermaier* claimed, without challenge, that he was the creditor of the wrongdoer. Thus, if the Receiver relies on *Obermaier* to suggest that creditor status is unnecessary to pursue a FUFTA claim, that suggestion is incorrect. Even if *Obermaier* could be interpreted in such a way, it is distinguishable from the instant case because it was decided prior to the Florida Supreme Court's definitive decision in *Friedman* specifically limiting recovery under FUFTA to creditors of a fraudulent transferor.

Here, the Receiver has not alleged that he is a creditor of the debtor-transferors and does not assert any further basis for proceeding under FUFTA. Significantly, the Receiver represents all of the Receivership Entities, including the Waxenberg estate;

moreover, the same law firm represents all of the same Receivership Entities. This would seem to suggest that neither of the Receivership Entities would have a claim against the other. Additionally, the Receiver cannot claim to be a creditor via the SEC. As noted *supra,* the Court has dismissed the SEC's claims for monetary recovery against all of the Receivership Entities. The Undersigned, therefore, finds that the Receiver lacks standing under FUFTA as pled.

**\*11** Accordingly, the Undersigned **REPORTS** and **RECOMMENDS** that Count I be **DISMISSED.**

**B. Pleading Fraud with Particularity, Fed.R.Civ.P. 9(b)**

Certain Defendants contend the Receiver's complaints should be dismissed for his failure to plead his FUFTA claim with particularity. To the extent the Receiver intends to assert any fraud claim in his amended complaints, he is reminded that such a claim must be pled with particularity as discussed *supra* and as required by Fed.R.Civ.P. 9(b). While a Ponzi scheme is deemed fraudulent as a matter of law *In re 21st Century Satellite Commc'n, Inc.,* 278 B.R. 577, 584 (Bankr.M.D.Fla.2002) (stating that Ponzi schemes are inherently fraudulent *ab initio),* if any fraud is alleged against Defendants, who are admittedly not perpetrators of the Ponzi scheme fraud, it must be alleged with particularity.[FN12]

> FN12. Other Defendants do not concede that Waxenberg and the entities' actions constituted a Ponzi scheme. For the purposes of this Order, the Court will accept the Receiver's allegation that Waxenberg and the entities' conduct was a Ponzi scheme.

**C. Statute of Limitations, Fla. Stat. § 726.110.**

Some Defendants further contend the Receiver's claims are time barred under FUFTA. The statute of limitations governing the Receiver's FUFTA claim varies depending on which statute he is asserting. *See* Fla. Stat. § 726.110. As the Receiver has failed to identify specifically in his complaints the provision(s) of FUFTA under which he is proceeding, the Court cannot address the statute of limitations argument on these Motions. Thus, the Court will construe the statute of limitations argument as a motion for a more definite statement. Should he elect to reassert these

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 10
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

claims, the Receiver should be directed to identify in any amended complaints (1) the specific transactions he is relying upon, including the date of the transactions and the source of payment, (2) the remedy he seeks and (3) the statutory basis for relief. Any additional arguments raised in Defendants' Motions related to the Receiver's FUFTA claims will not be addressed as the Court finds the Receiver lacks standing to pursue those claims as alleged.

### Equitable Claims

### A. Whether the Receive May Pursue His Unjust Enrichment Claim.

### i. The Receiver's Standing

As an alternative to his FUFTA claim, the Receiver demands recovery under an unjust enrichment claim. The Court must determine, therefore, whether the Receiver may accomplish in equity what he cannot accomplish at law.

The first inquiry regarding the Receiver's unjust enrichment claim is whether he has standing to pursue the claim. As stated above, when analyzing whether a plaintiff has standing, the court must evaluate both the constitutional and prudential implications of the plaintiff's claims. *See Valley Forge Christian College,* 454 U.S. at 472 (1982). The Eleventh Circuit has determined that a corporate entity involved in a Ponzi scheme lacks standing to pursue claims against a third party where there is an "absolute identity of interests" between the wrongdoing principal and the corporation. *See O'Halloran, 350 F.3d at 1204* (stating that a corporate entity that is merely the "alter ego" of the wrongdoer lacks standing to pursue claims for alleged injuries which resulted from a Ponzi scheme); *Troelstrup v. Index Futures Group,* Inc., 130 F.3d 1274, 1277-78 (7th Cir.1997) (differentiating cases like *Scholes* where there were entities with legal rights from cases where the enterprise has no legal identity apart from the defrauding party. The court found the receiver did not have standing to sue on behalf of the non-corporate enterprise with no identity distinct from the perpetrator.); *Feltman,* 122 B.R. at 473-74 (stating that "since the corporations were essentially only conduits for stolen money, any injury to the debtors ... must be substantially coterminous with the injury to the defrauded investors.... Thus, any alleged injury to the debtors is as illusory as was their corporate

identity").

**\*12** Here, the Receiver has conceded that the Estate of Howard Waxenberg is the only remaining embodiment of Waxenberg himself and "perhaps the case should be dismissed as to ... the Estate of Howard Waxenberg."(Tr. 106) Additionally, he has all but conceded that Downing & Associates Technical Analysis (n/k/a the Estate of Howard Waxenberg) was simply the "alter ego" of Waxenberg in that it did not have a controlling body or shareholders beyond Waxenberg. At the hearing, the Receiver stated "the Downing party was a d/b/a and of course ... would not be separate and distinct" from Waxenberg. (Tr. 20) Thus, certainly neither the Estate of Howard Waxenberg nor Downing & Associates would be able to assert a claim against any of the victims of the scheme. Accordingly, the Undersigned **REPORTS** and **RECOMMENDS** that the claims brought on behalf of the Estate of Howard Waxenberg and Downing & Associates Technical Analysis (n/k/a the Estate of Howard Waxenberg) against Defendants be **DISMISSED with prejudice.**

### ii. The Receiver's Unjust Enrichment Claim

The Court must next determine whether the Receiver has stated a claim for unjust enrichment as pled on behalf of the remaining Receivership Entities. The rights of receivers pursuing state law claims are determined by reference to state law. *See Knauer v. Jonathon Roberts Fin. Group,* 348 F.3d 230, 235 (7th Cir.2003) (citing *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 83, 88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994)). Under Florida law, a plaintiff states a claim for unjust enrichment when there has been (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof. *Hercules, Inc. v. Pages,* 814 F.Supp. 79, 80 (M.D.Fla.1993) (citing *Henry M. Butler, Inc. v. Trizec Properties, Inc.* 524 So.2d 710, 712 (Fla. 2d DCA 1988)). It is axiomatic that there must be a benefit conferred before unjust enrichment exists. *Henry M. Butler, Inc., 524 So.2d at 712.*

Under an unjust enrichment theory, the Receiver must allege some benefit to Defendants which, if retained, would be inequitable. To that end, it would

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

Page 11

presumably be inequitable, in most circumstances, for Defendants to retain money which did not belong to them. Here, however, Defendants correctly point out that the Receiver has failed to allege in the complaints whether Defendants received some amount in excess of the losses they sustained in this fraudulent Ponzi scheme. The Receiver has simply alleged in his complaints that Defendants received their "return of principal" in the final distribution made prior to Waxenberg's death.[FN13]"Principal" presumably refers to the initial losses Defendants sustained as a result of being victims of the fraud.

> FN13. The Receiver does not allege that Mrs. Waxenberg received a "return of principal" payment. Instead, the Receiver contends Mrs. Waxenberg received "significant distributions" from Waxenberg and the Receivership Entities as Howard Waxenberg's wife and as an investor. The Receiver has incorporated a spreadsheet entitled "Checks Written to Zelda Waxenberg from all Waxenberg Entities" into his amended complaint in her case. According to that spreadsheet, Mrs. Waxenberg's payments began on February 4, 1999, and continued until May 13, 2005. The spreadsheet does not provide any detail on the source of the payments over this time period. The Receiver did not incorporate a similar spreadsheet in the other Defendants' cases presently before the Court on their Motions.

In his global response to the Motions, but not in any allegation in the complaints, the Receiver has stated he is seeking "false gains" and has provided more detailed information on the payments made to Defendants. *See* App. C. Based on this submission, it appears that the Receiver is seeking to recover more than the "false gains" certain Defendants received from the Receivership Entities. In some instances, it appears to be seeking recovery from Defendants who suffered a loss or who "broke even," that is received no more than the initial fraud loss. Even the Receiver's primary legal authority rejects a recovery in such instances. *See Scholes,* 56 F.3d at 757-58. The *Scholes* court determined under the broader Illinois fraudulent conveyance act that the defendant investor/victim was only required to return "the difference between what he put in at the beginning and what he had at the

end."*Id.* The Receiver offers no legal authority to support his claimed entitlement to recover anything beyond such excess payments. In any event, the Receiver has failed to include sufficient detail in the complaints to apprise Defendants of their alleged "unjust enrichment" or to meet this threshold requirement. [FN14]As stated above, the complaints simply state Defendants received a return of their principal payment or Ponzi scheme loss, which, by definition, is not unjust.[FN15]For this reason, the claim for unjust enrichment should be dismissed.

> FN14.*See also World Harvest Church, Inc., 2006 WL 870310, at \*3* (stating on summary judgment that the facts surrounding a fraudulent conveyance to the defendants did not "fit neatly into the unjust enrichment theory" where there was clearly no expectation that the conveyance would be returned for value).

> FN15. Interestingly, the payment information provided by the Receiver in Appendix C shows that certain Defendants are being asked to return an amount equivalent to their initial contributions despite having allegedly received payments in excess of their initial contributions.

### iii. *In Pari Delicto*

**\*13** Likewise, as pled, the Receiver's equitable claim for unjust enrichment is barred by the doctrine of *in pari delicto.*[FN16]Under the doctrine of *in pari delicto,* a plaintiff who has participated in the wrongdoing may not recover damages resulting from the wrongdoing. *Edwards,* 437 F.3d at 1152. Again, whether the defense of *in pari delicto* applies against the Receiver in this case is resolved by reference to Florida law. As a general rule in Florida, the receiver steps into the shoes of the corporation, individual or estate whose interests he was appointed to protect and therefore takes the rights, causes and remedies that were available to the entity he was chosen to represent. *Hamilton v. Flowers,* 134 Fla. 328, 343, 183 So. 811 (1938); Fla. R. Civ. P. 1.620 (2007); *See also*16 Fletcher Cyc. Corp. § 7852.10 (2006) (stating that "any claim brought by a receiver is subject to the same defenses that could have been raised in a suit by the corporation").

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

FN16. The Latin phrase *"in pari delicto"* means "of equal fault." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 135, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Knauer v. Jonathon Roberts Fin. Group ("Jonathon Roberts Fin. Group "),* No.01-1168-C-K/T, 2002 WL 31431484, at *7 (S.D.Ind. Sept.30, 2002).* The doctrine is premised upon the equitable principle that " '[n]o [c]ourt will lend its aid to a man who founds his cause of action upon an immoral or illegal act.' " *Jonathon Roberts Fin. Group,* 2002 WL 31431484, at *7 (quoting *In re Dow,* 132 B.R. 853,860 (Bankr.S.D.Ohio 1991)). Under the doctrine, a plaintiff may not maintain a claim against a defendant if the plaintiff bears equal or greater fault for the claim asserted. *Jonathon Roberts Fin. Group,* 2002 WL 31431484, at *7;See also *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards ("Edwards "),* 437 F.3d 1145, 1152 (11th Cir.2006).

Attempting to avoid the *in pari delicto* defense, the Receiver relies on the *Freeman* decision which, citing *Scholes,* stated that defenses such as unclean hands and *in pari delicto* may not always apply against a receiver even though such defenses might have applied to the receivership entities outside of the receivership. 865 So.2d at 550. The court, however, distinguished fraudulent conveyance cases in which the receivership entities, or legally distinct entities, may be "cleansed" of the wrongdoing of their principal (i.e., *Scholes)* from tort cases in which the corporations were deemed "sham corporations" with no distinct identity from their principal (i.e., *Feltman). Id.* at 550-51.In an attempt to reconcile the cases, the *Freeman* court stated that as a general rule "when the entities in receivership do not include a corporation that has at least one honest member of the board of directors or an innocent stockholder, we do not perceive a method to separate the fraud and intentional torts of the insiders from those of the corporation itself."865 So.2d at 551.

Whether this reconciliation was necessary in a non-fraudulent conveyance case, such as *Freeman,* is questionable as the Seventh Circuit had previously limited its "cleansing of corporate zombies" [FN17] analysis in *Scholes* to cases arising under the Illinois fraudulent conveyance statute. *See Knauer,* 348 F.3d at 236*aff'g*2002 WL 31431484, at *10. Further, the only Eleventh Circuit case that has discussed the *Scholes* decision on this point is *Edwards* in which the court rejected a bankruptcy trustee's reliance on *Scholes* outside the context of a fraudulent conveyance action and found that the defense of *in pari delicto* may apply against a bankruptcy trustee. 437 F.3d at 1151-52. The court, following the unanimous lead of all circuits addressing the issue, concluded that *"in pari delicto* applies with equal force to a trustee-in-bankruptcy as a debtor outside of bankruptcy."*Id.* at 1151 (citations omitted).

FN17.*See Freeman* 865 So.2d at 550 (capsulizing the "cleansing of corporate zombies" theory espoused in *Scholes.*

*14 Here, the Receiver has offered no reasoned bases for providing greater protection to federal equity receivers in this context than would be provided for bankruptcy trustees, and the Undersigned can conceive of none. The policy arguments advanced by the Receiver are the same as those considered and rejected by the courts in *Freeman* and *Edwards* (i.e., the involuntary status of the receiver, "more money" in the receivership furthers the underlying policy of the statute establishing the receivership, avoiding windfall to the defendants, etc.). As such, the Undersigned finds that the doctrine of *in pari delicto* is available against the Receiver in these cases.

The Undersigned also finds that the "cleansing of corporate zombies" analysis in *Scholes,* if viable at all, should only be viable in the context of an action involving fraudulent conveyances, i.e., FUFTA. As the Eleventh Circuit explained, "fraudulent conveyances are an exception to the general rule that the trustee takes the debtor estate as it is at the commencement of the bankruptcy."*Edwards,* 437 F.3d at 1151-52 (citing bankruptcy statutes). In any event, whether the doctrine applies outright or applies subject to the "cleansing," which occurs under Florida law, according to *Freeman,* only when the corporation has at least one honest member of the board of directors or an innocent shareholder, is inconsequential in these cases as the final result would remain the same.

As stated by the *Freeman* court, even though the entities may be cleansed by the receivership in some

Not Reported in F.Supp.2d                                                                                                                    Page 13
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

instances, the receivership "cannot alter historical facts." 865 So.2d at 551. The facts in these complaints and the complaint filed in the SEC action clearly allege that the Receivership Entities were the perpetrators of the fraud and in concert with each other. As stated above, the Receiver has alleged [FN18] that Waxenberg collected over $130 million by offering and selling securities to approximately two hundred investors as part of his Ponzi scheme. (Receiver's Compl. ¶ 11) According to the complaints, he then pooled the investor/victims' principal funds into common accounts held in the name of the Receivership Entities. (Receiver's.Compl.¶ 12) Further, the Receivership Entities derived their assets from the investors' funds and had little, if any, additional income. (Receiver's Compl. ¶ 12)

> FN18. Citing the complaint filed in *Wiand v. Abraham,* 8:06-cv-609-T-23MSS, Dkt. 1 (M.D. Fla. April 7, 2006), http://ecf.flmd.circ1 1.dcn.

Similarly, the SEC has alleged that Waxen berg owned, controlled and was the sole manager of the Receivership Entities (the **"Defendants"**). (SEC Compl. ¶ 1, 5, 8, 9) [FN19] HKW Trading, LLC managed and controlled HKW Trading Fund I, LLC. (SEC Compl. ¶ 8) In fact, in its complaint, the SEC alleged that after Waxenberg's suicide, it was unclear who, if anyone, was in control of the **Defendants.**(SEC Compl. ¶ 4) According to the SEC complaint, the **Defendants** diverted or misappropriated investors' funds to Defendants HKW Trading Fund I, LLC and the Estate of Howard Waxenberg. (SEC Compl. ¶ 2) The **Defendants** falsely represented to investors that they were running a successful day-trading operation and falsely claimed to investors they were earning a quarterly net investment return of approximately 5% or approximately 20% annually. (SEC Compl. ¶ 3, 18) However, the **Defendants** materially overstated the amount of these returns and the value of the individual investors' accounts. (SEC Compl. ¶ 3) These fraudulently overstated returns duped investors into purchasing more securities from the **Defendants.**(SEC Compl. ¶ 17)

> FN19. The Receiver conceded at the hearing that the allegations contained in the SEC action applied to the instant cases. Further, the instant complaints reference the SEC action as the source and basis for the

authority asserted. *See, e.g., Wiand v. Schnall,* 8:06-cv-706-T-23MSS, Dkt. 5 ¶ 2 (M.D. Fla. June 6, 2006), http://ecf.flmd.circ11.dcn.

> The Court: What is the allegation of the SEC in the SEC proceedings?

> The Receiver: The SEC said that they were being-all entities were being operated as a Ponzi scheme and that is probably so.

> The Court: There is no way to divorce, though, this case from the allegation of the SEC in whose shoes the receiver stands to pursue the claims through the SEC proceedings on behalf of the entities.

> The Receiver: You are absolutely correct, Your Honor.

> The Court: So, whatever the SEC said they were is what they are.

> The Receiver: That is true, Your Honor ... (proceeded to assert argument for *Scholes'* cleansing)

> (Tr. 20-21)

**\*15** Actually, the **Defendants** were running a Ponzi scheme using new investors' capital contributions, not actual earnings, to pay investors. (SEC Compl. ¶ 20) Beginning at least in 2002, Defendants Howard Waxenberg Trading, LLC, HKW Trading, LLC and Downing & Associates Technical Analysis, directly and indirectly, knowingly, willfully or recklessly: (a) defrauded investors; (b) made untrue statements of material facts; and/or (c) engaged in acts, practices and courses of business as a fraud upon the purchasers of securities. (SEC Compl. ¶ 27) On April 25, 2006, the Receiver agreed to the permanent injunctive relief demanded by the SEC which enjoined all of the **Defendants**/Receivership Entities based on their alleged offenses and frauds. *HKW Trading, LLC,* 8:05-cv-1076-T-24MSS, Dkt. 81.

In short, the Receivership Entities are alleged to have orchestrated the wrongdoing and no wrongdoing is alleged against these Defendants. *See Edwards,* 437 F.3d at 1152;*Jonathon Roberts Fin. Group,* 2002 WL

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 14
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

31431484, at *7. As such, as applied here, the doctrine of *in pari delicto* stands as a bar to the unjust enrichment claim asserted. *See Quiller v. Barclay's American/Credit, Inc., 727 F.2d 1067, 1069 (11th Cir.1984)* (stating that a court may dismiss a complaint when an affirmative defense is clear from the face of the complaint).

As noted *supra*, if an action is dismissed it should generally be dismissed without prejudice. If, however, it is so clearly established that the plaintiff cannot, with leave to amend, cure the legal defects, leave to amend would be futile and the action should be dismissed with prejudice. *Stevens, 215 F.3d at 1239-40*; *See, e.g., Freeman, 865 So.2d at 553* (affirming dismissal with prejudice under Fed.R.Civ.P. 12(b)(6)); *Knauer, 348 F.3d at 238* (affirming dismissal with prejudice).

For the foregoing reasons, the Undersigned recommends that Count II be **DISMISSED with prejudice.**

**B. Whether the Receiver is Entitled to a Disgorgement of Unlawful Profits.**

In the third count in his complaints, the Receiver attempts to assert a separate claim for disgorgement of profits. Disgorgement is an "equitable remedy designed to deprive a wrongdoer of his unjust enrichment." *SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C.Cir.1989)*. Its primary purpose is not to punish the wrongdoer but to ensure that those guilty of fraud do not profit from their ill-gotten gains. *See SEC v. Bilzerian, 814 F.Supp. 116, 120 (D.C.Cir.1993)*; *SEC v. Wang, 944 F.2d 80, 85 (2d Cir.1991)*. In determining the disgorgement amount, " 'it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains.' " *SEC v. Chemical Trust, No. 00-8015-CIV, 2000 WL 33231600, at *11-12 (S.D.Fla. December 19, 2000)* (quoting *Bilzerian, 814 F.Supp. at 120*).

Here, Defendants correctly point out that the Receiver's disgorgement claim must fail as a matter of law because disgorgement is not an independent cause of action. It may be a remedy for a viable cause of action at common law or, in some circumstances, is provided as a statutory remedy for certain claims. *See Abbott Lab. v. Unlimited Beverages, Inc., 218 F.3d 1238, 1242 (11th Cir.2000)* (stating that disgorgement of profits is a remedy under the Lanham Act, 15 U.S.C. § 1117(a)). Additionally, the Receiver does not allege Defendants committed any wrongdoing or profited from a wrongdoing on their part. Rather, the complaints identify Waxenberg and the Receivership Entities as the perpetrators in the Ponzi scheme. The only basis for a request of disgorgement is the Receiver's unjust enrichment claim if it can be sustained. As the Receiver's request for disgorgement of profits hinges on the success of the Receiver's unjust enrichment claim, the Undersigned recommends Count III brought on behalf of the remaining Receivership Entities be **DISMISSED with prejudice** as a stand alone count.

**VII. CONCLUSION**

**\*16** Having reviewed the claims, the Undersigned respectfully **REPORTS** and **RECOMMENDS** that Defendants' Motions be **GRANTED:**

1. **With prejudice** as to **all counts** brought on behalf of the Estate of Waxenberg and Downing & Associates Technical Analysis;

2. **Without prejudice** as to Count I (FUFTA) [FN20] brought on behalf of the remaining Receivership Entities;

> FN20. While it seems implausible that the Receiver will be able to attain the status of a creditor under FUFTA by the Receiver's filing of amended complaints consistent with Fed.R.Civ.P. 11, the Eleventh Circuit has directed that, unless facially futile, a district court allow a plaintiff one opportunity to cure any defects in the complaint. *See Stevens, 215 F.3d at 1239-40.*

3. **With prejudice** as to Count II (unjust enrichment) brought on behalf of the remaining Receivership Entities; and,

4. **With prejudice** as the Count III (disgorgement of profits) brought on behalf of all parties as a stand alone claim.

In issuing this Report and Recommendation, the Undersigned is mindful of the claimed losses

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)
**2007 WL 963162 (M.D.Fla.)**

sustained by other victims of Waxenberg and the Receivership Entities' scheme. The Court is also aware of the potential convenience and efficiency of allowing the Receiver, at the expense of the receivership rather than the victims at their personal expense, to pursue funds to help equalize the victims' losses. Even so, the Receiver's actions, however laudable, cannot proceed without proper legal footing. Moreover, the Undersigned's Report and Recommendation does not foreclose the individual investors/victims of Waxenberg's fraud from recovering funds from or asserting claims against the Receivership Entities or others if legal or equitable bases exist for such claims.

Respectfully **RECOMMENDED.**

M.D.Fla.,2007.
In re Wiand
Not Reported in F.Supp.2d, 2007 WL 963162 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES L. KOPECKY, RECEIVER** | ) | |
| **FOR BRAD A. WEAVER AND** | ) | |
| **BETA ASSET MANAGEMENT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 07 C 2863** |
| | ) | |
| **v.** | ) | **Judge Pallmeyer** |
| | ) | |
| **LAKEWOOD PROPERTIES, LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### RECEIVER'S STATEMENT OF UNDISPUTED FACTS
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, James L. Kopecky ("the Receiver"), Receiver for Brad A. Weaver

("Weaver") and Beta Asset Management, Inc. ("Beta"), pursuant to Rule 56.1(a)(3) of the

Local Rules of the District Court for the Northern District of Illinois, submits this

Statement of Undisputed Facts in support of his Motion for Summary Judgment against

defendant, Lakewood Properties, Ltd. ("Lakewood"):

### THE PARTIES

1.      Plaintiff is the Receiver for Weaver and Beta in *Securities Exchange*

*Commission v. Weaver*, No. 04 C 8279 (hereinafter "*SEC v. Weaver*").  (Complaint,

Exhibit A, ¶ 3; Answer to Count III of Complaint, Exhibit B, ¶ 3.)

2.      The Receiver was appointed for the benefit of investors to "marshal,

conserve, protect, hold funds, operate, and with the approval of the Court, dispose of all

assets of any nature … in which [Weaver] and [Beta] have a legal, equitable or beneficial

interest, including money that [Weaver and Beta] improperly paid to investors …."

(Order Appointing Receiver, Exhibit C.)

3.      Weaver is an individual currently incarcerated at the Kankakee County Jail in Kankakee, Illinois.  (Excerpts from Transcript of Deposition of Brad Weaver ("Weaver Dep."), Exhibit D, p. 6, ll. 23-24 to p. 7, l. 1.)  During the time periods relevant to this lawsuit, Weaver held himself out as president of Beta.  (Weaver Dep., Exhibit D, p. 40, l. 24 to p. 41, ll. 1-5.)

4.       Beta is an Illinois corporation with a principal place of business in Chicago, Illinois.  (Plea Agreement between Weaver and the United States Attorney for the Northern District of Illinois ("Plea Agreement"), Exhibit E, ¶ 5.a.; Weaver Dep., Exhibit D, p. 39, ll. 21-24 to p. 40, ll. 1-9.)

5.      Lakewood is an Illinois corporation.  (Complaint, Exhibit A, ¶ 6; Answer to Count III of Complaint, Exhibit B, ¶ 6.)  Lakewood is in the business of purchasing and leasing residential real estate.  (Excerpts form Transcript of Deposition of Jon Withey ("Withey Dep."), Exhibit F, p. 27, ll. 21-24.)

6.      Mark Vehslage is the president of Lakewood.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 1.)

7.      Lakewood has designated Mark Vehslage as the person most knowledgeable and prepared to testify on behalf of Lakewood concerning its transactions with Weaver and Beta, the present lawsuit, the Complaint and Defendant's Answers and Affirmative Defenses.  (Answers to Plaintiff's Rules 31 and 30(b)(6) Deposition of Defendant by Written Questions, Exhibit H, ¶¶ 1 & 2.)

8.      Richard Schripsema is the Secretary of Lakewood.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 5.)

9.      Vehslage and Schripsema are the only two shareholders of Lakewood. (Lakewood's Responses to Requests to Admit, Exhibit G, Nos. 4, 8.)

**FACTS SUPPORTING VENUE AND JURISDICTION**

10.     The Court has subject matter jurisdiction pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1367.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Lakewood is headquartered in the Northern District of Illinois and the events giving rise to this lawsuit occurred in the Northern District of Illinois.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

12.     Weaver formed and incorporated Beta in 1998.  (Plea Agreement, Exhibit E, ¶ 5.a.)

13.     At all times relevant to this matter, Weaver was the sole owner of Beta and served as its president.  (Plea Agreement, Exhibit E, ¶ 5.a.)

14.     Weaver was also the sole owner of several related entities formed to offer interests in a hedge fund to investors and to manage the hedge fund, including: (1) Beta Capital Partners, LP; (2) Beta Capital Advisors, LLC; and (3) Beta Capital Management, LLC.  (Plea Agreement, Exhibit E, ¶ 5.b.)

15.     Weaver, through Beta and other entities, sold to the public "investments," including: (1) so-called "error account" trades; (2) shares in a Beta Capital Partners, L.P. hedge fund; and (3) notes purportedly issued by entities such as Raymond James and Beta Asset Management.  (Plea Agreement, Exhibit E, ¶ 5.e.)

16.     Weaver was a registered broker, or associated with a registered broker, from approximately 1999 through January 2004.  (Plea Agreement, Exhibit E, ¶ 5.d.)

17.     In Chicago and elsewhere, Weaver devised and participated in a scheme to defraud and to obtain money and property from investors and potential investors in the so-called "error trades," in the Beta Capital Partners, L.P. hedge fund, and in notes purportedly issued by entities such as Raymond James and Beta Asset Management, by means of materially false and fraudulent pretenses, representations and promises and by means of material omissions.  (Plea Agreement, Exhibit E, ¶ 5.f.)

18.     Weaver did not intend to use and, in fact, did not use money acquired from investors for the investments he had promised to them.  (Plea Agreement, Exhibit E, ¶ 5.k.)  Weaver admitted that he made transfers to avoid detection of his scheme.  (Weaver Dep., Exhibit D, p. 127, ll. 17-21.)

19.     Little to none of the money received by Weaver was invested in legitimate investments in 2003 or 2004.  (Weaver Dep., Exhibit D, p. 126, ll. 7-13.)

20.     Weaver misappropriated the investors' money.  (Plea Agreement, Exhibit E, ¶ 5.k.)

21.     Weaver used the money he received from some investors to make payments to other investors.  (Plea Agreement, Exhibit E, ¶ 5.k.; Weaver Dep., Exhibit D, p. 125, ll. 5-10.)

22.     At all times relevant to this matter, Beta was the owner of the following accounts: Account No. 1213000712 at North Community Bank (Beta's Bank Records, Group Exhibit K, pp. 11-16); Account No. 1213003385 at North Community Bank (Beta's Bank Records, Group Exhibit K, pp. 16-17; Lakewood's Responses to Requests

to Admit, Exhibit G); and Account No. 0028 7204 4535 at Bank of America. (Beta's Bank Records, Group Exhibit K, pp. 18-20.)

23. During the course of the scheme, Weaver caused approximately 87 investors to lose over $20 million. (Plea Agreement, Exhibit E, ¶ 5.p.)

24. In 2003 and/or 2004, Lakewood was the owner of Account No. 800071267 at Citibank. (Lakewood's Responses to Requests to Admit, Exhibit G, Nos. 23-24, 26.)

25. Lakewood also owned Account No. 0980781550 at Citibank. (Lakewood's Responses to Requests to Admit, Exhibit G, Nos. 27-28, 30.)

26. At all times relevant to this matter, Vehslage was the owner of Account No. 2423669 at the Northern Trust Co. (Lakewood's Responses to Requests to Admit, Exhibit G, Nos. 18-19.)

27. At all times relevant to this matter, Vehslage was the owner of Account No. 1113009789 at North Community Bank. (Lakewood's Bank Records, Group Exhibit J, at LWP 000096; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

28. At all times relevant to this matter, Schripsema was the owner of Account No. 2430290 at the Northern Trust Co. (Lakewood's Bank Records, Group Exhibit J, at LWP 000103-000104; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

29. Lakewood "invested" $983,000 in Beta, as detailed below in Paragraph 31. (Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response.)

30.     Beta transferred $4,229,000 to Lakewood (as detailed below in paragraph 32), or for the benefit of Lakewood, directly or through its principals.  (Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

31.     Lakewood made the following transfers of funds to Beta:

    a.   $125,000.00 from Citibank Account No. 800071267 to Beta's North Community Bank Account No. 1213000712 on or about January 30, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 33; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000047 & LWP 000110.)

    b.   $135,000.00 from Citibank Account No. 800071267 to Beta's North Community Bank Account No. 1213003385 on March 21, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 36; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000055.)

    c.   $113,000.00 from Citibank Account No. 800071267 to Beta's North Community Bank Account No. 1213003385 on May 12, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 38; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000063.)

    d.   $50,000.00 from Citibank Account No. 800071267 to Beta's North Community Bank Account No. 1213003385 on May 20, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 39; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000063 & LWP 000115-000116.)

    e.   $60,000.00 from Citibank Account number 800071267 to Beta's North Community Bank Account No. 1213003385 on June 3, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 40; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000068 & LWP 000117-000118.)

f.  $500,000.00 from Northern Trust Account No. 2423669 to Beta's Bank of America Account No. 0028 7204 4535 on June 16, 2004.  (Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 8 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000108.)

32.  Beta made the following transfers of funds to Lakewood:

a.  $95,000.00 from Beta's North Community Bank account number 1213003385 to Citibank Account No. 800071267 on February 25, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 35; Lakewood's Supplemental Discovery Responses, Exhibit R,  Interrogatory No. 11 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000051 & LWP 000112.)

b.  $40,000.00 from Beta's North Community Bank account number 1213003385 to Citibank Account No. 800071267 on February 25, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G No. 34; Lakewood's Supplemental Discovery Responses, Exhibit R,  Interrogatory No. 11 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000111.)

c.  $150,000.00 from Beta's North Community Bank account number 1213003385 to Citibank Account No. 800071267 on April 30, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 37; Lakewood's Supplemental Discovery Responses, Exhibit R,  Interrogatory No. 11 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000059 & LWP 000113.)

d.  $35,000.00 from Beta's North Community Bank Account No. 1213003385 to a Citibank account possessed or controlled by Lakewood on September 2, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 43; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

e.  $50,000.00 from Beta's North Community Bank Account No.1213003385 to Citibank Account No. 0980781550 on September 26, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 44; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

f.  $50,000.00 from Beta's North Community Bank Account No. 1213003385 to a Citibank account possessed or controlled by Lakewood on October 16, 2003.  (Lakewood's Responses to Requests to Admit, Exhibit G, No. 45; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

g. $100,000.00 from Beta's North Community Bank Account No. 1213003385 to a Citibank account possessed or controlled by Lakewood on November 24, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 46; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

h. $50,000.00 from Beta's North Community Bank Account No. 1213003385 to a Citibank account possessed or controlled by Lakewood on December 29, 2003. (Lakewood's Responses to Requests to Admit, Exhibit G, No. 47; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

i. $9,000.00 from Beta's North Community Bank Account No. 1213003385 to North Community Bank Account No. 1113009789, owned by Vehslage, on February 20, 2004. (Lakewood's Bank Records, Group Exhibit J, at LWP 000096; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

j. $50,000.00 from Beta's North Community Bank Account No. 1213003385 to North Community Bank Account No. 1113009789, owned by Vehslage, on March 8, 2004. (Lakewood's Bank Records, Group Exhibit J, at LWP 000096; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

k. $500,000.00 from Beta's North Community Bank Account No. 1213003385 to North Community Bank Account No. 1113009789, owned by Vehslage, on April 1, 2004. (Lakewood's Bank Records, Group Exhibit J, at LWP 000097 & LWP 000099; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

l. $250,000.00 from Beta's Bank of America Account No. 0028 7204 4535 to Northern Trust Account No. 2430290, owned by Schripsema, on May 19, 2004. (Lakewood's Bank Records, Group Exhibit J, at LWP 000103-000104; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

m. $250,000.00 from Beta's Bank of America Account No. 0028 7204 4535 to Northern Trust Account No. 2423669, owned by Vehslage, on May 19, 2004. (Lakewood's Bank Records, Group Exhibit J, at LWP 000105-000106; Lakewood's Supplemental Discovery Responses, Exhibit R, Interrogatory No. 11 Supplemental Response.)

n. $2,600,000.00 wired from Beta's Bank of America Account No. 0028 7204 4535 to Chicago Title and Trust, for the benefit of Lakewood, on June 4, 2004. (Lakewood's Responses to Requests to Admit, Exhibit G, ¶ 48; Lakewood's Supplemental Discovery Responses, Exhibit R,

Interrogatory No. 11 Supplemental Response; Lakewood's Bank Records, Group Exhibit J, at LWP 000107.)

33. In addition, to the transfers from Beta to Lakewood, or for the benefit of Lakewood, to which Lakewood admits in its discovery responses (identified in paragraph 32), Beta made two additional transfers totaling $70,100 to or for the benefit of Lakewood:

    o. $50,100.00 from Beta's North Community Bank Account No. 1213003385 to a Citibank Account possessed or controlled by Lakewood on or about July 11, 2003. (Beta's Bank Records, Group Exhibit K, pp. 1-2.)

    p. $20,000.00 from Beta's North Community Bank Account No. 1213003385 to Citibank Account No. 0980781550, on or about August 7, 2003. (Beta's Bank Records, Group Exhibit K, pp.6-7.)

34. The above transfers of funds in paragraphs 32 and 33 from Beta to Lakewood totaling $4,299,100 were to the detriment of other investors of Beta. (Weaver Dep., Exhibit D, p. 126, ll. 14-17.)

35. The funds that Weaver caused to transfer to Lakewood came from other investors of Beta. (Weaver Dep., Exhibit D, p. 125, ll. 11-14.)

36. The transfers of funds to Lakewood directly or through Mark Vehslage and Richard Schripsema, among others, allowed the scheme to continue unabated. (Weaver Dep., Exhibit D, p. 128, ll. 20-24; p. 129, ll. 1-7.)

37. Lakewood provided no services to, or for the benefit of, Beta or Weaver. (Lakewood's Objections and Responses to Plaintiff's Interrogatories, Exhibit L, No. 6.)

38. Lakewood provided no products or tangible goods to, or for the benefit of, Beta or Weaver. (Lakewood's Objections and Responses to Plaintiff's Interrogatories, Exhibit L, No. 7.)

39.     Richard Schripsema did not provide any services, products, or tangible goods to, or for the benefit of, Beta or Weaver. (Schripsema's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit Q, Nos. 22-25.)

40.     Mark Vehslage did not provide any services, products, or tangible goods to, or for the benefit of, Beta or Weaver.  (Vehslage's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit Q, Nos. 22-25.)

41.     On or about June 4, 2004, Lakewood used $2.6 million of the funds it received from Beta to retire a mortgage on a multi-unit condominium building located at 855-859 LaSalle Street, Chicago, Illinois ("the LaSalle condos") that was owned by Lakewood.  (Form 8275 Disclosure Statement, Exhibit I, MV 0015; Excerpts from Transcript of Deposition of Heather Lengyel ("Lengyel Dep.")., Exhibit M, p. 114, ll. 4-6, 14-20; p. 116, ll. 24-25, p. 117, ll. 1-5; p. 123, ll. 18-22; p. 124, ll. 5-14; p. 135, ll. 15-19.)

42.     On or after June 4, 2004, through 2005, the LaSalle condos were subsequently sold with profits from these sales going to Vehslage and Schripsema. (Withey Dep., Exhibit F, pp. 112, 133-134, 156-161.)

43.     In December 2004, Vehslage put down $159,000 earnest money toward a purchase of a home for his family in California that he subsequently had to forego because the purchase could not go through.  (Lengyel Dep., Exhibit M, pp. 183, 188-189; Withey Dep., Exhibit F, pp. 170-171.)  This $159,000 was recorded as a loss on Lakewood's 2004 federal tax return.  (Withey Dep., Exhibit F, pp. 170-171.)

44.     In February, 2006, Vehslage made a $395,000 down payment toward a purchase of home in Santa Barbara, California for approximately $3 million and

purchased four cars—a Porsche Cayenne, a Cadillac XLR, a Land Rover and a Yukon Denali. (Lengyel Dep., Exhibit M, p. 70, ll. 16-24; p. 152, ll. 24-25; p. 153, ll. 1-2, 19-25, p. 154., ll. 1-2; p. 198, ll. 22-25; p. 199, ll. 1-4, 10-15.)

45.     Until recently, Lakewood did not report the funds it received from Beta on Lakewood's corporate tax returns. (Form 8275 Disclosure Statement, Exhibit I, MV 0015.)

46.     Jon E. Withey, Lakewood's accountant, was unaware that Vehslage and Schripsema had invested any of Lakewood's funds in Beta in 2003. (Withey Dep., Exhibit F, p. 74, ll. 11-24 to p. 75, ll. 1-6; p. 150, ll. 6-20.) If Withey had been aware of Lakewood's investment in Beta, said investment would have been reflected on Lakewood's 2003 tax return and balance sheet. (*Id.*, p. 76, ll. 2-6; p. 110, ll. 9-14.; p. 176, l. 13 to p. 178, l. 4.)

47.     Likewise, Withey was unaware that Vehslage and Schripsema had invested any of Lakewood's funds in Beta in 2004. (Withey Dep., Exhibit F, p. 117, ll. 7-11; p. 150, ll. 6-20.) Had Withey known about the investment, that investment would have been reflected in Lakewood's 2004 tax return and balance sheet. (*Id.*, p. 110, ll. 5-14.) According to Withey, Vehslage was "fairly astute" about numbers. (*Id.*, p. 31, ll. 12-19.). Withey confirmed that the money Lakewood received from Beta in June 2004 alone was "a significant amount of money." (*Id.*, p. 116, ll. 2-21.)

48.     Withey was also unaware that Lakewood received in excess of $2.6 million from Beta in 2004. (Withey Dep., Exhibit F, p. 164, ll. 15-18.) Had Withey known that Lakewood had "profited" on its investment with Beta, that "profit" would have been reflected on Lakewood's tax return. (*Id.*, p. 117, ll. 18-22.)

49.     At the time of transfers of funds to Lakewood, Beta was insolvent. (Weaver Dep., Exhibit D, p. 127, ll. 4-7.)

50.     On July 22, 2005, the United States Attorney's Office for the Northern District of Illinois charged Weaver by Information with five counts of wire fraud, in violation of 18 U.S.C. §1343.  (*U.S. v. Weaver* Information, Exhibit N.)  On May 25, 2006, Weaver pled guilty to Count One of the Information.  (Plea Agreement, Exhibit E, ¶¶ 1, 4.)  On February 20, 2008, the Court sentenced Weaver to 151 months imprisonment.  (*U.S. v. Weaver* Criminal Judgment Order, Exhibit O.)

51.     On December 23, 2004, the SEC filed its Complaint in *SEC v. Weaver* alleging that Weaver's and Beta's conduct violated section 17(a) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. 240.10b-5).  (Complaint, Exhibit A, ¶ 12; Answer to Count III of Complaint, Exhibit B, ¶ 12.)  The court entered a Final Judgment and Permanent Injunction against Weaver and Beta on February 3, 2006.  (*SEC v. Weaver* Judgment Against Weaver, Exhibit S.)

52.     On May 22, 2007, as part of his duties as Receiver, the Receiver filed the present lawsuit against Lakewood to recoup monies paid to Lakewood by Beta.  During the course of this case, the Receiver served Plaintiff's Rules 31 and 30(b)(6) Deposition of Defendant by Written Questions on Lakewood.  Vehslage responded to the written questions on behalf of Lakewood by invoking the Fifth Amendment and declining to answer all but 2 of the 128 questions propounded on Lakewood.  (Lakewood's Answers to Plaintiff's Rules 31 and 30(b)(6) Deposition by Written Questions, Exhibit H.)

53.     Vehslage also invoked the Fifth Amendment and declined to answer all but 2 of the 71 written deposition questions propounded to him. (Vehslage's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit P, Nos. 3-69.)

54.     Richard Schripsema invoked the Fifth Amendment and declined to answer all but 2 of the 69 written deposition questions propounded to him. (Schripsema's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit Q, Nos. 3-69.)

55.     Both Vehslage and Schripsema are experienced investors, and they were aware that they had received unreasonably excessive returns on their investments with Beta.  (Vehslage's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit P, Nos. 28, 37-38, 44-58; Schripsema's Answers to Plaintiff's Rule 31 Deposition by Written Questions, Exhibit Q, Nos. 28, 44-54.)

Respectfully submitted,

JAMES L. KOPECKY, RECEIVER
FOR BRAD A. WEAVER AND
BETA ASSET MANAGEMENT, INC.

 /s Cynthia M. Peterson
Attorney for Plaintiff

Pravin B. Rao
Cynthia M. Peterson
PERKINS COIE LLP
131 S. Dearborn St., Suite 1700
Chicago, Illinois 60603
(312) 324-8620
(312) 324-9620 (facsimile)

Dated: June 9, 2008

**LIST OF EXHIBITS SUBMITTED IN SUPPORT OF
RECEIVER'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Exhibit A | Complaint |
| Exhibit B | Answer to Count III of Plaintiff's Complaint |
| Exhibit C | Order Appointing Receiver |
| Exhibit D | Excerpts from Transcript of Deposition of Brad Weaver |
| Exhibit E | Plea Agreement |
| Exhibit F | Excerpts from Transcript of Deposition of Jon Withey |
| Exhibit G | Defendant Lakewood's Objections and Responses to Plaintiff's Requests to Admit |
| Exhibit H | Answer to Plaintiff's Rule 31 and 30(b)(6) Deposition of Defendant by Written Questions |
| Exhibit I | Form 8275 Disclosure Statement |
| Exhibit J | Defendant Lakewood's Bank Records |
| Exhibit K | Beta Asset Management's Bank Records |
| Exhibit L | Defendant Lakewood's Objections and Responses to Plaintiff's Interrogatories |
| Exhibit M | Excerpts from Transcript of Deposition of Heather Lengyel |
| Exhibit N | *U.S. v. Weaver* Information (July 22, 2005) |
| Exhibit O | *U.S. v. Weaver* Criminal Judgment Order (Feb. 20, 2008) |
| Exhibit P | Answers to Plaintiff's Rule 31 Deposition of Mark Vehslage by Written Questions |
| Exhibit Q | Answers to Plaintiff's Rule 31 Deposition of Richard Schripsema by Written Questions |
| Exhibit R | Defendant Lakewood's Supplemental Discovery Responses |
| Exhibit S | *SEC v. Weaver* Judgment Against Weaver (Feb. 3, 2006) |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 9th day of June, 2008 she caused a true and correct copy of ***Receiver's Statement of Undisputed Facts in Support of Motion for Summary Judgment*** to be filed with the Clerk of the Court using the CM/ECF system and to be served on the following counsel of record via electronic filing notification:

>      Eugene J. Geekie, Jr.
>      Matthew C. Crowl
>      Zhiyuan "Mike" Xu
>      Schiff Hardin LLP
>      6600 Sears Tower
>      232 South Wacker Drive
>      Chicago, IL 60606

>      _/s  Cynthia M. Peterson_____