# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES L. KOPECKY, RECEIVER    )
FOR BRAD A. WEAVER AND       )
BETA ASSET MANAGEMENT, INC.,  )
                                   )
        **Plaintiff,**          )
                                   )
        **v.**               )     **Case No.  08 C 3135**
                                   )
MARK VEHSLAGE, HEATHER       )
LENGYEL, and RICHARD          )     **Honorable Blanche M. Manning**
SCHRIPSEMA,               )
                                   )
        **Defendants.**      )

## RECEIVER'S MEMORANDUM IN SUPPORT
## OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT
## MARK VEHSLAGE

Plaintiff, James L. Kopecky ("the Receiver"), Receiver for Brad A. Weaver ("Weaver") and Beta Asset Management, Inc. ("Beta"), pursuant to Federal Rule of Civil Procedure 56(a) and (d), submits this Memorandum in support of his Motion for partial Summary Judgment against Defendant Mark Vehslage ("Vehslage") as to Count III of Plaintiff's Amended Complaint:

## **INTRODUCTION**

Vehslage received $2.6 million dollars through a fraudulent transfer from a Ponzi scheme operated by Weaver and Beta.  The Receiver filed this lawsuit to recoup the monies paid to Defendants so the funds can be redistributed to investors who lost hundreds of thousands of dollars in the fraudulent scheme.[1]  Count III of the Amended Complaint seeks to void the

---

[1] Any money judgment entered against Defendants will technically be for the benefit of Beta.  If the Court deems it appropriate, the funds will be equitably redistributed to the people who lost money in Weaver's financial scheme.

fraudulent transfer to Vehslage and seeks a money judgment against him pursuant to the Uniform Fraudulent Transfer Act ("UFTA"), as adopted in Illinois. *See* 740 ILCS 160/1 *et seq*.

The undisputed material facts show that Beta made fraudulent transfers to Lakewood and that Vehslage was a subsequent transferee of at least one of the fraudulent transfers in the amount of $2.6 million. Because the transfers to Lakewood were made with actual intent to defraud investors, they are void under UFTA. *See* 740 ILCS 160/5(a). The elements of constructive fraud are also present and constitute an additional ground for voiding the transfers under UFTA. *See* 740 ILCS 160/5(b). Finally, the transfer to Vehslage must be voided because Vehslage provided no services or consideration of anywhere near equivalent value in exchange for the transfer. UFTA specifically provides that the creditor may recover judgment for the value of the asset transferred against any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee. *See* 740 ILCS 160/9(b)(2).

For these reasons, the Court should grant summary judgment in favor of the Receiver and against Vehslage on Count III of the Complaint and enter a money judgment against Vehslage for the value of the funds transferred.

## UNDISPUTED FACTS

Brad Weaver ran a Ponzi scheme in which none of the investments sold by Weaver were legitimate. (*Id.*, ¶¶ 15-19.) Instead of purchasing legitimate investments on behalf of his investors, Weaver used money from some investors to pay off other investors until the money ran out. (*Id.*, ¶¶ 18-19.) During the course of the scheme, Weaver caused approximately 87 investors to lose over $20 million. (*Id.*, ¶ 21.)

---

*See SEC v. Cavanaugh*, 445 F.3d 105, 117 (2d Cir. 2006) ("Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation or to the United States Treasury.").

Lakewood, a corporation in the commercial real estate business, was one of Beta's investors. (*Id.*, ¶¶ 4.) Lakewood's total profit from Weaver's Ponzi scheme was $3,316,100. Lakewood has admitted that part of these profits came from Beta in the form of a single wire transfer to Chicago Title & Trust of $2.6 million for the benefit of Lakewood on June 4, 2004. (*Id.* ¶¶ 24.) The same day, Vehslage received a wire transfer from Lakewood's Chicago Title & Trust escrow account to his personal bank account in the amount of $2,658,275.22. (*Id.* ¶¶ 25.)

Neither Lakewood's profits nor the subsequent transfers to Vehslage came from legitimate investments—they were taken out of the pockets of other investors to the detriment of the investors and to Beta, which was looted by Weaver for his own profit. (*Id.*, ¶¶ 26-28.) Indeed, the $2.6 million transferred to Lakewood and subsequently to Vehslage came directly from another investor who wired $2.6 million to Beta on June 4, 2004. (*Id.* ¶¶ 23.)

Neither Lakewood nor Vehslage provided any goods or services to Beta in exchange for the money transfers. (*Id.*, ¶¶ 29-31.) Nor did Vehslage provide any goods or services to Lakewood. (*Id.*, ¶ 31.) Neither Lakewood nor Vehslage took the transfer in good faith. (*Id.* ¶¶ 29-32.) Tellingly, the money subsequently transferred to Vehslage is not reflected on his personal or business tax returns. (*Id.* ¶ 32.) Moreover, Beta was insolvent at the time it transferred these funds to Lakewood. (*Id.*, ¶ 36.)

On December 23, 2004, the U.S. Securities and Exchange Commission ("SEC") filed a Complaint against Weaver and Beta alleging that they violated section 17(a) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. 240.10b-5). (*Id.*, ¶ 38.) On February 3, 2006, the Court entered judgment against Weaver and Beta. (*Id.*) In the course of the SEC's lawsuit against Weaver, Plaintiff was appointed as

Receiver for the benefit of investors to "marshal, conserve, protect, hold funds, operate, and with the approval of the Court, dispose of all assets of any nature … in which [Weaver] and [Beta] have a legal, equitable or beneficial interest, including money that [Weaver and Beta] improperly paid to investors …." (*Id.*, ¶ 2.)

On July 22, 2005, the U.S. Attorney for the Northern District of Illinois charged Weaver by Information with five counts of wire fraud, in violation of 18 U.S.C. §1343 (*Id.*, ¶ 37.)  On May 25, 2006, Weaver pled guilty to Count One of the Information.  (*Id.*)  On February 20, 2008, the Court sentenced Weaver to 151 months imprisonment.  (*Id.*)  Weaver is currently incarcerated at the Kankakee County Jail in Kankakee, Illinois.  (*Id.*, ¶ 3.)

On May 22, 2007, as part of his duties to Beta and its investors, the Receiver filed a three-count complaint against Lakewood for the return of Lakewood's illegitimate profits.  (*Id.*, ¶ 39.)  This lawsuit is currently pending before Judge Pallmeyer.  On June 9, 2008, the Receiver filed a motion for summary judgment against Lakewood on the Receiver's UFTA and unjust enrichment claims.  (*Id.*)  Naturally, the disposition of the instant motion against Vehslage rests in part on the disposition of the motion against Lakewood.  After it determines that Beta's transfers to Lakewood were fraudulent, the Court can then hold that the subsequent transfer to Vehslage was likewise fraudulent.

In that case, Mark Vehslage declined to testify in a related matter brought by the Receiver against Lakewood   In response to written deposition questions propounded on him, both personally and as the Rule 30(b)(6) representative of Lakewood, Vehslage invoked the protections of the Fifth Amendment.  (*Id.*, ¶¶ 39-40.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions to file, and affidavits, and where the moving party is entitled to judgment as a matter of law." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). A motion for partial summary judgment is proper if it seeks to dispose of an entire count or claim. *Northeast Ill. Reg'l Commuter R.R. Corp. v. Kiewit Western Co.*, 396 F.Supp.2d 913, 921 (N.D.Ill. 2005). In this case, the Receiver is seeking summary judgment against Defendant Vehslage as to Count III of his Amended Complaint. Summary disposition on Count III will dispose of the Receiver's Count III claim against Vehslage in its entirety.

Facts are usually construed in favor of the non-moving party. *Springer* at 483-84. In this case, however, the Court may draw an adverse inference against Defendant Vehslage, based on the invocation of his Fifth Amendment rights in response to sworn interrogatories in the Lakewood matter. Specifically, the invocation of the Fifth Amendment by Vehslage requires an inference that the facts presented by the Receiver are true. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995); *see SEC v. Colello*, 139 F.3d 674 (2nd Cir. 1998) (holding that district court correctly considered relief defendant's invocation of the Fifth Amendment in granting summary judgment against him).[2]

An inference that Plaintiff's evidence is true is particularly appropriate here where Vehslage's refusal to testify significantly hampered the Receiver's ability to obtain relevant

---

[2] *See also Brenner v. Commodity Futures Trading Comm'n.*, 338 F.3d 713, 720 (7th Cir. 2003) (upholding summary judgment against petitioners based on "evidence offered by the [CFTC], combined with the petitioners' failure to respond to that evidence by invoking various privileges," including the Fifth Amendment); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663-64 (7th Cir. 2002) (holding that the trial court erred in failing to consider the invocation of the Fifth Amendment by the executives of one of the defendants and reversing summary judgment in favor of the defendants).

discovery.  As the Seventh Circuit has stated: "[T]he party asserting the privilege is not the only one whose case is consequently impaired.  The opponent, unable to obtain discovery, is also disadvantaged."  *Seguban*, 54 F.3d at 390 n.4.


## ARGUMENT

### I.    THE RECEIVER IS ENTITLED TO JUDGMENT UNDER THE UNIFORM FRAUDULENT TRANSFER ACT.

Under the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.*,

> a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: 1) with actual intent to hinder, delay or defraud any creditor of the debtor or 2) without receiving a reasonably equivalent value in exchange fore the transfer or obligation. . .

740 ILCS 160/5.

Under UFTA, there are two types of fraudulent conveyances: "fraud in fact" (or actual fraud) and "fraud in law" (or constructive fraud).  *Wachovia Sec, LLC v. Neuhauser*, 528 F. Supp. 2d 834, 858 (N.D. Ill. 2007); *see In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837, 841 (C.D. Ill. 2005).  In fraud-in-fact cases, the creditor must prove fraudulent intent on the part of the debtor.  *Wachovia Sec., LLC*, 528 F. Supp. 2d at 858.  Specifically, the creditor must show that the debtor "made the transfer … with actual intent to hinder, delay, or defraud any creditor of the debtor."  740 ILCS 160/5(a)(1).  A transfer is not voidable under Section 5(a)(1) if the transferee can prove that he took it "in good faith and for a reasonably equivalent value."  740 ILCS 160/9(a); *see In re Spatz*, 222 B.R. 157, 170 (N.D. Ill. 1998) (burden is on transferee to prove both elements of defense to actual fraud).

In fraud-in-law cases, the creditor need not prove actual intent. *Wachovia Sec., LLC*, 528 F. Supp. 2d at 859. Instead, it must be determined that the transfer was made for less than "reasonably equivalent value" and that the debtor was

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2). In other words, constructive fraud is proved by showing that the transferor was insolvent and did not receive reasonably equivalent value for the transfer. *In re Phillips*, 379 B.R. 765 (N.D. Ill. 2007).

Most significantly here, UFTA authorizes judgment "against ... any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee." 740 ILCS 160/9(b)(2).

### A.    The Receiver Has Standing to Sue Under UFTA.

The Receiver has standing under UFTA because he stands in the shoes of Beta, who meets the definition of "creditor" under UFTA. A "creditor" means "a person who has a 'claim.'" 740 ILCS 160/2(d). A "claim" is a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2(c).

Beta, and thus the Receiver, has a right to payment of the monies that belonged to Beta but were looted by Weaver, fraudulently distributed to Lakewood and subsequently transferred to Vehslage. The diversion of corporate assets by an officer of a corporation is a "classic injury" to a corporation. *Small v. Sussman*, 713 N.E.2d 1216, 1220 (Ill. App. Ct. 1999). Further, where there is an injury to a corporation, a lawsuit must be maintained, not by an individual investor in

the corporation, but by the corporation itself.  *Id.* at 1221; *see Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) ("Illinois follows the widespread rule that an action for harm to the corporation must be brought in the corporate name").  The Receiver, as Beta's representative, has the right to sue on behalf of Beta and thus has a "right to payment" and a "claim" against the subsequent transferee under the UFTA.

In *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), the Seventh Circuit decided that a receiver has standing to pursue fraudulent transfer claims against relief defendants.  The statute addressed in *Scholes* was the predecessor to UFTA, but the Court's reasoning still applies and mandates a finding that standing exists here.  *Id.* at 755; *see Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1126-27 (D. Ariz. 2006) (holding that receiver had standing to redress injuries to receivership entity for the benefit of investors in the entity); *SEC v. Cook*, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001) (same) (Tab 1).[3]  Indeed, UFTA is routinely used by receivers to recoup monies fraudulently transferred by corporations.  *See*, *e.g.*, *Donell v. Kowell*, 2008 WL 2579200 at *1 (9th Cir. July 1, 2008); *Quilling v. Schonsky*, 247 Fed. Appx. 583, 586 (5th Cir. 2007); *SEC v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 300-02 (5th Cir. 2007); *Warfield v. Carnie*, 2007 WL 1112591, at *9-13 (N.D. Tex. Apr. 13, 2007); *In re Randy*, 189 B.R. 425, 443 (N.D. Ill. 1995).  The Receiver has standing to bring this suit because, "although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that [Beta] suffered when its manager caused [Beta] to commit fraud."  *Donell*, 2008 WL 2579200 at *10.

---

[3]  Copies of all unreported cases cited in this Memorandum are attached at Tab 1

**B.    The Payments to Lakewood and Subsequently to Vehslage Were a Result of "Fraud in Fact."**

The fact that Weaver used Beta to run a Ponzi scheme is conclusive evidence that the payments to Lakewood were made with an "actual intent to hinder, delay, or defraud any creditor of the debtor."[4]  *See* 740 ILCS 160/5(a)(1).  "Transfers made in furtherance of Ponzi schemes have achieved a special status in fraudulent-transfer law."  *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1136-37 (D. Ariz. 2006).  "The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell*, 2008 WL 2579200 at *4.  "The orchestrator of the scheme must know all along, from the very nature of his activities, that investors at the end of the line will lose their money."  *Warfield*, 453 F. Supp. 2d at 1136-37.  "Knowledge to a substantial certainty constitutes intent in the eyes of the law, and this knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them."  *Id.*; *see Donell,* 2008 WL 2579200 at *4 ("Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator was engaged or was about to be engaged in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or intended to incur or believed or reasonable should have believed that he or she would incur debts beyond his or her ability to pay as they became due") (citations omitted); *see also Terry v. June*, 432 F. Supp. 2d 635, 639-40 (W.D. Vir. 2006) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible."); *In re Randy*, 189 B.R. 425, 439 (N.D. Ill. 1995) (where debtor's intent to run a Ponzi scheme was proved, it could "certainly

---

[4] Even in a case involving a subsequent transferee, the focus of UFTA is on the intent of the debtor, not on the intent of the creditor who subsequently transfers money to a third-party transferee.  See 740 ILCS 160/5.  Thus, the analysis in the Memorandum focuses on Beta's intent when it transferred $2.6 million to Lakewood, not Lakewood's intent when it transferred $2.6 to Vehslage.  As a practical matter, the issue of whether Beta's transfers to Lakewood were fraudulent will be determined on the Receiver's motion for summary judgment against Lakewood.

be inferred that he had 'actual intent to hinder, delay, or defraud' when he paid his brokers commissions for their efforts to market" his scheme); *In re Canyon Sys. Corp.*, 343 B.R. 615, 636-37 (S.D. Ohio 2006) (proof of Ponzi scheme establishes fraudulent intent by clear and convincing evidence).

In addition, the existence of a plea agreement, in which the operator admits the existence of the Ponzi scheme, is all the proof needed on this issue. *Scholes v. Lehmann*, 56 F.3d at 762; *In re Slatkin*, 222 Fed. Appx. 545, 547 (9th Cir. Jan. 8, 2007); *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 851 (M.D. Fla. 2005). In his plea agreement, Weaver admitted that he used false and fraudulent statements to entice his people to "invest" in his Ponzi scheme. (Rule 56.1 Stmnt. ¶ 13.) Weaver misappropriated money from his investors and used the money from some investors to pay others. (*Id.*, ¶¶ 17-19.) He never intended to use and, in fact, did not use money acquired from investors for the investments he had promised to them. (*Id.*, ¶ 15-16.) Similarly, Weaver admitted that he made the transfers to avoid detection of his scheme. (*Id.*) These admissions conclusively establish the existence of a Ponzi scheme and determine that, as a matter of law, Weaver made the transfers of funds to Lakewood with actual fraudulent intent.[5]

Moreover, the transferee's awareness of the scheme is irrelevant. *Resource Dev. Int'l, LLC*, 487 F.3d at 301 (good faith defense rejected when transfer actually or constructively fraudulent); *Quilling v. Schonsky*, 247 Fed. Appx. at 586 (a transferee's knowledge is irrelevant to whether transfer made with intent to defraud); *McCarn's Allstate Fin., Inc.*, 326 B.R. at 852-53 (finding that "it is irrelevant … that the Defendants did not have knowledge of the Ponzi scheme."). Thus, any protestations of ignorance from Vehslage must be disregarded.

---

[5] "A Ponzi scheme involves individuals … who convince investors to purchase interests in phony or unprofitable investment schemes, paying off old investors with the money obtained from new investors." *United States v. Frykholm*, 267 F.3d 604, 607 n.1 (7th Cir. 2001).

Vehslage does not have a defense to a claim based on actual fraud because Beta did not receive reasonably equivalent value for the payments to Lakewood and, likewise, Lakewood did not receive reasonably equivalent value for its payments to Vehslage. "The vast majority of courts that have considered the issue have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits." *Warfield*, 2007 WL 1112591, at *12; *see*, *e.g.*, *Scholes*, 56 F.3d at 756-58; *Terry*, 432 F. Supp. 2d at 642-43; *Randy*, 189 B.R. at 441; *In re Canyon Sys. Corp.*, 343 B.R. 615, 642-43 (S.D. Ohio 2006). This is because the investors "could have no reasonable expectation of profiting from an illegal Ponzi scheme, and because they profited from an illegal contract." *Warfield*, 2007 WL 1112591, at *13. As one court put it: "It takes cheek to contend that in exchange for the payments [a transferee] received, the … Ponzi scheme benefited from his efforts to extend the fraud by securing new investments." *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006).

Furthermore, neither Lakewood nor Vehslage can possibly prove that either acted in good faith in accepting the profits from the Ponzi scheme. "Good faith" is not defined within UFTA, but the Official Comments to the Model Act state: "Knowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." *Uniform Fraudulent Transfer Act*, 7A U.L.A. § 8 cmt. 2. Because Vehslage has "taken the Fifth" with respect to every issue relevant to this case, however, he cannot assert that he or Lakewood acted in good faith and thus cannot raise a genuine issue as to this fact. *See Cook*, 2001 WL 256172, at *4 (where defendant invoked Fifth Amendment, court had no way of determining whether he acted in good faith and thus defendant failed to raise a genuine issue of fact on that issue).

Moreover, the failure of Vehslage to report the income from Beta on Lakewood's tax returns and his personal tax returns, and his failure to tell Lakewood's accountant about Lakewood's financial gains from Weaver's fraudulent scheme, are persuasive evidence that neither Lakewood nor Vehslage acted in good faith when they accepted the money.  (Rule 56.1 Stmt., ¶¶ 32-35.)  According to Lakewood's own accountant, Vehslage was "fairly astute" about numbers and finances.  (*Id.*, ¶ 34.)  He confirmed that the money Lakewood received in June, 2004 alone was "a significant amount of money."  (*Id.*)  To Vehslage, an experienced investor, the extraordinarily excessive returns on Lakewood's purported investments with Beta should have, at the very least, raised a red flag with respect to their legitimacy, and are further evidence that Lakewood and Vehslage did not act in good faith.  (*Id.,* ¶ 41.)

Ultimately, however, Vehslage's assertion of his Fifth Amendment privilege precludes him from proving he did not think Weaver's scheme was fraudulent.  In response to questions relating to the purpose of the transfers, Vehslage answered as follows:

> Q: You knew that Beta Asset Management and Brad Weaver transferred funds to Lakewood, and for its benefit, with the actual intent to hinder, delay, or defraud any creditor including other purported Beta Asset Management investors, correct?
>
> A: I respectfully assert my constitutional privilege under the Fifth Amendment to the Constitution of the United States and decline to answer the question on the grounds that the answer may tend to incriminate me.

(Rule 56.1 Stmnt., ¶¶ 39-40.)

Accordingly, because there is no genuine issue of material fact, the Receiver is entitled to summary judgment.

C.       **The Payments to Lakewood and Subsequently to Vehslage Were Also a Result of "Fraud in Law."**

Even if the evidence on actual intent was not so overwhelming, summary judgment on the UFTA claim would be proper because of the strong evidence of constructive fraud, *i.e.*, that Lakewood did not give reasonably equivalent value for the money it received and that Beta was insolvent at the time of the transfers.  See 740 ILCS 160/5(a)(2); *In re Phillips*, 379 B.R. 765 (N.D. Ill. 2007).  It is undisputed that Lakewood did not provide services, products or tangible goods to, or for the benefit of, Beta.  (Rule 56.1 Stmnt., ¶¶ 29-31.)

Further, as demonstrated above, as a matter of law, a transferor does not receive reasonably equivalent value for false profits paid to investors.  *Scholes*, 56 F.3d at 756-58.  "Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator was engaged or was about to be engaged in a business transaction for which the remaining assets of the debtor 'were unreasonably small in relation to the business or transaction', [] 'or intended to incur or believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they became due[].'"  *Donell,* 2008 WL 2579200 at *4 (citing 470 ILCS 160/5(a)(2)).  Thus, Vehslage cannot dispute that the transfers from Beta were not made for reasonably equivalent value.

Finally, multiple courts have held that a Ponzi scheme is, by definition, insolvent from its inception.  *See Stenger v. World Harvest Church*, 2006 WL 870310, at *10 (N.D. Ga. March 31, 2006); *Terry*, 432 F. Supp. 2d at 640 (W.D. Vir. 2006).  Thus, the transfers to Vehslage from Beta via Lakewood were a result of constructive fraud and must be voided.  For this additional reason, summary judgment should be granted against Vehslage and in favor of the Receiver on the UFTA claim.

**D.      Judgment Against Vehslage is Appropriate Because Vehslage is Not a Good Faith Transferee Who Took For Value.**

UFTA authorizes judgment "against ... any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee."  740 ILCS 160/9(b)(2).  The undisputed facts show that on June 4, 2004, in the form of a single wire transfer, Beta transferred to Lakewood's Chicago Title & Trust escrow account $2.6 million for the benefit of Lakewood.  (*Id.* ¶¶ 24.)  The same day, Lakewood subsequently wired the amount of $2,658,275.22 from its Chicago Title & Trust escrow account to Mark Vehslage's personal bank account.  (*Id.* ¶¶ 25.)

The Receiver is aware of no evidence that Vehslage provided value to Lakewood for the $2.6 million payment he received.  In response to Plaintiff's Rule 31 Deposition of Mark Vehslage by Written Questions, Vehslage was specifically asked whether he provided any value for the transfer of these funds:

Q:      Mark Vehslage did not provide value in good faith for the receipt of the funds transferred from Chicago Title and Trust to his account on June 4 2004, correct?

A:      I respectfully assert my constitutional privilege under the Fifth Amendment to the Constitution of the United States and decline to answer the question of the grounds that the answer may tend to incriminate me.

In addition, Vehslage did not report the income on his tax returns.  In fact, he did not report any distribution of $2.6 million from Lakewood Properties.  Vehslage's failure to report the income from Lakewood on his personal tax returns, and his failure to tell his accountant about the financial gains from Weaver's fraudulent scheme, are evidence that he is not a good faith transferee for value. (Rule 56.1 Stmt., ¶¶ 32-35.)

Moreover, Vehslage cannot provide any evidence of value to Lakewood or Beta from which he could create a genuine issue of fact.  He does not, and cannot, show loan documents, promissory notes, contracts for services, or any other documents, evidencing value he provided

to Lakewood.  Thus, the only possible conclusion is that he did not take for value, and, therefore, summary judgment against him is proper.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Court should grant summary judgment against Vehslage and in favor of the Receiver under UFTA and pursuant to unjust enrichment principles. Vehslage should be ordered to relinquish the profits he made from Weaver's fraudulent scheme so those profits can be equitably distributed among the investors who were defrauded by Weaver.

Respectfully submitted,

JAMES L. KOPECKY, RECEIVER
FOR BRAD A. WEAVER AND
BETA ASSET MANAGEMENT, INC.

_____/s Elizabeth Neugent Dixon___

James L. Kopecky, ARDC No. 6225359
Elizabeth Neugent Dixon, ARDC No. 6280713
James L. Kopecky, P.C.
190 S. LaSalle St., Ste. 850-A
Chicago, Illinois 60603
T: (312) 527-3966
F: (312) 527-3968
Jim@jlkopecky.com
Elizabeth@jlkopecky.com

## CERTIFICATE OF SERVICE

I, Elizabeth Neugent Dixon, certify that on the 29th day of July, 2008, I caused a true and correct copy of ***Receiver's Memorandum in Support of His Motion for Partial Summary Judgment Against Mark Vehslage*** to be filed with the Clerk of the Court using the CM/ECF system and to be served on the following counsel of record via electronic filing notification:

Eugene J. Geekie, Jr.
Matthew C. Crowl
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
232 South Wacker Drive
Chicago, IL 60606

/s Elizabeth Neugent Dixon

# Tab 1

Westlaw.

--- F.3d ----                                                                    Page 1
--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363
**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

**Donell v. Kowell**
C.A.9 (Cal.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Ninth Circuit.
James H. **DONELL**, Receiver for J.T. Wallenbrock
& Associates and Citadel Capital Management
Group, Inc., Plaintiff-Appellee,
v.
Robert **KOWELL**, Defendant-Appellant.
No. 06-55544.

Argued and Submitted Dec. 6, 2007.
Filed July 1, 2008.

Richard D. Ackerman, Temecula, CA, for the defendant-appellant.
Peter A. Davidson, Los Angeles, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Central District of California; Edward Rafeedie, District Judge, Presiding. D.C. No. CV-04-09702-ER.

Before PASCO M. BOWMAN,FN* MELVIN BRUNETTI, and JAY S. BYBEE, Circuit Judges.

> FN* The Honorable Pasco M. Bowman, United States Circuit Judge for the Eighth Circuit, sitting by designation.

## OPINION

BYBEE, Circuit Judge:
**\*1** Robert Kowell found an investment opportunity that sounded too good to be true. In Kowell's case, it wasn't. J.T. Wallenbrock & Associates ("Wallenbrock") promised Kowell a 20 percent return on his investment every ninety days, risk free, and that is nearly what he got. Because he received regular interest payments from Wallenbrock, Kowell was quite surprised to learn later that an SEC in-

vestigation had revealed the business to be a Ponzi scheme in which thousands of investors had been defrauded. Several years after Kowell first invested, and long after he had spent his returns, he was informed by the receiver for Wallenbrock that California law requires him to pay back all of his gains. Kowell challenges a judgment requiring him, as an innocent investor, to disgorge his profits as fraudulent transfers under the Uniform Fraudulent Transfer Act. He also asks this court to permit him to offset any liability by amounts paid in federal income taxes on his earnings. The district court found that Kowell was liable to repay $26,396.10, plus pre-judgment interest of $5,159.22. We affirm.

I

A

The Uniform Fraudulent Transfer Act ("UFTA") as adopted by California states in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

came due.

CAL. CIV. CODE § 3439.04(a).[FN1]

> FN1. Notwithstanding the quoted language above, all courts construing UFTA state that there is an "or" between subsections (a)(1) and (a)(2).

Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors.[FN2] *See, e.g., In re Agric. Research & Tech. Group,* 916 F.2d 528, 534 (9th Cir.1990) ("*Agritech*"); *Scholes v. Lehmann,* 56 F.3d 750, 755 (7th Cir.1995). The Ponzi scheme operator is the "debtor," and each investor is a "creditor." *See Scholes,* 56 F.3d at 755 (explaining that defrauded Ponzi scheme investors are actually tort creditors). The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer.

> FN2. A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."*In re United Energy Corp.,* 944 F.2d 589, 590 n. 1 (9th Cir.1991).*See generally Cunningham v. Brown,* 265 U.S. 1, 7-9 (1924) (detailing the remarkable criminal financial career of Charles Ponzi).

**B**

Robert Kowell and his mother Edna were two of the thousands of investors in a Ponzi scheme operated by Wallenbrock. *See SEC v. J.T. Wallenbrock,* 313 F.3d 532 (9th Cir.2002) (detailing the scheme). Wallenbrock promised investors a 20 percent return

in ninety days, by using their money to provide working capital to Malaysian latex glove manufacturers. *Id.* at 535-36.Ordinarily, Wallenbrock claimed, these manufacturers had to wait eighty to ninety days after shipment to collect payments from buyers. Wallenbrock would purchase these manufacturers' accounts receivables at a significant discount, providing the glove manufacturers with immediate access to working capital. Wallenbrock investors, in turn, would enjoy a 20 percent return when Wallenbrock collected the receivables from glove purchasers in due time. *Id.* In reality, the officers of Wallenbrock took the investors' money and used some of it to pay off earlier investors, some to pay for personal expenses, and some to invest in risky start-up companies.

*2 In January of 2002, the Securities and Exchange Commission ("SEC") brought a civil enforcement action against Wallenbrock, alleging that it was engaged in a fraudulent scheme to sell unregistered securities. *Id.* at 535.Notwithstanding Wallenbrock's characterization of the fraudulent investment instruments as "notes" (and therefore not "securities" within the meaning of the Securities Act), we held that the investment instruments were, for purposes of the SEC's enforcement action, "securities." *Id.* at 537.Wallenbrock was later placed in receivership and appellee James H. Donell ("the Receiver") was appointed receiver.

On August 24, 2004, Kowell and his mother received a letter from Donell. The letter informed Kowell that Wallenbrock had been declared a Ponzi scheme, and that Donell had been authorized by a federal court to recover "profits" paid to investors. The letter stated that of approximately 6,000 investors, only 800 had received payments in excess of their principal investment. The letter claimed that Kowell had invested "the sum of $ .00," and had received back payments totaling $69,546.70. Thus, Kowell had allegedly received a "profit" of $69,546.70. The letter encouraged Kowell "[t]o take advantage of this one-time offer to settle with the Receivership estate for 90% of the profit you

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

received" by mailing a check in the amount of $62,592.03 (calculated as 90 percent of $69,546.70). The letter also required Kowell to execute an enclosed Settlement Agreement. It stated in bold letters that "it is imperative that I hear from you within 20 days from the date of this letter," or else "I will proceed accordingly."

Kowell replied by letter on August 31, 2004. Kowell stated that he had no idea Wallenbrock was a Ponzi scheme, and was in fact dubious that this was the case. Kowell expressed confusion as to how he could be liable to other investors if he had no idea Wallenbrock was a fraud. Kowell was also confused about the determination that Wallenbrock "notes" were actually securities. Kowell pointed out that Donell's letter claimed that Kowell's initial investment was "0.00," and that this must be error because Kowell had obviously made some non-zero investment in order to be eligible for returns from Wallenbrock. Finally, Kowell's letter stated that the money received in payments had been spent long ago, and if Kowell was required to pay back this amount, close to $70,000, he would have to declare bankruptcy.

Donell responded with a letter on September 22, 2004, which reiterated that Kowell was liable. The letter stated that "[t]he law in this regard goes back years and years," but notably did not cite any legal authority justifying Donell's demands. The letter also threatened:

> If you refuse to work out a settlement agreement with us, we will sue you and that will be your only option. It is not what we want for either you or your mother, however.... If you hire an attorney, you may certainly file a motion to bar the Receiver from collecting money from those that profited. Both the Receiver and the SEC would file objections and it would probably take about $20,000.00 in legal fees for you to file such a motion.

**\*3** Kowell refused to sign the settlement agreement. By a letter dated September 27, 2004, he reiterated

his utter disbelief that Wallenbrock was in fact a Ponzi scheme and his outrage that a good-faith investor in a business could be required to return his profits years later.

The Receiver filed a complaint in federal district court on November 30, 2004. The complaint sought to avoid the transfers to Kowell as fraudulent and to recover property transferred under CAL. CIV. CODE §§ 3439.04(a)(1)-(2) and 3439.05. Retreating from his earlier position that Kowell was liable for $69,546.70, the Receiver now claimed he was entitled to recover $50,431.78. On motion for summary judgment, the district court found that there were no disputed issues of fact as to Kowell's liability under § 3439.04, and granted judgment for the Receiver. Applying the statute of limitations, the district court found that the receiver was only entitled to recover $26,396.10, the total of the payments to Kowell within the statutory period, plus pre judgment interest of $5,159.22. The district court made no ruling on whether Kowell would be permitted to offset his liability by the amount paid in taxes on those payments or other expenses. Kowell timely appealed.

II

Although the Receiver only filed suit under a California statute, we have subject matter jurisdiction because this proceeding is ancillary to the SEC enforcement action. Wallenbrock was found liable to its investors and to the SEC under Sections 10(b) and 15(c)(1) of the Securities Exchange Act of 1934 (and related Rules 10b-5 and 15c1-2) and Sections 17(a)(1), (2), and (3) of the Securities Exchange Act of 1933. The district court, using its equity powers, appointed the Receiver to "use reasonable efforts to determine the nature, location, and value of all assets and property" belonging to Wallenbrock, "determine the identity of all investors, amounts invested by investors, and payouts to investors," and "take such action as necessary" to identify, preserve, collect, or liquidate Wallenbrock's assets. The district court authorized the Re-

--- F.3d ----                                                                    Page 4
--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363
**(Cite as: — F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

ceiver to "bring such legal actions based on law or equity in any state or federal court as he deems necessary" to carry out his duties.

The federal securities laws create exclusive federal jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by" federal securities laws. 15 U.S.C. §§ 77v(a), 78aa. The federal district court properly authorized the Receiver to bring suits under state law in federal court under ancillary jurisdiction for the purpose of effectuating its decree of liability against Wallenbrock because the primary lawsuit against Wallenbrock presented a federal question. *See* 28 U.S.C. § 1367; Fed.R.Civ.P. 66. As the Supreme Court stated in *Peacock v. Thomas,* "we have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments -including attachment, mandamus, garnishment, and the pre-judgment avoidance of fraudulent conveyances." 516 U.S. 349, 356 (1996); *see also Pope v. Louisville, New Albany & Chicago Ry.,* 173 U.S. 573, 577 (1899) (holding that a receiver appointed to "accomplish the ends sought and directed" by a suit with a proper basis for federal jurisdiction may proceed in ancillary jurisdiction on claims with no other independent basis for federal jurisdiction); *Scholes,* 56 F.3d at 753 (holding that federal jurisdiction over a claim under the Illinois UFTA is based on the ancillary jurisdiction of the federal courts); *Tcherepnin v. Franz,* 485 F.2d 1251, 1255-56 (7th Cir.1973); *Esbitt v. Dutch-American Mercantile Corp.,* 355 F.2d 141, 142-43 (2d Cir.1964).

*4 We review a district court's rulings on summary judgment motions *de novo. Agritech,* 916 F.2d at 533. California's fraudulent transfer act and the federal bankruptcy code's fraudulent transfer provisions are almost identical in form and substance; therefore, we draw upon cases interpreting both. *In re AFI Holding, Inc.,* 525 F.3d 700, 703 (9th Cir. April. 16, 2008); *Agritech,* 916 F.2d at 534.

III

Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers:

> The money used for the [underlying investments] came from investors gulled by fraudulent representations. [The defendant] was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the Ponzi scheme operator]. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment-the difference between what he put in at the beginning and what he had at the end.

*Scholes,* 56 F.3d at 757-58; *see also In re Slatkin,* 525 F.3d 805, 814-15 (9th Cir. May 6, 2008). The policy justification is ratable distribution of remaining assets among all the defrauded investors. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky." *In re United Energy Corp.,* 944 F.2d 589, 596 (9th Cir.1991).

Although we previously have not had occasion to prescribe an analysis for applying UFTA to allow recovery from investors in a Ponzi scheme, federal district and bankruptcy courts have adopted a largely uniform practice. In adopting this analysis, we first describe the theories of liability on which the receiver may proceed. We then describe a two-step process for determining the existence of liability and the amount of this liability.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 5

--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363

**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

A

There are two theories under which a receiver may proceed under UFTA: actual fraud or constructive fraud. Under § 3439.04(a)(1), codifying the "actual fraud" theory, the receiver alleges that the debtor (Ponzi scheme operator) made transfers to the transferee (the winning investor) "[w]ith actual intent to hinder, delay, or defraud" the creditors (the losing investors)."[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent" to defraud. *In re AFI Holding,* 525 F.3d at 704 (internal quotation marks omitted); *Agritech,* 916 F.2d at 535.Under § 3439.04(a)(2), codifying the "constructive fraud" theory, the receiver alleges that the transfer of "profits" to the winning investor was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer," because profits gained through theft from later investors are not a reasonably equivalent exchange for the winning investor's initial investment. *See Scholes,* 56 F.3d at 757.Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction,"§ 3439.04(a)(2)(A), or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due,"§ 3439.04(a)(2)(B).

*5 In the context of a Ponzi scheme, whether the receiver seeks to recover from winning investors under the actual fraud or constructive fraud theories generally does not impact the amount of recovery from innocent investors. Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, *including* amounts which could be considered "return of principal." However, there is a "good faith" defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay. *See*CAL. CIV. CODE § 3439.08(a); *Scholes,* 56 F.3d at 759;*Agritech,* 916 F.2d at 535.Under the construct-

ive fraud theory, the receiver may only recover "profits" above the initial outlay, unless the receiver can prove a lack of good faith, in which case the receiver may *also* recover the amounts that could be considered return of principal. CAL. CIV. CODE § 3439.08(d); *Scholes,* 56 F.3d at 757.The Seventh Circuit has suggested that the only practical distinction between these theories of recovery is the allocation of burdens of proof. *See id.* at 756-57.The parties do not dispute that Kowell acted with good faith at all times; therefore, the issue of who bears the burden of proof is not before us.[FN3]

> FN3. Similarly, because the parties do not dispute Kowell's good faith, we need not consider the precise definition of good faith. *Cf. Agritech,* 916 F.2d at 535-36 (stating that a Ponzi scheme investor claiming good faith must meet an objective standard, and possibly prove that a diligent inquiry would not have discovered the fraudulent purpose of the transfer, but declining to determine a precise definition of good faith).

B

Drawing from this theory, federal courts have generally followed a two-step process. First, to determine whether the investor is liable, courts use the so-called "netting rule." *See* Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers,* 72 AM. BANKR. L.J. 157, 168-69 (1998) (surveying federal district court and bankruptcy cases). Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. If the net is negative, the good faith investor is not liable because payments received in amounts less than the initial investment, being payments against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the good faith losing investor's as-yet unsatisfied restitution claim against the Ponzi scheme perpetrator, are not avoidable within the meaning of UFTA.[FN4] *See* CAL. CIV. CODE § 3439.04(a)(2) (holding that only payments made "[w]ithout receiving a reasonably equivalent value" are avoidable as fraudulent transfers); *United Energy,* 944 F.2d at 597 (holding there has been no fraudulent transfer to a good faith investor where a Ponzi scheme makes payments that total less than that investor's initial investment).[FN5]

> FN4. Under the actual fraud theory, the good faith losing investor is technically still liable even if his net transactions are negative, because even payments that total less than the amount of that investor's initial outlay were made "[w]ith actual intent to hinder, delay, or defraud [a] creditor of the debtor." CAL. CIV. CODE § 3439.04(a)(1). However, because of the "good faith" defense, that permits an innocent investor to retain funds up to the amount of the initial outlay, CAL. CIV. CODE § 3439.08(a), the good faith investor with a net loss will not face any actual liability.

> FN5. The application of the netting rule may be more complex in a case where the relationship between the investor and the Ponzi scheme perpetrator changes over time. *See, e.g., In re Lake States Commodities, Inc.,* 253 B.R. 866, 872 (Bankr.N.D.Ill.2000) (considering whether to permit netting of transactions from a period in which the defendant undisputably acted in good faith with transactions from a later period during which the defendant may have come to learn of the Ponzi scheme and then continued to invest, while lacking good faith, to keep the scheme afloat). The parties here do not dispute that Kowell acted with good faith at all times; we express no opinion on the application

of the netting rule in more complex cases.

Second, to determine the actual amount of liability, the court permits good faith investors to retain payments up to the amount invested, and requires disgorgement of only the "profits" paid to them by the Ponzi scheme. *See In re Lake States Commodities, Inc.,* 253 B.R. 866, 872 (Bankr.N.D.Ill.2000) (collecting cases). Payments of amounts up to the value of the initial investment are not, however, considered a "return of principal," because the initial payment is not considered a true investment. Rather, investors are permitted to retain these amounts because they have claims for restitution or recision against the debtor that operated the scheme up to the amount of the initial investment. Payments up to the amount of the initial investment are considered to be exchanged for "reasonably equivalent value," and thus not fraudulent, because they proportionally reduce the investors' rights to restitution. *United Energy,* 944 F.2d at 595. If investors receive more than they invested, "[p]ayments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity." *Lake States,* 253 B.R. at 872.

*6 Although all payments of fictitious profits are avoidable as fraudulent transfers, the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable. *Warfield v. Alaniz,* 453 F.Supp.2d 1118, 1131 (D.Ariz.2006) (holding that a court-appointed receiver could not base his claims under Arizona's UFTA on transfers that took place outside of the limitations period); *Neilson v. Union Bank of Cal., N.A.,* 290 F.Supp.2d 1101, 1145-46 (C.D.Cal.2003) (holding that plaintiffs could prevail if they could prove at trial that certain transfers made pursuant to a Ponzi scheme were made within the limitations period of California's UFTA). Once the district court has identified the avoidable transfers, it has the discretion to permit the receiver to recover pre-judgment interest on the fraudulent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transfers from the date each transfer was made. *In re Slatkin*, 525 F.3d at 820;*Agritech*, 916 F.2d at 541-42."[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."*In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir.1998).

IV

A

The district court applied the analysis described above. The Receiver filed suit against Kowell under both § 3439.04(a)(1) (actual fraud) and § 3439.04(a)(2) (constructive fraud). The claim under § 3439.04(a)(1) alleged that "[t]he payments made to Kowell by Wallenbrock were made with the actual intent to hinder, delay or defraud Wallenbrock's Noteholders," now the "creditors of Wallenbrock." The claim under § 3439.04(a)(2) alleged that" [t]he payments made to Kowell in excess of Kowell's Principal Investment were made without Kowell giving a reasonably equivalent value to Wallenbrock in exchange for the payments." The district court did not indicate under which theory it granted summary judgment for the Receiver, although it cited "actual fraud" cases. *See In re Cohen*, 199 B.R. 709, 717 (9th Cir.B.A.P.1996); *In re Slatkin*, 310 B.R. 740, 748-49 (C.D.Cal.2004). Because Kowell's good faith was not disputed, the district court could have granted summary judgment on either ground. There was no triable issue of fact that Wallenbrock was a Ponzi scheme, *see Wallenbrock*, 313 F .3d 532, or that payments made in furtherance of that scheme were fraudulent transfers. *See In re AFI Holdings*, 525 F.3d at 703-04.

The district court, to determine Kowell's liability, netted the amount Kowell received from Wallenbrock against his initial investment, finding that Kowell invested $22,858.92 and received $73,290.70, for a net profit of $50,431.78. In the alternative, the court noted that Kowell had admitted

in his own interrogatory answer that he paid taxes on approximately $50,000 in profits, which was sufficient to establish a net gain for purposes of proving liability under § 3439.04.

**\*7** Kowell argues that the district court erred in admitting the declaration and report of Samuel Biggs, the Receiver's accounting expert, to prove that Kowell netted $50,431.78, because the declaration and report lacked foundation. Kowell's claim fails because the declaration satisfies the requirements for foundation and expert opinion. *See*FED. R. EVID. 703, 705. Samuel Biggs is a certified public accountant, and his declaration and report were based on accounting records held by Wells Fargo Bank and one of the scheme perpetrators. More importantly, any error in admitting the Biggs declaration would have been harmless, because Kowell admitted in his own interrogatory that he received approximately $50,000 in net profits. The netting rule is used not to determine the amount of liability but rather the existence of liability; it requires only a positive net transaction with the Ponzi scheme. Thus, Kowell's admission that he netted $50,000 was sufficient to establish the existence of liability under § 3439.04.

The district court properly limited the Receiver's recovery to amounts transferred to Kowell within the statutory period. California's UFTA has its own associated statute of limitations. CAL. CIV. C ODE § 3439.09. An action under § 3439.04(a)(1), for actual fraud, must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."CAL. CIV. C ODE § 3439.09(a). An action under § 3439.04(a)(2), for constructive fraud, must be brought within four years after the transfer was made. CAL. CIV. CODE § 3439.09(b). The Receiver filed suit on November 30, 2004. The district court found Kowell liable only for payments received on December 20, 2000, June 19, 2001, and September 19, 2001, totaling $26,396.10. Thus, although Kowell actu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 8
--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363
**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

ally netted $50,431.78 in total, the district court entered judgment for $26,396.10, plus pre-judgment interest.

Kowell argues that the district court should have required the Receiver to trace the transfers and demonstrate whether the three payments within the statutory period were return of principal or profit. He argues that if some of the transfers from within the statutory period were returns of the principal which Kowell invested *before* the statutory period, these transfers would also fall outside of the statute of limitations. Kowell's proposed tracing requirement is unsupported by law and would be unmanageable in practice. We decline to require such tracing. As with the netting rule:

> [T]he trustee need not match up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers. This may be the only workable rule in the typical Ponzi scheme case, where documentation of transfers is less than complete, payments are sporadic and not always in accordance with the documentation of the investment, and neither the investor nor the debtor can recall precisely what the parties intended.

*8 *Lake States,* 253 B.R. at 872 (citation omitted). The district court may presume that the earliest payments received by the investor are payments against the investor's claim for restitution. Transfers in excess of that amount, made within the statute of limitations, are avoidable as fraudulent conveyances.

B

Kowell offers several theories as to why we should not permit courts to require innocent investors to disgorge net profits from a Ponzi scheme under UFTA. We address each in turn.

1

First, Kowell argues that UFTA was never intended to apply to innocent investors in a Ponzi scheme. To support his argument, he challenges that the text of the statute covers transfers between "debtors" and "creditors," not between early investors and later investors in the same enterprise. In the same vein, he argues that if all the investors in the scheme are "creditors" under UFTA, he should be considered a creditor as well, and not, as the receiver argues, a "transferee." In other words, Kowell argues that application of UFTA in the wake of a Ponzi scheme seems to necessitate that all investors in the scheme be deemed "creditors" but only some are deemed "transferees," but that nothing in the text of the statute dictates this result.

Kowell's claim fails because the terms of the statute are abstract in order to protect defrauded creditors, no matter what form a Ponzi scheme or other financial fraud might take. *See Agritech,* 916 F.2d at 534 (describing UFTA as one of "two overlapping bodies of law applicable to[a collapsed Ponzi scheme] which permit the trustee to recover"); *Lake States,* 253 B.R. at 871-872 (discussing numerous cases applying UFTA in the wake of a collapsed Ponzi scheme). Laws governing fraudulent transfer have existed for centuries, as codified (in terms remarkably similar to the current version of § 3439.04) in the Statute of 13 Elizabeth I. *See* An Act Against Fraudulent Deeds, Gifts, and Alienations, 1571, 13 Eliz. c. 5, s.2 (avoiding conveyances made with the "Purpose and Intent to delaye hynder or defraude Creditors"). In construing this early codification, an English court noted, "And because fraud and deceit abound in these days more than in former times, it was resolved in this case by the whole Court, that all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud."*Twyne's Case,* 76 Eng. Rep. 809, 815 (1601) (Star Chamber).

In this case, we need not construe the terms particularly broadly in order to see that they apply quite clearly to Kowell. As we discussed above, when Kowell and the other innocent victims gave money

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                      Page 9
--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363
**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

to Wallenbrock, they were not actually investors, but rather tort creditors with a fraud claim for restitution equal to the amount they gave. *See United Energy,* 944 F.2d at 595.At that point, Wallenbrock was in fact a "debtor," and Kowell and all other innocent investors were "creditors." *See*CAL. CIV. CODE § 3439.04(a). Wallenbrock then began making payments to Kowell, not because Kowell's money had actually been profitably invested, but because Wallenbrock had the "actual intent to hinder, delay, or defraud [the other tort] creditor[s]," i.e., the later victims of the scheme. CAL. CIV. CODE § 3439.04(a)(1). At the pointat which the payments to Kowell exceeded the amount of Kowell's claim for restitution, Kowell was no longer a creditor of Wallenbrock. His initial, fraudulently obtained payment had been restored. Thus, Kowell is incorrect when he argues that all innocent investors are similarly situated, and that if the losing investors are "creditors," then so is he. Once Kowell has regained his initial "investment," he is no longer a creditor-his claim has been repaid. The other victims who did not receive payments in excess of the initial amount they were fraudulently induced to put into the scheme are the "creditors" that UFTA protects.

2

**\*9** Second, Kowell argues that the federal securities laws preempt UFTA, and therefore, because the Wallenbrock "notes" have been deemed securities, the Receiver may only sue him for securities fraud, not for restitution as the recipient of a fraudulent transfer. Federal preemption may be express or implied. *See Montalvo v. Spirit Airlines,* 508 F.3d 464, 470 (9th Cir.2007). Kowell does not cite to any provision of federal securities laws that would demonstrate express preemption of state uniform fraudulent transfer law. Federal preemption may be implied through "conflict preemption," when a state law actually conflicts with, or poses an obstacle to the accomplishment of the purposes of, a federal law, or "field preemption," when a federal law so thoroughly occupies a legislative field that there is

no room for state action in that area. *See id.*Kowell does not suggest how the federal securities laws might conflict with, pose an obstacle to, or occupy the field of, state fraudulent transfer laws.[FN6]To the contrary, federal securities law expressly creates exclusive federal jurisdiction to permit enforcement of "*any* liability or duty" created by the Securities Act through "*all* suits in equity and actions at law" that may prove effective. 15 U.S.C. § 78aa (emphasis added).

> FN6. Kowell's reliance on *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350 (1991), and *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940 (9th Cir.2005), is misplaced. *Lampf* held that a private cause of action implied under Rule 10b-5 of the Securities Act must be brought under the Act's statute of limitation. 501 U.S. at 359.Preemption was not implicated. *Livid Holdings* addressed the effects of the Sarbanes-Oxley Act on *Lampf.* 416 F.3d at 950.

UFTA permits a receiver or trustee to further the purpose of many securities laws by providing recourse to defrauded debtors.[FN7]The fact that the initial perpetrator may have been found guilty for securities fraud does not mandate that actions brought against other participants sound in securities fraud. The actions against participants like Kowell are brought to "enforce [a] liability or duty" created by the securities laws.[FN8]

> FN7. Although in this case bankruptcy proceedings were not initiated, a common epilogue to a collapsed Ponzi scheme is a bankruptcy proceeding. Once in bankruptcy, federal law authorizes the trustee to bring suit under both applicable state law and also the fraudulent transfer provision of the bankruptcy code. *See*11 U.S.C. § 548 (the federal fraudulent transfer provision); 11 U.S.C. § 544(b) (authorizing the trustee to recover fraudulent transfers under § 548 and also applicable state law);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*United Energy,* 944 F.2d at 593-594 (applying both federal law and California's UFTA). Thus, not only do federal securities laws not preempt UFTA, but federal bankruptcy law expressly permits actions under UFTA. 11 U.S.C. § 544(b).

FN8. For the same reasons, we reject Kowell's argument that the statute of limitations found in the securities laws applies to his case. The fact that Wallenbrock was found guilty of securities fraud, aside from supporting federal jurisdiction in this ancillary proceeding, has no bearing on the case. The Receiver brought suit under California Civil Code § 3439.04, and that statute expressly provides a limitations period. CAL. CIV. CODE § 3439.09.

3

Third, Kowell argues that it is inequitable to apply UFTA to recover profits he received because he was an innocent victim of the Wallenbrock scheme, just like those whom UFTA purports to protect. We are aware that it may create a significant hardship when an innocent investor such as Kowell is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent.[FN9] Nevertheless, courts have long held that is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell. *See Scholes,* 56 F.3d at 757 ("[I]t may seem 'only fair' that [the early investor] should be entitled to the profits ... made with his money.... [However, h]e should not be permitted to benefit from a fraud at [later investors'] expense merely because he was not himself to blame for the fraud.").

FN9. The hardship visited on innocent investors who are later required to disgorge their profits has been widely reported as yet another common tragic result of a Ponzi scheme. *See, e.g.,* E. Scott Reckard,

*You Won, Now Give it Back,* L.A. TIMES, May 20, 2004, at A1.

Moreover, pursuant to UFTA, the Receiver is only entitled to recovery of the amounts above Kowell's initial investment transferred within the limitations period. Thus, the statute protects Kowell in two ways. It allows him to keep the full amount of his original investment, *see Scholes,* 56 F.3d at 757, and it shields those "profits" paid to Kowell for which the statute of limitations has run. According to the Receiver, in this case approximately 6,000 investors participated in the *Wallenbrock* Ponzi scheme, but only about 800 received back more than their initial investment. It is likely that many of the other 5,200 losing investors will see only a portion of their initial investment returned. *See* McDermott, *supra,* at 157-159 (explaining that assets recovered after a collapsed Ponzi scheme typically are insufficient to satisfy claims by defrauded investors). We see nothing inequitable in the effort to mitigate the losses suffered by other innocent investors.

4

**\*10** Fourth, Kowell argues that the Receiver does not have standing to bring this action against him. Ordinarily, he points out, a debtor does not have standing to avoid his own transactions. Similarly, he claims that the Receiver cannot represent the interests of all of the investors because Kowell himself is an investor as much as any other and yet his interests are adverse to those of the Receiver. The Seventh Circuit confronted similar arguments in *Scholes,* in which the defendants (winning investors) argued that the receiver did not have standing to sue them because he was "really" suing on behalf of the losing investors, as opposed to the corporation. 56 F.3d at 753. Under bankruptcy law, they argued, "a receiver does not have standing to sue on behalf of the creditors of the entity in receivership. Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity

in receivership...."*Id.*

*Scholes* held that, during the operation of the scheme, the corporations created by the scheme operator were "robotic tools" of the operator, but nonetheless separate legal entities in the eyes of the law that were forced (by the operator) to pay out funds to early investors instead of using the corporation's funds for legitimate investments. *Id.* at 754.Once the scheme collapsed, "[t]he appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the operator's] evil zombies. Freed from his spell they became entitled to the return of the moneys-for the benefit not of [the operator] but of innocent investors-that [the operator] had made the corporations divert to unauthorized purposes."*Id.* We agree with the Seventh Circuit's colorful analysis. The Receiver has standing to bring this suit because, although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud.

5

Fifth, Kowell argues that even if UFTA applies to this case, he should not be found liable because his initial investment provided "reasonably equivalent value" in exchange for the profits he earned in the scheme. *See*CAL. CIV. CODE § 3439.04(a)(2). Despite the intuitive appeal of Kowell's argument, we reject it by considering the economic exchange in a Ponzi scheme.

UFTA identifies an avoidable transfer as one made "[w]ithout receiving a reasonably equivalent value in exchange."CAL. CIV. CODE § 3439.04(a)(2). Unlike contract law, which requires only that "adequate" consideration be given, UFTA requires that, to escape avoidance, a transfer have been made for "reasonably equivalent value." The purpose is not to identify binding agreements, but to identify transfers made with no rational purpose except to avoid creditors. *See Scholes,* 56 F.3d at 756.

Payouts of "profits" made by Ponzi scheme operators are not payments of return on investment from an actual business venture. Rather, they are payments that deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture. *Id.* at 756-57.The appearance of a profitable business venture is used to convince early investors to "roll over" their investment instead of withdrawing it, and to convince new investors that the promised returns are guaranteed. *Cf. Agritech,* 916 F.2d at 537 ("[Defendant's] demand for payment explicitly stated that the payment would induce other investors to transfer funds into new partnerships [Defendant] was syndicating."). Up to the amount that "profit" payments return the innocent investor's initial outlay, these payments are settlements against the defrauded investor's restitution claim. Up to this amount, therefore, there is an exchange of "reasonably equivalent value" for the defrauded investor's outlay. Amounts above this, however, are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business. These amounts are not a "reasonably equivalent" exchange for the defrauded investor's initial outlay.

*11 In this case, Kowell never actually possessed an interest in a company purchasing account receivables from Malaysian glove manufacturers. The investment strategy promised by Wallenbrock's officers was a lie to induce Kowell and investors like him to fund Wallenbrock. What Wallenbrock did was return to Kowell his own money, plus money from subsequent "investors," to persuade Kowell to continue to invest and to secure testimonial evidence from people like Kowell to induce others to invest. Although Kowell was putting real money into Wallenbrock, and was getting what looked like real profits in return, in fact he never received "reasonably equivalent value" for his investment, just cash that was moved around in an elaborate shell game.

V

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Kowell argues that even if he is liable to return amounts in excess of his initial outlay, he should be permitted to offset this liability by amounts paid as income taxes on those gains, bank transfer fees, and other expenses. Kowell argues that unless these offsets are permitted, he will be forced to pay back more money than he actually netted from his participation in the scheme. He argues that UFTA should not be applied so as to aid other investors in recovering the full amount of their outlay by forcing Kowell to retain less than the full amount of his outlay. Kowell cites no authority to support his position. The cases cited by the Receiver, however, do not guide us to the contrary conclusion.

In *In re Tiger Petroleum Company,* the trustee attempted to classify certain "investors" who did not actually receive payments for amounts greater than their initial investments liable as net-gain investors under the netting rule through the novel argument that tax benefits those investors received due to participation in the scheme should be added into the calculation of their gains. 319 B.R. 225, 238-39 (Bankr.N.D.Okla.2004). The bankruptcy court rejected the trustee's argument because adopting it might lead to inequitable results, and could also require courts to consider even more creative claims as to what "value" investors received. *Id.* Also, tax benefits were transfers of value from the federal government, not from the debtor. *Id. In re Tiger Petroleum* says nothing about whether an innocent winning investor may offset his liability under UFTA for amounts that have been used in good faith to pay income taxes on his gains.

The Receiver also quotes *In re Acequia, Inc.* for the proposition that "[a] fraudulent conveyance cannot be offset against or exchanged for a general unsecured claim."34 F.3d 800, 817 (9th Cir.1994) (internal quotation and citation omitted). This quote is taken out of context. In *In re Acequia,* we stated that a fraudulent conveyance cannot be offset against a general unsecured claim *against the debtor.*In other words, under *In re Acequia,* an investor like Kowell could not offset his liability to the Re-

ceiver for amounts in excess of his initial outlay with an alleged claim against Wallenbrock. The principle behind this is apparent: permitting each winning investor to offset his profits by a claim against the debtor would defeat UFTA entirely. *Id.* ("It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor]." (internal quotations and citation omitted) (alterations in original)). This case says nothing about whether an innocent winning investor may seek an offset against his liability to the receiver for amounts paid in good faith as taxes on his gains.

**\*12** Kowell's argument does merit consideration. The purpose of UFTA is to permit the receiver to collect those assets that can actually be located and recovered in the wake of a Ponzi scheme, and to ratably distribute those assets among all participants, including the many investors who lost everything. UFTA accomplishes this by requiring good faith participants to disgorge their gains and permitting them keep the full amount of their initial investment. *See Scholes,* 56 F.3d at 757-58.Prohibiting good faith investors from claiming offsets for amounts that were paid in good faith as taxes will mean that some investors, like Kowell, will actually not be permitted to retain the full amount of their investment. Kowell argues this exceeds the policy goal of UFTA.

Nevertheless, three factors lead us to decline to permit good faith investors to claim offsets for taxes or other expenses paid in connection with receipt and management of income from a Ponzi scheme. First, as Kowell's argument suggests, if we permit offsets for taxes, logic suggests we should also permit offsets for bank transfer fees and other fund management fees. There would also be no reason to prohibit offsets for the other countless expenses Kowell has incurred. There is simply no principle by which to limit such offsets; one could argue that every purchase made with the gains from the scheme

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 13

--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363

**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**

would not have been made "but for" receipt of that money. If each net winner could shield his gains in their entirety in this manner, the purpose of UFTA would be defeated, and the multitude of victims who lost their entire investment would receive no recovery.

Second, even if we could limit permissible offsets to a few areas such as taxes paid, this would introduce complex problems of proof and tracing into each case. This would severely reduce the receiver's ability to effectively gather what few assets can be located in the wake of a failed Ponzi scheme. In addition, were we to adopt a tax offset, the amount of the offset would depend on Kowell's tax bracket. Thus, two Wallenbrock investors, having made identical payments and having received identical returns, might receive different tax offsets because of their other financial decisions. Third, we cannot discern the equity in permitting an offset here, when any taxpaid credit offered to Kowell must come at the expense of other Wallenbrock investors. The Internal Revenue Service is not a party to this suit, and the disappointed investors have no cause of action to recover those monies from the IRS.

We thus decline to start down a path we do not recognize. There is no basis in UFTA for Kowell's offset. Accordingly, Kowell is not entitled in this action to offset his liability to the Receiver by the taxes (or other expenses) he paid on his Wallenbrock "profits." If Kowell believes he overpaid his taxes for the years he received Wallenbrock "profits," he may wish to pursue his remedies with the IRS.

VI

Ponzi schemes leave no true winners once the scheme collapses-even the winners were defrauded, because their returns were illusory. Those who receive gains from innocent participation in the scheme may be required to disgorge those amounts, long after the money has been spent. Addressing

the victims of the original Ponzi scheme, the Supreme Court commented that "[i]t is a case the circumstances of which call strongly for the principle that equality is equity."*Cunningham v. Brown,* 265 U.S. 1, 13 (1924). In this case, then, equity compels that Kowell share some of the hardship equally with those who lost their initial investment.

*13 California's Uniform Fraudulent Transfer Act has treated Kowell fairly. Indeed, Kowell actually benefitted from the equitable concerns embodied in UFTA. Kowell "invested" $22,858.92 into the scheme; Wallenbrock made payments to Kowell (including the return of his initial "investment") totaling $73,290.70. The Receiver's original demand letter inaccurately informed Kowell that he owed $69,546.70, and tried to pressure him to mail a check for 90 percent of that amount, or $62,592.03, within 20 days or face consequences. Because Kowell did not succumb to these tactics and instead sought protection in federal court, the Receiver was forced to concede that Kowell netted only $50,431.78. Further, the applicable statute of limitations limited Kowell's actual liability to $26,396.10, plus pre-judgment interest of $5,159.22, for a total liability of $31,555.32.

Thus, comparing the total he received, $73,290.70, with the amount he must return, $31,555.32, shows that Kowell will be permitted to retain $41,735.38 of the monies Wallenbrock paid him-for a net gain of $18,876.46 on his initial investment of $22,858.92 (calculated as $41,735.38 - $22,858.92). This represents a total return of approximately 83 percent on his investment, or, an annualized return, over the period of investment from 1997 to 2001, of approximately 16 percent.

Most of the scheme's 5,200 net losers are likely to recover only pennies on the dollar of their initial investment.

The judgment is **AFFIRMED.**

C.A.9 (Cal.),2008.
Donell v. Kowell

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08 Cal. Daily Op. Serv. 8363
**(Cite as: --- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)))**


--- F.3d ----, 2008 WL 2579200 (C.A.9 (Cal.)), 08
Cal. Daily Op. Serv. 8363

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.))**

▷
S.E.C. v. Cook
N.D.Tex.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Benjamin Franklin COOK, et al., Defendants,
andFPC-1 LIMITED PARTNERSHIP, et al., Defendants Solely for Purposes of Equitable Relief
Lawrence J. WARFIELD, As Receiver for Dennel
Finance Limited Petitioner,
v.
Craig BOONE, Rhonda Boone, Ronald Berglund,
Marlene Berglund, Otto Jarrell, Merlin Saunders,
William Whelan, and Cindy Kay Whelan, Respondents.
No. CA 3:00-CV-272-R.

March 8, 2001.

*MEMORANDUM OPINION AND ORDER*

BUCHMEYER, Chief J.
*1 Before this Court are the Receiver's Motion for Partial Summary Judgment Against Ronald Berglund (the "Receiver's Motion"), filed December 29, 2000 and Respondent Ronald Berglund's ("Berglund") Cross Motion for Partial Summary Judgment (the "Cross Motion"), filed January 16, 2001. For the reasons stated below, the Receiver's Motion is GRANTED and Berglund's Cross Motion is DISMISSED AS MOOT.

I. BACKGROUND

This case centers upon an investment program titled Dennel Finance Limited ("Dennel"), which was operated by Benjamin Cook and others (the "Defendants") for the sole purpose of conducting a Ponzi scheme.[FN1] Under the scheme, the Defend-

ants collected over $45,000,000, most of which they used to pay returns to earlier investors, to pay commissions to facilitators for recruiting investors, and to purchase personal property and cover personal expenses for themselves.

> FN1. A Ponzi scheme is a fraudulent investment scheme where money from new investors is used to pay "profits" on the money contributed by earlier investors, without the operation of an actual revenue-producing business other than the raising of new funds by finding more investors. The scheme is named for Charles Ponzi, who was convicted for perpetrating such schemes in the 1920's. Black's Law Dictionary 1180 (7th Ed.1999).

Berglund worked as a facilitator recruiting new investors for Dennel. The Receiver has alleged that Berglund received a total of $334,982.53 in commissions from Dennel, a fact that Berglund does not dispute.

On March 16, 1999, in Civil Action Number 3:99-cv-0571-R, this Court entered an Order Appointing Temporary Receiver in which the Receiver was appointed for the purpose of collecting, receiving and taking custody of the assets of Dennel. The Receiver was further authorized to initiate lawsuits to recover such assets. On January 31, 2000, this Court entered an Order authorizing the present suit against Berglund and others to seek the recovery of receivership assets.

The Receiver's Motion is based on the claim that the commissions paid to Berglund by Dennel were in fact fraudulent transfers and, as such, Berglund should be forced to return all monies that he received from Dennel. Berglund bases his Cross Motion on all remaining claims that the Receiver has asserted against him. Because the Receiver has agreed to abandon the claims addressed in Berglund's Cross Motion should the Receiver's Motion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 2
Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.))**

be granted, the Court will consider the Receiver's Motion first.

## II. ANALYSIS OF THE RECEIVER'S MOTION

### 1. Summary Judgment Standard

"Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, 'there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." ' *Wilson Industries, Inc., v. Aviva America, Inc .,* 185 F.3d 492, 494 (5th Cir.1999)(quoting *Amburgey v. Corhart Refactories Corp.,* 936 F.2d 805, 809 (5th Cir.1991)); Fed.R.Civ.P. 56(c). However, all reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion. See*Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 640 (5th Cir.1985). Furthermore, as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied. See*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986); *Coke v. General Adjustments Bureau,* 640 F.2d 584, 595 (5th Cir.1981)(en banc).

**\*2** The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. See*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a claim upon which summary judgment is sought, the moving party may discharge its summary judgment burden by showing that "there is an absence of evidence to support the nonmoving party's case."*Id .* at 325.Once the moving party satisfies this burden, the nonmoving party may then oppose the motion by going "beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designat[ing] 'specific facts showing that there is a genu-

ine issue for trial." ' *Id.* at 324;*Anderson,* 477 U.S. at 256. Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex,* 477 U.S. at 322.

### 2. Standing of the Receiver

In this Court's Order Appointing Temporary Receiver, filed March 16, 1999, the Court authorized the Receiver to "institute, defend, compromise or adjust such actions or proceedings in state or federal courts ... as may in [the Receiver's] discretion be advisable or proper for the protection of the Receivership Assets ... [or] for the collection, preservation and maintenance of the Receivership Assets."Pursuant to the authority granted to him by this Order, the Receiver alleges that the payment of commissions to Berglund constituted avoidable fraudulent transfers under the Uniform Fraudulent Transfer Act ("UFTA").

Bergland challenges the right of the Receiver to avoid fraudulent transfers made by Dennel in this case because the UFTA creates a right in creditors to avoid fraudulent transfers made by a debtor. Berglund argues correctly that the Receiver stands in the shoes of Dennel. He goes on to assert that because Dennel is not a creditor, but is rather the debtor in this case, the Receiver does not have standing to sue under the UFTA.

However, a receiver represents not only the entity in receivership, but also the interests of its creditors. See*Camerer v. California Sav. & Commercial Bank of San Diego,* 4 Cal .2d 159, 170 (1935); *see also*66 Am.Jur.2d *Receivers* § 450 (1973). After all, the very purpose of receivership is to secure the assets of the corporation for ultimate payment to the creditors. 66 Am.Jur.2d *Receivers* § 450. Further, while the general rule is that the receiver may only bring actions that could have been brought by the entity in receivership, "there are certain situations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.))**

where the receiver is permitted to assert rights and defenses not available to the insolvent."*Butcher v. Howard*, 715 S.W.2d 601, 604 (Tenn.App.1986)(quoting *Camerer*, 4 Cal.2d at 170). Thus, while the debtor would not be entitled to "set aside a transfer in fraud of his creditors ... the receiver acting for the creditors may attack it."*Id;see also*66 Am.Jur.2d *Receivers* § 450. Given the foregoing exception, the Court holds that the Receiver has standing to sue to avoid fraudulent transfers on behalf of the creditors of Dennel.

### 3. The UFTA

**\*3** Under the UFTA, a debtor makes a fraudulent transfer if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor ..." Tex. Bus. & Com. Ann. § 24.005 (Vernon 1987). Whether the debtor made the transfer with the requisite intent may be determined by considering a non-exhaustive list of factors, or "badges of fraud." [FN2]*Id.* However, in the case of a Ponzi scheme, many courts have found that the debtor's intent to hinder, delay or defraud is established by the mere existence of the Ponzi scheme. *E.g.,In re Independent Clearing House Co.*, 77 B.R. 843 (Bankr.D.Utah 1987)(finding the requisite intent to defraud from the fact that the debtor must have known that the Ponzi scheme would inevitably collapse and that later investors to the scheme would lose their investments when the collapse occurred); *see also,In re Ramirez Rodriguez*, 209 B.R. 424, 434 (Bankr.S.D.Tex.1997)(holding that, as a matter of law, payments of commissions and profits in a Ponzi scheme constituted transfers made with actual intent to hinder, delay or defraud).

> FN2. For instance, the court can consider whether the transfer was made to an insider, the transfer was concealed, or the debtor was or quickly became insolvent when the transfer was made.

The intent of the person running a Ponzi scheme when he makes large payments of money to investors or to brokers who bring in more investors is to keep the scheme going. The debtor knows to a substantial certainty that the scheme cannot go on forever and later investors will eventually lose. Thus, when he takes incoming funds and transfers them to early investors and brokers, he is making such transfers with the actual intent to hinder, delay or defraud later investors and creditors.

There is no issue of material fact with regard to whether Dennel was in fact a Ponzi scheme because Berglund does not dispute that the Receiver has substantially established this by his affidavit. Therefore, because Dennel was a Ponzi scheme, as a matter of law the commissions paid to Berglund were made with the intent to hinder, delay or defraud the creditors of Dennel. As such, they are fraudulent transfers that are voidable under the UFTA. Tex. Bus. & Com. Ann. § 24.008.

### A. Good Faith and Reasonably Equivalent Value

Berglund argues that there are material questions of fact regarding whether the commission payments he received from Dennel were made for reasonably equivalent value. An otherwise fraudulent transfer is not voidable against a person who takes "in good faith and for reasonably equivalent value."*Id.* at § 24.009.

The language of section 24.009 creates a conjunctive test for determining whether the "good faith and reasonably equivalent value defense" is available to a transferee. Thus, to successfully raise this defense to the voidability of a fraudulent transfer, a party must show that the transfer was taken both in good faith *and* for reasonably equivalent value. Thus, Berglund must show that there are material questions of fact regarding whether he acted in good faith and whether he provided reasonably equivalent value to Dennel in exchange for the commission payments.

### 1. Good Faith

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)

**(Cite as: Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.))**

*\*4* The issue of good faith is a "defensive matter as to which the defendants asserting the existence of good faith have the burden of proof."*Cohen v. Pomona Valley Imports, Inc.,* 199 B.R. 709, 718 (B.A.P. 9th Cir.1996)(discussing UFTA § 8(a) which is identical to § 24.009); *see also*In re Agricultural Research & Technology Group, Inc.,* 916 F.2d 528, 535 (9th Cir.1990)(explaining that the burden of establishing good faith falls upon the party asserting the defense)."One lacks the good faith that is essential to the UFTA § 8(a) defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction."*Cohen,* 199 B.R. at 719.

Berglund asserts that the Receiver has presented no evidence that Berglund "acted in concert with Cook or other principals of Dennel."Berglund Response at 4. However, it is not the Receiver's burden to show this. The Receiver has proven that the transfers were fraudulently made. If Berglund wishes to raise section 24.009 as a defense he may do so, but the burden falls on him to present facts that support it.

Unfortunately for Berglund, he has failed to present any evidence that he acted in good faith. For that matter, he has not presented any evidence regarding his state of mind at all. Berglund has taken the Fifth Amendment and chosen not to answer any questions regarding his involvement in or his knowledge about Dennel. The Court has no way of knowing whether Berglund should have been induced "to inquire further about the transaction" because he has presented no evidence about what he knew or did not know about Dennel.[FN3]Based on the lack of evidence that Berglund has presented, no reasonable jury could find that Berglund acted in good faith because he has presented absolutely no evidence that he did so.[FN4]Thus, Berglund has failed to allege sufficient facts which create a triable issue of fact regarding whether he is entitled to the good faith and reasonably equivalent value defense to the voidability of an otherwise fraudulent transfer.

FN3. The Court notes that Berglund has referred to the deposition of Bill Whelan as support for the proposition that Berglund himself was not aware that Dennel was operating as a Ponzi scheme. However, the Court fails to see how the testimony of another individual provides any relevant evidence regarding whether or not Berglund himself was acting in good faith when he accepted the commission payments from Dennel. Such evidence is irrelevant to the present inquiry, which is whether Berglund acted in good faith, given the knowledge available to *him* at the time he accepted the transfers.

FN4. The Court further notes that both the Court and a potential jury are entitled to draw an adverse inference from the fact that Berglund has asserted his Fifth Amendment rights in a civil case. *Baxter v. Palmigiano,* 425 U.S. 308 (1976). Thus, not only has Berglund failed to produce evidence that he acted in good faith, he has also failed to attempt to rebut the negative inference raised by his assertion of the Fifth Amendment.

2. Reasonably Equivalent Value

Section 24.009 requires *both* good faith *and* reasonably equivalent value. Because Berglund has failed to raise a material question of fact regarding whether he acted in good faith in accepting the fraudulent transfers, there is no need to consider whether he gave reasonably equivalent value. He has failed to meet his burden in presenting section 24.009 as a defense to the avoidability of the fraudulent transfers made to him by Dennel. Thus, the Court finds that the commissions paid to Berglund were fraudulent transfers, which are voidable by the Receiver as Berglund has failed to meet his burden in presenting a defense.

III. ANALYSIS OF THE CROSS MOTION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.))

On January 16, 2001, Berglund filed his Cross Motion for summary judgment on all of the Receiver's remaining claims against him. In the Receiver's Response to the Cross Motion, the Receiver states that he will not pursue the remaining claims against Berglund, should the Receiver's Motion for Summary be granted. Because the Court has determined that the Receiver's Motion should be granted, the Court also holds that Berglund's Cross Motion for Summary Judgment be dismissed as moot, as the Receiver has agreed to abandon his remaining claims against Berglund.

IV. Conclusion

*5 For the reasons stated above, the Receiver's Motion is GRANTED and Berglund's Cross Motion is DISMISSED AS MOOT.

It is so ORDERED.

N.D.Tex.,2001.
S.E.C. v. Cook
Not Reported in F.Supp.2d, 2001 WL 256172 (N.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                            Page 1
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

**C**
Warfield v. Carnie
N.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas,Dallas Division.
Lawrence J. WARFIELD, as the Receiver for Resource Development International, Plaintiff,
v.
George M. CARNIE, et al., Defendants.
**Civil Action No. 3:04-cv-633-R.**

April 13, 2007.

Kelly M. Crawford, Charlene Cantrell Koonce, Scheef & Stone, Dallas, TX, for Plaintiff.
John M. Frick, Law Office of John M. Frick, Richardson, TX, Derrick J. Hahn, Robert J. Andreotti, Hahn Law Firm, Dallas, TX, for Defendants.

*MEMORANDUM OPINION*

JERRY BUCHMEYER, United States District Court Judge.
**\*1** Now before the Court are Plaintiff Lawrence Warfield's Motion for Partial Summary Judgment against Richard Danesi (both individually and d/b/a Ai-Ki International Establishment) and Ai-Ki International Establishment (Ai-Ki) (Dkt. No. 159), Plaintiff's Motion for Partial Summary Judgment against George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine (Dkt. No. 224), and Defendants George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine's Motion for Summary Judgment against Plaintiff (Dkt. No. 224). Having reviewed the motions, the related submissions, the evidence presented to the Court, and the applicable law, the Court GRANTS the Receiver's Motions for Partial Summary Judgment and DENIES Defendants George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine's Motion for Summary Judgment.

**I. BACKGROUND**

This case arises out of an earlier-filed lawsuit that is currently pending before this Court entitled *SEC v. Resource Development International*, Civ. No. 3:02-cv-605-R (the RDI case). In the RDI case, the Securities and Exchange Commission (SEC) is prosecuting several individuals and entities for allegedly operating a fraudulent "prime bank" securities scheme known as the Resource Development International Trading Program (RDI). The SEC alleges that the RDI program functioned as a fraudulent "Ponzi scheme" and not as a legitimate investment program. Shortly after the RDI case was filed, the Court appointed Lawrence J. Warfield to serve as Receiver for RDI and its affiliated entities. Pursuant to the order governing his appointment, Warfield has filed this case, *Warfield v. Carnie*, to recover RDI assets that he has traced to several individuals during his investigation of how RDI's assets were disposed.

The claims at issue in the motions pending before the Court depend, in part, on the RDI program's specific characteristics and a history of the litigation. To put these motions in perspective, the Court will briefly summarize the history of the RDI case and the context in which this case arises.

**A. The RDI Case**

The RDI program was a fraudulent prime bank financial investment program that was masterminded for over two years by David Edwards and his father, James Edwards. The RDI program arose from an earlier Ponzi scheme known as Dennel Finance Limited (Dennel), which was created and directed by Benjamin Franklin Cook. In March 1999, the SEC shut down the Dennel program after filing suit against Cook and his affiliates for securities fraud. That case, *SEC v. Cook,* was also heard by this Court.[FN1]

    FN1. This Court also presided over the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

SEC's successful prosecution of the operators and facilitators of the Dennel program. *See SEC v.Cook, et al.* (Civil No. 3:99-cv-571-R). In addition, the Court also oversaw the appointed receiver's attempt to recover receivership assets from various defendants, participants, and other persons designated as defendants for the purpose of equitable relief.

After the Dennel program was shut-down, the Edwardses and others began selling investments in RDI, their own trading program. Acting through another entity named Pacific International Limited Partnership (PILP), the Edwardses fraudulently collected millions of dollars from investors, which they, in turn, placed with the fraudulent Dennel program. From approximately January 1999 until at least September 2001, RDI collected more than $73 million from more than 1,300 investors from at least 34 different states.

**\*2** The Edwardses conducted the RDI prime bank scheme, in part, to raise money to repay certain Dennel investors, including several investors whose funds they had personally solicited. Additionally, the Edwardses used an entity they owned and controlled, Sound Financial Services, Inc., to disburse substantial amounts of RDI funds to investors in other unrelated failed ventures.

After repaying investors in both the Dennel scheme and unrelated ventures, the Edwardses continued to operate the RDI program. Like the Dennel Program, the Edwardses required more and more investors to keep the RDI scheme afloat. They and their sales people, known as facilitators, lured funds from investors by falsely promising to facilitate lucrative-yet completely secure-transactions in foreign prime bank securities. In reality, the type of investment program described to RDI investors never existed and the payments that investors received were nothing more than funds provided by new investors.

Once the Edwardses learned the SEC had shut

down Dennel and was investigating the RDI program, they moved their primary accounts for the RDI program offshore to the Bank of Nevis International, Ltd. (Bank of Nevis). There, they opened offshore accounts in the name of Jade Asset Management, Inc. (Jade) and arranged for many of their RDI facilitators to also set up offshore accounts at the Bank of Nevis so that their "commissions" could be easily transferred between accounts. The Edwardses recruited their friend Edward Harris FN2 to serve as the President of Jade and make the wire transfers of hundreds of thousands of dollars from the Bank of Nevis.

> FN2. Harris had previously helped the Edwardses collect millions of dollars from investors for the Dennel scheme through PILP.

Ultimately, the RDI program became too large and collapsed when the Edwardses could no longer pay the returns that they promised to investors or the enormous commissions promised to the investment facilitators. At first, payments to investors became sporadic, but then ceased altogether.

**B. Warfield's Appointment as Receiver for RDI**

On March 25, 2002, the Court appointed Warfield as temporary receiver for all defendants in the RDI case. Shortly thereafter, the Court entered a preliminary injunction that, in part, continued the RDI receivership under Warfield. The Court's order authorizes Warfield to collect, receive, and take possession, custody, or control of RDI's assets and the assets of its affiliated entities.

To determine how receivership assets were disposed, each Defendant in the RDI case was ordered to prepare an accounting of funds paid to and received from RDI. The Defendants who refused to comply with these directives were found to be in contempt of court and were incarcerated until they complied with the order.

Immediately after the Receiver seized the RDI of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

Page 3

fice, David Edwards and Edward Harris broke into the office and removed an unknown number of boxes, thereby concealing potentially thousands of transactions, as well as the identity of persons against whom the Receivership held potential claims.

**\*3** Approximately one month after his appointment, the Receiver began issuing subpoenas to various financial institutions to obtain records related to accounts that either transferred to or received funds from known accounts operated by the Defendants. The process is expensive, since the Receiver is required to pay each bank's expenses related to gathering and producing copies of all requested documents, but absolutely essential to discovery of persons holding receivership assets. Subpoenas were issued beginning in May 2002. As of July 7, 2005, subpoenas had been served on not less than 24 banks, 4 credit unions and 4 other types of financial institutions, related to more than 220 different accounts and approximately 1,300 investors, as well as each of the receivership entities and relief defendants. With respect to these records, the Receiver and his staff have analyzed not less than 32,500 banking transactions to determine who received fraudulent transfers in excess of any investment made in any receivership entity.

The process of reviewing the documents requires the Receiver and his staff to evaluate tens of thousands of pages of banking records to determine whether any particular account or individual received more than invested, whether the account was held in a trade name, whether the account was connected to or transacted with other, previously unknown, persons or accounts, the manner in which checks were endorsed, persons listed on signature cards, etc. Information related to every transfer to or from an account owned by a receivership entity was entered into a computer for cross-referencing with information about recipient accounts. Review of the information requires an ongoing evaluation, but nonetheless, allowed the Receiver to identify many persons who have been unjustly enriched by

their receipt of receivership assets. As late as March 2004, while continuing his analysis regarding the tens of thousands of transactions between the receivership entities and third parties, the Receiver identified an additional 340 persons who received a net benefit from the receivership entities at the expense of the RDI program investors.

Through forensic accounting, the Receiver has reconstructed the RDI program's operations and determined that the organization received $73.6 million from investors. Of this amount, approximately $31 million was paid to investors and $30.6 million was paid to facilitators. Approximately $5.3 million was used by the Edwardses to pay people who had invested with them in failed ventures preceding the RDI Trading Program.

**C. This lawsuit: *Warfield v. Carnie, et al.* (No. 3:04-cv-633-R)**

On March 25, 2004, the Receiver filed this lawsuit against defendants who, he claims, either facilitated investments in the RDI program, received transfers from the receivership entities as "repayments" for investments in unrelated payphone ventures, or otherwise received "false profits" from the receivership entities.

**\*4** The Receiver alleges that, beginning in 1999, the Edwardses provided George Carnie and other Defendants with informational materials about RDI. Carnie and other Defendants later used those materials to solicit new investors into the program. During these solicitations, Carnie and others promised prospective investors astronomical, riskless returns on their investments in the range of 24%-120% per year.

Warfield alleges that Defendants disseminated information and solicited investors in furtherance of the RDI Ponzi scheme. He also alleges that Defendants received investor funds totaling at least $2,548,000. Those funds allegedly constitute receivership assets which are subject to the jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

tion and control of this Court. The Receiver seeks to recover investor monies from Defendants under theories of fraudulent transfer, conversion, civil conspiracy, breach of fiduciary duty, fraud, negligent misrepresentation, and violations of federal securities laws.

The Receiver moves for partial summary judgment against Richard Danesi (individually and d/b/a Ai-Ki International Establishment) and Ai-Ki International Establishment (the Danesi Defendants) on fraudulent transfer and unjust enrichment claims. The Receiver also moves for summary judgment on the Danesi Defendants' affirmative defenses of limitations and laches.

The Receiver moves for partial summary judgment against George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine (collectively the Carnie Defendants) on fraudulent transfer, unjust enrichment, and alter ego claims. In addition, the Receiver also moves for summary judgment on the Carnie Defendants' affirmative defenses of statutes of limitations, waiver, estoppel, ratification, fraudulent inducement, negligence, set-off, proportionate responsibility, and absence of an indispensable party. The Carnie Defendants have filed a cross motion for summary judgment on their claim that the Receiver's action is barred by limitations and that the payments made by the receivership entities to the Carnies and Sandaines were taken in good faith and for reasonably equivalent value.

**D. Undisputed Facts**

**1. The Danesi Defendants**

In February 1999, Danesi traveled to Liechtenstein and formed Ai-Ki. Danesi admits that he had sole, exclusive control over Ai-Ki and that there was "no stock or anything like that in the corporation."As the company's president, Danesi had the authority to transfer assets from Ai-Ki.

By his own admission, Danesi served as an

"intermediary" for the RDI program, connecting people who had money with people who were interested in using the money for a "best efforts program." It was in this capacity that he approached David Edwards in the summer of 1999 about an investment opportunity. According to Danesi, he and Edwards negotiated for Edwards to transfer funds to him for investment. By mid-July 1999, he and Edwards had executed various agreements to this effect, which authorized Danesi to invest the money that Edwards agreed to send him. Danesi maintains that one of his agreements with Edwards permitted him to pay his travel expenses and administrative services from the money invested.

*5 In reality, Danesi conned the Edwardses into believing that he was promoting a legitimate investment program. Danesi admits that he never had personal knowledge of the legality or legitimacy of any program that he promoted to prospective investors. He also admits that he did not conduct any due diligence on any of these programs to determine whether they were legitimate investment opportunities.

The Danesi Defendants received a considerable amount of assets from RDI for investment in the program that Danesi had marketed to the Edwardses. Danesi and Ai-Ki admit that on July 22, 1999, they received a $300,000 wire transfer into Ai-Ki's account at LGT Bank in Liechtenstein from RDI's U.S. Bank account in Carson City, Nevada. However, this money was not invested as promised. Instead, Ai-Ki, through Danesi, transferred the money into another account under Danesi's control in The Netherlands.

The evidence submitted to the Court further reveals that Danesi received an additional $2,500,000 through two subsequent transfers from RDI. The first transfer occurred on September 27, 1999. On that day, Jade transferred $1,000,000 from its Bank of Nevis account to Danesi's ABN-Amro account. The second transfer occurred on November 12, 1999. That day, Jade transferred an additional $1,500,000 from its Bank of Nevis account to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

Danesi's ABN-Amro account.

After these transfers were made, Danesi represented to RDI and Jade that the money had been invested and had earned as much as 182% in returns, even though he never made any investment with the funds that were entrusted to him. In December 1999, Danesi remitted $999,984.50 in illusory "returns" from his ABN-Amro account to Jade's account at the Bank of Nevis. Danesi did not remit any further funds to RDI, leaving him in possession of a net amount of $1,800,015.50 in receivership assets.

**2. The Carnie Defendants: George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine**

Sometime in early 1998, George Carnie approached Larry Johnson, a facilitator of the Dennel scheme, for investment advice. Johnson recommended PILP as a lucrative opportunity and spoke to Carnie at length about the program. Johnson also provided Carnie with a standardized packet of contract forms that he needed to complete before making the investment. Although Carnie claims that he conducted his own independent research into the Edwardses and PILP, he maintains that he never understood how the investment program worked. Nevertheless, Carnie made an initial investment of $150,000 into PILP in May 1998, and made several additional investments into the program over a span of two years. Carnie's daughter, Laurie Sandaine, also invested $120,000 in PILP in 1998.[FN3]

> FN3. Like her father, Lorie Sandaine also met with Johnson and completed the standardized documentation for her $120,000 investment in PILP. She claims to have included her husband's name on the documents because Washington is a community property state. Her father arranged for a wire transfer of $120,000 to PILP through an intermediary trust established on behalf Laurie Sandaine and her husband, Randy

Sandaine. According to the Carnie Defendants, this investment was an early payout on property that both families owned jointly and intended to sell.

As stated previously, PILP operated in conjunction with Dennel until the SEC shut down the Dennel program in March 1999. Accounting records corroborate this and reveal that the investments made by the Carnies and Sandaines before March 1999 were forwarded to Dennel. Those records also reveal that Carnie and the Sandaines received substantial monetary distributions from Dennel through PILP as returns on their investments.

*6 Carnie continued investing with the Edwardses even after Dennel was shut down. The Edwards's new program, RDI, required investors to establish offshore accounts as repositories for monetary transfers. Consequently, Carnie (with Johnson's assistance) formed an offshore corporation named Aruca, Inc., in the State of Nevis, the Federation of Saint Kitts and Nevis. Carnie then opened two bank accounts in Aruca's name at the Bank of Nevis. Records from the Bank of Nevis reveal that Aruca received assets from Jade (as "returns" on Carnie's RDI investments) and from an offshore corporation named Kelp.

By his own admission, Carnie claimed only a 9% interest in Aruca "for tax purposes," but asserts that he was the only owner of Aruca that ever deposited or received money from Aruca's bank accounts. Records from the Bank of Nevis confirm that Carnie exercised total control over all assets that Aruca received.

Meanwhile, Carnie set up a Nevada corporation called Roja, Inc., in order to receive assets from Aruca. Carnie and his wife, Deanna Carnie, were the only signatories on Roja's bank accounts. Carnie admits that one of the reasons for establishing Roja was to protect his assets from lawsuits. Aruca's bank records reveal that Carnie did in fact transfer assets from Aruca to Roja.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)

(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

After conducting a comprehensive forensic accounting of financial records made available to him, the Receiver and his accountants have concluded that George and Deanna Carnie invested $1,145,000 into the RDI program through various receivership entities and received a total return of $2,262,761.33. Additionally, the Receiver has found that the Sandaines received $184,000 from Receivership entities even though they never personally invested anything in the RDI program. Based on these figures, the Receiver contends that the Carnies received $1,117,761.33 in excess of their RDI investments, and the Sandaines received $184,000, despite having never made a single investment in RDI or any affiliated entity.

## II. ANALYSIS

### A. Summary Judgment Standard

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'"*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 1). Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure is appropriate when there is no genuine issue as to any material fact in the case and the moving party is entitled to judgment as a matter of law.Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 322;*Melton v. Teachers Ins. & Annuity Ass'n of Am.,* 114 F.3d 557, 559 (5th Cir.1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323;*Calbillo v. Cavender Oldsmobile,* 288 F.3d 721, 725 (5th Cir.2002). Where the nonmovant

bears the burden of proof on a claim upon which summary judgment is sought, the movant may also discharge its initial burden by showing that there is an absence of evidence to support the nonmoving party's case. *See Celotex,* 477 U.S. at 325. Once the movant has met its initial burden, the nonmovant must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts."*Id.* at 586."If the evidence [proffered by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See id.* at 255 (1986).

### B. Choice of Law

*7 The Court must first resolve a choice of law dispute before proceeding to the merits of the Receiver's claims. The Receiver contends that Washington law governs this lawsuit since federal choice of law rules apply and, under those rules, Washington is "the state with the most significant relationship to the occurrence and the parties."By contrast, the Danesi Defendants argue that Texas choice of law rules apply and would show that the law of either Liechtenstein or The Netherlands applies to the Receiver's suit against them.[FN4]

> FN4. The Carnie Defendants do not object to Washington law as the applicable law governing the Receiver's claims.

As a threshold matter, the Court recognizes that it has supplemental jurisdiction over the Receiver's pendent state law claims under the Uniform Fraudulent Transfer Act and for unjust enrichment. *See*28

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

U.S.C. § 1367. A federal court exercising pendent jurisdiction over state law claims must apply the substantive law of the state in which it sits. *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 353 (5th Cir.1989) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and *Erie R.R Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The forum state's choice of law rules are included within this directive. *Corrigan,* 883 F.2d at 353. Consequently, the Court will apply Texas choice of law rules to determine which law applies to the Receiver's fraudulent transfer and unjust enrichment claims.

To resolve choice-of-law questions, Texas courts apply the rules of the Restatement (Second) of Conflict of Laws. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 420-21 (Tex.1984). The particular application of the Restatement's choice of law rules depends on the nature of the claims at issue. *See SnyderGeneral Corp. v. Great American Ins. Co.,* 928 F.Supp. 674, 677 (N.D.Tex.1996). The Receiver's fraudulent transfer claims sound in tort. *See, e.g., Terry v. June,* 420 F.Supp.2d 493, 503 (W.D.Va.2006) (receiver's fraudulent conveyance claim sounded in tort and, therefore, would be governed by the test embodying the Restatement's general approach to tort claims); *SEC v. Infinity Group,* 27 F.Supp.2d 559, 564 (E.D.Pa.1998) (holding same), *aff'd,*212 F.3d 180 (3d Cir.2000).

Section 145 of the Restatement governs choice of law disputes in tort actions. Under § 145, the local law of the state which has the "most significant relationship to the occurrence and the parties" will govern the claim.Restatement (Second) Conflict of Laws § 145(1) (1971); *Duncan,* 665 S.W.2d at 421.

The following factors are relevant to this inquiry: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement

(Second) Conflict of Laws § 145(2). Additional factors that should also be considered in cases like this one, which involve an alleged fraud or misrepresentation, are the place where the defendant made the representations; the domicile, residence, nationality, place of incorporation, and place of business of the parties; and the place where a tangible thing which is the subject of the transaction between the parties was situated at the time. Restatement (Second) Conflict of Laws § 148.

**8** Under this analysis, the Court concludes that Washington is the state with the most substantial relationship to the parties and the alleged fraudulent transfers of receivership assets. RDI and several of its affiliates (e.g., Jade, Sound Financial Services, and IERC) had their principle places of business in Washington. In fact, all of RDI's business was conducted from its Tacoma office. By implication, RDI bore its "injuries" from the fraudulent transfers in Washington more so than in any other state. Moreover, to the extent that receivership assets were ordered transferred out of RDI and its affiliates, those decisions-and, hence, the "conduct" causing injury-occurred in Washington at the direction of James and David Edwards, both of whom were residents of Washington at the time.

Although the Court is aware that the RDI fraud ensnared over 1,300 investors from at least 34 states, those individuals are not parties to this action. Rather, RDI-through Warfield-is the plaintiff. In any event, even if the Court were to consider the myriad domiciles of the RDI investors as relevant to its analysis under § 145, Washington State, in the aggregate, nevertheless has more relevance to the Receiver's fraudulent transfer claims since every investor's relationship was "centered" in Washington. Washington State is where RDI prospectuses and solicitations originated; where investors sent their completed applications to participate in the RDI program; where they sent their money; and where their investment contracts were executed. Washington addresses also appeared on all preprinted letterhead that the Receiver has discovered. For these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

Page 8

reasons, the Court concludes that Washington law should govern the Receiver's fraudulent transfer claim.

The Danesi Defendants claim that the laws of Liechtenstein or The Netherlands should apply to this controversy since most, if not all, of the events giving rise to the Receiver's claim against the Danesi Defendants occurred in those countries, far "beyond the borders of the United States."Because the Receiver has not relied on that law in his motion, they argue, summary judgment is inappropriate since "the Receiver has not proven his case as a matter of law."

Danesi's arguments fail for two principal reasons. First, as demonstrated above, foreign law does not control the Receiver's claims since those jurisdictions do not have the "most substantial relationship" to the occurrence and the parties; rather, Washington does. The masterminds behind RDI and the other receivership entities, David and James Edwards, lived in Washington State. RDI was a Nevada corporation with its principal place of business in Tacoma, Washington. Jade Asset Management, Ltd., also operated from Tacoma and was capitalized entirely by assets from the various receivership entities that the Edwardses controlled. To the extent that the receivership entities executed contracts or made monetary transfers to Danesi or Ai-Ki, they did so from Washington State while under the control of Washington residents. In light of these substantial connections to Washington State, it does not matter that the funds were transferred overseas.

*9 Second, and more significantly, Danesi has not provided any evidence (admissible or not) of his location or domicile while he directed the transfers between RDI and the European bank accounts he controlled. Instead, Danesi and Ai-Ki have submitted hundreds of pages of foreign bank statements to prove that the transactions "occurred" abroad. However, they have not attempted to translate, much less summarize, those documents from German. Instead of showing how the documents prove

that the transactions "occurred" abroad, the Danesi Defendants seem to expect that the Court will be moved to that conclusion by the *gestalt* of this massive document dump. The Court is not so easily swayed. Merely proving that money was received abroad into foreign bank accounts does not prove that the transaction "occurred" abroad for purposes of the Restatement or the Uniform Fraudulent Transfer Act.

### C. The Uniform Fraudulent Transfer Act

Washington has enacted the Uniform Fraudulent Transfer Act (UFTA).*See*Wash. Rev.Code §§ 19.40.041, *et seq.* (2005). Under the UFTA, a defrauded creditor may recover amounts transferred from a debtor if the creditor can prove that the debtor made a fraudulent transfer of assets [FN5] and the transferee is not entitled to claim a statutory defense [FN6] from liability. To recover under the theory of actual fraud, the creditor must show that the "debtor" made a particular transfer "[w]ith actual intent to hinder, delay, or defraud any creditor."*Id.* at § 19.40.041(a)(1); *see also, Sedwick v. Gwinn,* 73 Wash.App. 879, 873 P.2d 528 (Wash.Ct.App.1994).FN7

> FN5. A transfer may be actually fraudulent or constructively fraudulent to the debtor's creditors. *See*Wash. Rev.Code §§ 19.40.041(a)(1) (actual fraud) & (a)(2) (constructive fraud). Here, the Receiver alleges that the transfers made from the receivership entities were made with actual intent to defraud the creditors of those entities-e.g., the investors. For that reason, the Court will not analyze whether the transfers were also constructively fraudulent as to those creditors.

> FN6.*See*Wash. Rev.Code §§ 19.40.041, 19.40.081.

> FN7. The Receiver correctly notes that the UFTA is modeled on § 548(a)(1) of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

Bankruptcy Code, and therefore, cases interpreting § 548(a)(1) may also be used to interpret the UFTA. *See Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir.2006) (finding that Washington's UFTA was "virtually identical" to 11 U.S.C. § 548 and that cases interpreting § 548 are consistent with Washington law).

If the creditor successfully proves that a transfer was made with actual intent to defraud, then the transferee may avoid liability by proving that he or she acted in "good faith" *and* exchanged "reasonably equivalent value" for the transfer. Wash. Rev.Code § 19.40.081; *In re Agricultural Research and Tech. Group, Inc.,* 916 F.2d at 535.

A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in receivership. *See, e.g., Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995); *In re Rodriguez,* 209 B.R. 424, 433 (Bankr.S.D.Tex.1997); *In re Randy,* 189 B.R. 425, 438-39 (Bankr.N.D.Ill.1995).

The Receiver now moves for summary judgment on his fraudulent transfer claims against the Defendants. The Receiver contends that he is entitled to summary judgment since the evidence conclusively demonstrates that (1) the transfers from the receivership entities to Defendants were made with "actual intent to hinder, delay, or defraud ... creditor[s]" of the receivership entities; (2) Defendants received those transfers; and (3) Defendants did not exchange reasonably equivalent value for the amounts that the Receiver seeks to recover.

**1. Actual Fraud**

The Receiver contends that RDI and its affiliated entities were Ponzi schemes, insolvent from inception, and, therefore, any transfers made from those entities were made with actual intent to defraud. Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme.

*See Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir.2006) (citing *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924)) (applying Washington law); *SEC v. Cook,* 2001 WL 256172 *3 (N.D.Tex.2001) (Buchmeyer, J.) (citing *In re Independent Clearing House Co.,* 77 B.R. 843 (Bankr.D.Utah 1987)). The Ninth Circuit and other courts have held similarly. *See In re Agricultural Research & Tech. Group,* 916 F.2d 528, 536 (9th Cir.1990) (interpreting § 548(a)(1) of the Bankruptcy Code); *In re Cohen,* 199 B.R. 709, 717 (9th Cir.BAP1996) ("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers ...."); *In re M & L Business Machine Co.,* 59 F.3d 1078, 1079-80 (10th Cir.1995); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.1995); *In re Slatkin,* 310 B.R. 740, 748-49 (Bankr.C.D.Cal.2004).

**a. Ponzi Schemes in General**

*10 A "Ponzi scheme" is a term generally used to describe an investment scheme that is not supported by any underlying business venture or investment opportunity but that has the illusion of profitability in order to recruit more investors and to sustain the program for the benefit of its operators. The operators induce investors into the program by promising exorbitant, unrealistic returns on their principal investments through lucrative investment opportunities or business ventures that often do not exist. *See In re M & L Business Machine Co.,* 59 F.3d 1078, 1080 (10th Cir.1995). Typically, the initial investors of the program are paid the promised returns from either the principal investments of new investors or their own principal investments.*In re United Energy Corp.,* 944 F.2d 589, 590 n. 1 (9th Cir.1991).

By structuring distributions in this manner, Ponzi scheme operators create the perception that their alleged investment opportunity is profitable. This, in turn, attracts new investors into the program. The program then cascades into a massive sham, as re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 10
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

turns paid to investors are financed not through the success of any underlying business venture (if any venture exists at all), but instead from the principal sums of newly attracted investors. *In re Hedged-Investments Associates, Inc.,* 48 F.3d 470, 471 n. 2 (10th Cir.1995)

For that reason, a Ponzi scheme operator who transfers incoming funds to prior investors and brokers in furtherance of the illicit scheme makes such transfers with the actual intent to hinder, delay or defraud later investors and creditors. *See Cook,* 2001 WL 256172 at *3.

### b. The RDI Trading Program was a Ponzi Scheme

As explained below, the summary judgment evidence presented to the Court overwhelmingly establishes that RDI and its affiliated entities in receivership were nothing more than elaborate Ponzi schemes. The Danesi Defendants concede that RDI was operated as a Ponzi scheme, while the Carnies Defendants all but concede the issue by not explicitly addressing it. As Receiver, Warfield qualifies as RDI's custodian of records and is competent to testify about its business operations. *See Byron,* 436 F.3d at 559 (citing *United States v. Jones,* 554 F.2d 251, 252 (5th Cir.1977)). Through a forensic accounting of those business records and other records obtained from third party individuals and financial institutions, Warfield and his accountants have discovered that the receivership entities did not make any real investments with the money that flowed into the RDI program. Instead, interest payments and profit distributions paid to investors were wholly funded by new principal investments into the program.

Warfield has also discovered that many of the documents that were used in the day-to-day operation of the RDI program were the same materials that were used in the Dennel program, another Ponzi scheme. Those documents include promotional materials, application forms, prospectuses, and sham security certificates.

*11 The close affiliation between RDI and Dennel also tends to prove that the RDI program was a Ponzi scheme. Operators of the RDI program began operating the program as soon as the SEC shut down the Dennel program. As in the Dennel scheme, RDI's promotional materials solicited hundreds of prospective investors with promises of riskless high returns. Many of the promotional documents guaranteed that participants would receive *monthly* interest payments of 4% on their investments (equivalent to a 60% annual rate of return), a patently unrealistic rate of return for a legitimate investment program.

Like most Ponzi schemes, RDI's operational materials were replete with false statements and financial inaccuracies designed to prey on less sophisticated investors. For example, new investors were advised to "pool" their investments into RDI with other people's investments as if such a strategy would minimize their overall risk exposure in that lone investment. In reality, the aggregation of those investments was necessary to sustain the program since every new investment served as the source of monthly interest payments for a preceding investment. RDI's issuance of false securities and financial statements also indicates that it was operated as a Ponzi scheme.

The payments received by the Carnie Defendants and the Danesi Defendants were made in furtherance of the Ponzi scheme. The payments made to the Carnie Defendants qualified as either returns on their investments or commission payments in return for recruiting new investors into the program. Similarly, the transfer of funds from RDI and Jade to Danesi and Ai-Ki were in furtherance of the Ponzi scheme since those transfers were intended to be an investment of RDI funds into the scheme that Danesi was fraudulently marketing to David Edwards-a proprietary investment that Edwards entered into to enrich RDI's funds (or to at least sustain the program for the time being). Consequently, the Court finds that the transfers of RDI

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

funds made to Defendants were fraudulent transfers under the UFTA. Wash. Rev.Code § 19.40.041(a)(1).

In light of the above, the Court finds that RDI and its affiliates operated as a fraudulent Ponzi scheme, which, by law, was insolvent from inception. Therefore, all payments made in furtherance of the scheme were, as a matter of law, made with actual intent to hinder, delay or defraud RDI's creditors.

**2. The Carnie and Danesi Defendants received Receivership assets in excess of any investment in RDI.**

The undisputed evidence, as set forth in Kurt Heinzel's affidavit, establishes that the Danesi Defendants received a total net amount of $1,800,015.50 from RDI and its affiliated entities. Of that amount, both Danesi and Ai-Ki received $300,000, jointly and severally, while Danesi himself received the remaining $1,500,015.50. Likewise, the undisputed evidence reveals that the Carnies and Sandaines received a net amount of $1,117,761.33 and $184,000, respectively, from RDI after it began to exist independently of Dennel.

*12 Although Defendants claim that they provided reasonably equivalent value for the funds they received in excess of their initial investments in the Ponzi scheme, these claims are not supported in law or evidence before the Court.

**3. UFTA Good Faith Defense**

The parties dispute whether Defendants are entitled to avoid liability for any fraudulent transfers received. Under the UFTA, a transferee may avoid liability for a fraudulent transfer made with actual fraudulent intent if he or she (1) acted in good faith *and* (2) gave reasonably equivalent value in exchange for the transfer. *See*Wash. Rev.Code § 19.40.081.[FN8]Therefore, under § 19.40.081, the mere fact that the transferee acted in good faith, without any intent to assist the debtor to defraud or evade creditors, is insufficient to relieve the transferee of liability if the transfer was exchanged for less than reasonably equivalent value.[FN9]

FN8. This is because liability is imposed on a transferee of a transfer made with actual fraudulent intent only if the transfer is "voidable." Wash. Rev.Code § 19.40.081. A transfer made with actual fraudulent intent is not voidable if the transferee took in good faith and gave reasonably equivalent value to the debtor. *Id.*

FN9. A good faith transferee will, however, be entitled to a reduction of liability to the extent of any value given. *See*Wash. Rev.Code § 19.40.081(d).

The Receiver contends that both groups of defendants cannot avoid liability under the UFTA since they cannot produce any evidence that they exchanged reasonably equivalent value for the amounts that he seeks to recover. As the Receiver correctly notes, a Ponzi scheme investor who receives an amount in excess of his or her initial investment has received two types of payments-(1) a full return of the principal investment and (2) amounts received in excess of the initial investment, i.e., "fictitious profits." The vast majority of courts that have considered the issue have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits. *See In re Hedged-Investors Associates, Inc.,* 84 F.3d 1286, 1290 (10th Cir.1996); *Scholes v. Lehmann,* 56 F.3d 750, 757-58 (7th Cir.); *In re Taubman,* 160 B.R. 964, 967 (Bankr.S.D.Ohio 1993); *Eby v. Ashley,* 1 F.2d 971, 973 (4th Cir.1924).

**a. The Carnie Defendants did not exchange reasonably equivalent value for the amounts that the Receiver seeks to recover.**

With respect to the Carnie Defendants, the Receiver argues that, as a matter of law, the transfers he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)

**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

seeks to recover were not made in exchange for reasonably equivalent value since he only seeks to recover amounts that they received in excess of their principal investments.

By contrast, the Carnie Defendants [FN10] argue that they exchanged reasonably equivalent value for their profits by loaning money to the receivership entities under a contractual agreement, i.e. they are entitled to some amount of return for the use of their money.

> FN10. The Court finds it unnecessary to reach the issue of whether Aruca or Roja were alter egos of the Carnies. Under UFTA, subsequent transferees are liable for fraudulent transfers on the same grounds as initial transferees. Wash. Rev.Code. § 19.40.081(b). Carnie admitted that he maintained control over all assets transferred to Aruca and to Roja. The Carnies were the only signatories on Aruca's account with the Bank of Nevis. Therefore, the receivership assets transferred to Carnie through Aruca or Roja were transfers to Carnie for the purposes of UFTA.

First, the Carnie Defendants' arguments fail because an illegal contract is void; it creates no legal entitlement to profits or interest. *See In re United Energy Corp.,* 944 F.2d 589, 595 (9th Cir.1991). Therefore, investors in illegal Ponzi schemes have only provided reasonably equivalent value up to the portion of their actual investment in the scheme. The false profits they may have gained from the illegal scheme are not reasonably equivalent value. *Id.*

**\*13** Second, the Carnie Defendants' investments in the Ponzi scheme were not loans. Instead, even if the Carnie Defendants relied in good faith on the investment contracts with the receivership entities, they were investment contracts as opposed to loans. The Carnie Defendants invested in alleged securities with the hope of reaping a profit rather than providing a loan with an entitlement to some kind of return. *See e.g. State v. Phillips,* 108 Wash.2d 627, 741 P.2d 24, 28-29 (Wash.1987).

Because the Carnie Defendants could have no reasonable expectation of profiting from an illegal Ponzi scheme, and because they profited from an illegal contract, the Carnie Defendants did not exchange reasonably equivalent value for their profits. The Court finds that the Carnie Defendants did not provide any evidence that they conferred reasonably equivalent value in exchange for the money they received from the receivership entities in excess of their initial investments.

**b. The Danesi Defendants did not exchange reasonably equivalent value for the $1.8 million that they received from RDI and Jade.**

The Receiver alleges that the Danesi Defendants have not produced any evidence that they exchanged reasonably equivalent value with RDI or any other receivership entity for the $1.8 million they received. As proof, the Receiver points to Ai-Ki's own admission that it did not confer any value upon any receivership entity in return for the assets it received. Additionally, the Receiver notes that although Danesi claims to have provided "administrative services" to RDI in exchange for the money he was paid, Danesi provides no evidence of the value of those services, much less an explanation of the types of services that he claims to have rendered. For these reasons, the Receiver argues that Danesi's claim that he conferred reasonably equivalent value is a mere conclusory allegation and cannot suffice as summary judgment evidence.

The Court finds that the Danesi Defendants failed to provide any evidence that they conferred reasonably equivalent value on RDI or any other Receivership Entity in exchange for the money transferred to them. Danesi's claim that he provided "administrative services" to the Receivership Entities is a bald statement unsupported by any specific evidence.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

Page 13

The Court finds that, even after viewing the evidence in the light most favorable to the defendants, no defendant has produced any evidence that he or she exchanged reasonably equivalent value in exchange for the amounts that Warfield seeks to recover. The Carnie and Danesi Defendants have failed to meet their burden to show that they exchanged reasonably equivalent value, an essential element of the good faith defense. Consequently, the Court finds that no genuine issue of material fact exists on whether the Defendants exchanged reasonably equivalent value with respect to the amounts that the Receiver seeks to recover. As a matter of law, they did not.

Having concluded that neither the Carnie Defendants nor the Danesi Defendants have shown any legal basis for the Court to reject the Receiver's claim for summary judgment on his UFTA claim, the Court now finds that the Receiver is entitled to summary judgment on his fraudulent transfer claims.

**D. Statute of Limitations**

*14 Under the UFTA, a fraudulent transfer claim is "extinguished" if not brought "within four years of the allegedly fraudulent transfer or, *if later,* within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."Wash. Rev.Code § 19.40.091 (emphasis added). With respect to the latter portion of the statute, the Washington Supreme Court has held that § 19.40.091 requires a fraudulent transfer claim be filed within one year after the *"fraudulent nature"* of the transfer is discovered-i.e., "[when] all the elements of the cause of action for fraud are discovered or should have been discovered."*Freitag v. McGhie,* 133 Wash.2d 816, 947 P.2d 1186, 1190 (Wash.1997) (emphasis added). Therefore, the statute of limitations does not begin to run when the mere transfer itself is discovered.[FN11] Instead, a claim under § 19.40.091 accrues upon discovery of the fraudulent nature of the conveyance.[FN12]*Id.* at 1189.

FN11. The Carnie Defendants contend that the Court should follow the holding of *McMaster v. Farmer,* 76 Wash.App. 464, 886 P.2d 240, 242 (Wash.Ct.App.1994), in which the Washington Court of Appeals interpreted the "extinguishment provision" of § 19.40.091 as a four-year statute of repose, to which equitable tolling doctrines do not apply. The Court declines to do so. As the Receiver correctly notes in his reply brief, the Washington Supreme Court in *Freitag v. McGhie,* 133 Wash.2d 816, 947 P.2d 1186 (Wash.1997), expressly overruled *McMaster* to the extent that *McMaster* had held that the UFTA claim must be commenced within one year of the discovery of the relevant transfer itself and not the discovery of its "fraudulent nature." *Freitag,* 947 P.2d at 1188 (citing *McMaster,* 886 P.2d at 240). In *Freitag,* the Washington Supreme Court found that the UFTA, as codified in § 19.40.091, had incorporated the common law discovery rule into the statute of limitations. *See id.* at 1189.The court explicitly overruled *McMaster* and rejected the notion that a claim must be filed within one year of the discovery of the transfer itself and not its fraudulent nature. As the court explained, "[c]ommon sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance."*Id.*

FN12. Under Washington law, the statute of limitations for a claim begins to run when the claim has "accrued." Wash Rev.Code § 4.16.005; *Malnar v. Carlson,* 128 Wash.2d 521, 910 P.2d 455 (Wash.1996). A claim is said to "accrue" when a party has the right to enforce the cause of action and seek relief in the courts. *Gunnier v. Yakima Heart Center,* 134 Wash.2d 854, 953 P.2d 1162

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

(Wash.1998).

The Receiver has moved for summary judgment on the Defendants' statute-of-limitations defenses. He argues that his claims are timely for two reasons: first, the doctrine of adverse domination tolled the limitations period on his claims until the date of his appointment as Receiver, at which time RDI and its affiliated entities were no longer controlled by the Edwardses. Second, he contends that the discovery rule and the doctrine of fraudulent concealment further tolled the relevant statutes of limitations until at least February 4, 2004, for the Carnie Defendants and March 18, 2004, for the Danesi Defendants. On those dates, Warfield alleges that he and his staff obtained sufficient information about the transfers and investments made between the Defendants and RDI to determine if the transfers received had been fraudulent. Prior to then, he argues that he could not determine whether the "net effect" of the transfers between Defendants and RDI were harmful-i.e., whether the transfers at issue were "fraudulent" transfers. Because he filed his claims within one year of those dates, Warfield argues that his claims are timely under the one-year provision of Wash. Rev.Code § 19.40.091.[FN13]

> FN13. The Receiver filed his lawsuit against the Carnies and the Sandaines on June 29, 2004, and October 6, 2004, respectively, both of which were within one year of the alleged February 4, 2004, accrual date. Likewise, the Receiver filed his lawsuit against the Danesi Defendants on March 25, 2004, only days after the alleged March 18, 2004, accrual date.

By contrast, both the Carnie Defendants and the Danesi Defendants maintain that the Receiver's claims are barred. The Carnie Defendants argue that the Receiver's UFTA claim is barred because "the undisputed evidence establishes that the Receiver, Receivership Entities, and their creditors were actually aware of the basic facts giving rise to such claims more than a year before the suit was commenced."As proof, they note that Warfield,

while serving as the receiver in the Dennel case, knew of the Edwardses' activities; knew that RDI and its affiliated entities operated as Ponzi schemes; knew that the Edwardses were operating PILP, the largest investor in the Dennel program; and knew that the Carnies were two of approximately one hundred individual investors who had invested in PILP. They emphasize that Warfield even asked about their PILP investments while deposing David Edwards in the Dennel case and even admitted to sending them a letter on April 12, 2000. Although they maintain that they never received Warfield's letter, the Carnie Defendants argue that the letter and Warfield's possession of contract documents, letters, and checks in the name of RDI proves that he knew that transfers were being made to them by no later than April 2000. For that reason, they argue, this Receiver's lawsuit is untimely.

**\*15** Upon closer inspection of the evidence, the Court concludes that the Carnies have failed to present a genuine issue of material fact that limitations bars the Receiver's UFTA claims against them.

The Danesi Defendants also claim that the Receiver's claims are barred, but for different reasons. The Danesi Defendants argue (rather unpersuasively) that the Receiver's motion is incorrectly premised on United States law, which, they argue, does not apply to an overseas transaction. Again, this argument fails based on the Court's choice of law analysis.

**1. Equitable Tolling**

The Receiver argues that limitations does not bar summary judgment relief because limitations was tolled by various equitable tolling doctrines. He argues that equitable doctrines tolled the statute of limitations on his claims until, at the earliest, February 4, 2004, for the Carnie Defendants and March 18, 2004, for the Danesi Defendants. In determining whether limitations was equitably tolled here, the Court will look to Washington law for the ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 15
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

plicable statute of limitations period and tolling provisions. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 746, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980).

**2. Adverse Domination**

The Receiver asserts that the doctrine of adverse domination tolled the statute of limitations until at least March 25, 2002, the date of his appointment in the RDI case. Under the common law doctrine of adverse domination, the statute of limitations for an entity's claim is tolled when the entity is controlled or dominated by individuals engaged in conduct that is harmful to the entity. *See FDIC v. Jackson*, 133 F.3d 694, 698 (9th Cir.1998); *FDIC v. Dawson*, 4 F.3d 1303 (5th Cir.1993); *Farmers & Merchants Nat'l Bank v. Bryan*, 902 F.2d 1520 (10th Cir.1990); *Shapo v. O'Shaughnessy*, 246 F.Supp.2d 935, 953 (N.D.Ill.2002) (citing *Resolution Trust Corp. v. Gallagher*, 800 F.Supp. 595, 600 (N.D.Ill.1992), *aff'd,* 10 F.3d 416 (7th Cir.1993)). The doctrine recognizes that officers or directors who have engaged in activities that harm an entity cannot be expected to have brought suit against themselves. *Shapo,* 246 F.Supp.2d at 953; *In re Western World Funding, Inc.*, 52 B.R. 743, 765 (Bankr.D.Nev.1985) ("Since it can act only through its agents, the corporation is considered to be 'incapacitated' while the wrongdoers are in control, as they cannot be expected to institute an action against themselves."). Under those circumstances, the entity is paralyzed to defend itself against the wrongdoers and the doctrine ensures that the statute of limitations begins to run only once the wrongdoing directors lose control of the entity. *Shapo,* 246 F.Supp.2d at 953.

The doctrine has been applied in a wide variety of contexts. *See, e.g., Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 879 (9th Cir.1984); *Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 772 (4th Cir.1995) ("the wrongdoers' control results in the concealment of any causes of action from those who otherwise might be able to protect the

corporation"); *Quilling v. Cristell,* 2006 WL 316981 *6 (W.D.N.C.2006) ("Equitable tolling principles recognize that so long as a corporation remains under the control of wrongdoers, it cannot be expected to take action to vindicate the harms and injustices perpetrated by the wrongdoers."); *Resolution Trust Corp. v. Farmer,* 865 F.Supp. 1143, 1157-58 (E.D.Pa.1994); *Resolution Trust Corp. v. Gardner,* 798 F.Supp. 790, 795 (D.D.C.1992); *FDIC v. Howse,* 736 F.Supp. 1437, 1442 (S.D.Tex.1990).

**\*16** To date, the Washington courts have not addressed whether the doctrine of adverse domination is recognized under Washington law. In the absence of controlling state authority, this Court must make an *"Erie* guess" as to whether the Washington Supreme Court would adopt the doctrine of adverse domination in this case. *See Byron,* 436 F.3d at 558 (citing *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 406 (5th Cir.2004)); *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992) ("[I]t is the duty of the federal court to determine as best it can, what the highest court of the state would decide.").

The Receiver argues that the Washington Supreme Court would adopt the doctrine of adverse domination if the question were before it. However, the Carnie Defendants maintain that even if the doctrine were found to apply, it would not apply to a situation like this one, where third parties are sued by the company on whose behalf the suit is brought, even though there is no fiduciary relationship between the two. Consequently, the Court must first resolve whether it should apply the doctrine and then determine whether the doctrine should apply to third parties like the Carnie Defendants and the Danesi Defendants.

The Court concludes that, if asked to rule on the issue, the Washington courts would recognize the doctrine of adverse domination in cases in which directors' control of a corporation reasonably prevented others from discovering the directors' wrongdoing.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 16
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

As an initial matter, the Washington courts have generally incorporated principles of common law when construing the UFTA. In *Freitag v. McGhie*, 133 Wash.2d 816, 947 P.2d 1186, 1189-90 (Wash.1997), the Washington Supreme Court recognized that the purpose of the UFTA was to "discourag[e] fraud." In fact, "within the UFTA itself lies a mandate to apply the common law to the extent it is not inconsistent with the provisions of the act."This mandate is expressly stated in Section 19.40.902, which advises that unless otherwise stated, "the principles of law and equity," including the law relating to "fraud," shall supplement the UFTA. *Id.*

Another reason for the Court to believe that the Washington Supreme Court would recognize the doctrine of adverse domination is that the Washington courts have already applied a special rule for tolling statutes of limitations in criminal prosecutions arising out of Ponzi schemes. This suggests that the Washington Supreme Court, for the sake of consistency, would favorably consider a special tolling rule for civil claims arising from a Ponzi fraud.

In *State v. Argo*, 81 Wash.App. 552, 915 P.2d 1103 (Wash.Ct.App.1996), a Ponzi scheme operator appealed his convictions for securities fraud, arguing in part that the trial court had erred by not limiting the charges against him to transactions that had occurred five years prior to the filing of the information, the period of time corresponding to the statute of limitations for securities fraud. The Washington Court of Appeals affirmed his convictions, holding that the statute of limitations for the crimes had been tolled since the defendant had "lulled" the victims of his fraud into a state of "passive inactivity" by providing them with falsified periodic investment reports and sham interest payments on their investments. *Id.* at 1111.The court found that these activities, "which continued well into the five year statute of limitations period, served to lull the victims, and groom them for future investments in the fraudulent scheme."*Id.* at 1111-12.Consequently,

the court found that the lulling doctrine tolled the statute of limitations until Argo ceased his fraudulent activities. *Id.*

*17 Although the lulling doctrine had never been applied by a Washington court prior to *Argo*, the court ruled that it should nevertheless apply the doctrine as a matter of practical necessity. *See id.*Because the Ninth Circuit had applied the lulling doctrine in federal prosecutions for securities fraud, the Court believed that it was appropriate to apply the doctrine in the situation before it. *See United States. v. Brown*, 578 F.2d 1280 (9th Cir.1978).

Yet another reason for the Court to believe that the Washington Supreme Court would apply the doctrine of adverse domination is that various Ninth Circuit cases have recognized the adverse domination doctrine. Like the Fifth Circuit, the Ninth Circuit has recognized that the doctrine of adverse domination applies not only against culpable officers and directors, but also against third parties who are also liable to the plaintiff-entity. *See, e.g., FDIC v. Jackson*, 133 F.3d 694, 698 (9th Cir.1998) (applying Arizona law); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir.1984); *FDIC v. Dawson*, 4 F.3d 1303, 1308-10 (5th Cir.1993) (noting that federal district courts have liberally applied the doctrine in favor of government-appointed receivers with many district courts predicting in the absence of controlling state precedent that the states in which they sit would adopt the doctrine).

Additionally, a few courts within the jurisdiction of the Ninth Circuit have already applied the doctrine in the absence of controlling state authority. *See, e.g., Jackson*, 133 F.3d at 698;*United States v. First Nat. Bank & Trust of Wibaux*, 1994 WL 775440 *6 (D.Mont.1994) ("This Court believes that the Montana Supreme Court, faced with a situation where an alleged wrongdoer controlled a corporation and thereby prevented the corporation from timely asserting its claims against the wrongdoer, would adopt the doctrine of adverse domination.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 17
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

The Court, therefore, applies the doctrine of adverse domination, tolling the statute of limitations until the date of the Receiver's appointment, March 25, 2002. Prior to Warfield's appointment, the receivership entities operated as nothing more than conduits for the RDI fraud under the control of various defendants in the RDI case who fully, completely and exclusively controlled RDI and its affiliated entities. For that reason, it would have been impossible for the receivership entities to have asserted their legal rights before Warfield's appointment since the RDI entities were controlled by the Edwardses and the other perpetrators of the Ponzi scheme.

**3. Fraudulent Concealment and the Discovery Rule**

The UFTA requires the filing of fraud claims within four years after the transfer was made, "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."Wash. Rev.Code § 19.40.091. UFTA claims are subject to the equitable tolling principles of fraudulent concealment and the discovery rule. *Freitag v. McGhie,* 133 Wash.2d 816, 947 P.2d 1186, 1190 (Wash.1997). Therefore, a plaintiff must file suit under the UFTA within one year of the date that the plaintiff discovered the fraudulent nature of the transfer. *Id.* at 1190.Further, the doctrine of fraudulent concealment tolls the accrual of a cause of action where an affirmative act conceals the facts underlying the claim, the plaintiff is ignorant of the facts giving rise to the claim, and the plaintiff is diligent in discovering the facts. *Giraud v. Quincy Farm & Chem.,* 102 Wash.App. 443, 6 P.3d 104, 110 (Wash.Ct.App.2000).

*\*18* The Carnie Defendants assert that the statute of limitations should have begun to run when the Receiver discovered that PILP and RDI were Ponzi schemes. And certainly the statute of limitations started to run when he became aware of transfers made between the receivership entities and the Carnie Defendants in April 2000.

However, as the Receiver points out, under the discovery rule the action does not begin to accrue until the Receiver discovers the fraud *and the damages.First Maryland Leasecorp v. Rothstein,* 72 Wash.App. 278, 864 P.2d 17, 20 (Wash.Ct.App.1993). There is no evidence in the record that the Receiver knew of the net benefits the Carnie Defendants received until the Receiver was able to take George Carnie's deposition on February 4, 2004. It was then that the Receiver was able to piece together the Carnie's connection with Aruca and Roja. And even then, Mr. Carnie challenged the Receiver's net benefit analysis and claimed that he "just broke even" in his investments with the receivership entities.

The Carnie Defendants also argue that the Receiver's fraudulent concealment theory fails because "there is no evidence that the Carnies or Sandaines had actual or subjective knowledge of the wrongs committed by the Receivership Entities."However, the doctrine of fraudulent concealment in this case does not focus on the Carnies' or Sandaines' actions, but on the actions of the defendants in the underlying lawsuit. *In re William Dec,* 272 B.R. 218, 226 (Bankr.N.D.Ill.2001); *In re Pomaville,* 190 B.R. 632, 637 (Bankr.D.Minn.1995).

No genuine issue of material fact exists regarding whether the defendants in the underlying lawsuit fraudulently concealed and destroyed documents. Not only did the defendants use offshore bank accounts and numerous affiliated companies to conceal their fraud, they illegally broke into their offices to steal boxes of documents containing evidence of their fraudulent transfers after the Receiver had taken possession. Because no one questions the fraudulent intent of the underlying defendants, no material issue of genuine fact exists regarding fraudulent concealment.

Of course, in order to benefit from the doctrine of fraudulent concealment, the Receiver must show that he was diligent in discovering the facts giving rise to his causes of action against Defendants. The Court also finds, as a matter of law, that the Receiv-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 18
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

er was diligent in discovering the claims against the Carnie Defendants and the Danesi Defendants.

The Court assesses the Receiver's diligence objectively. *In re United Ins. Mgmt.,* 14 F.3d 1380, 1385 (9th Cir.1994). And the Receiver must demonstrate that he conducted a "painstaking investigation." *Freschi v. Grand Coal Ventures,* 767 F.2d 1041, 1047 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986).

Under this standard, the Court finds no genuine issue of material fact regarding the Receiver's diligence. As the undisputed facts confirm, the Receiver began his investigation on the day he was appointed. He issued subpoenas for 220 bank accounts related to transactions involving over 1,300 investors. He requested and ultimately sought court orders to obtain records from the Bank of Nevis. He conducted an analysis of over 32,500 banking transactions. He instituted numerous ancillary actions on behalf of the receivership, and he ultimately noticed and took the deposition of George Carnie in order to question him about his transactions with PILP and RDI. It was through diligent investigation that the transactions were discovered and then linked to Aruca, Roja, and the Carnies. And then, even in deposition, Mr. Carnie continued to assert that he did not receive funds from the receivership entities in excess of his initial investment. Again, the Carnie Defendants provide no evidence to the Court that the Receiver's mere knowledge of the Ponzi scheme, knowledge of the identities of many of its investors, and knowledge, specifically, that the Carnies were investors somehow put him on notice that the Carnie Defendants reaped a net profit from their investments. Instead, that conclusion took more time and further investigation.

*19 Under the doctrines of fraudulent concealment and the discovery rule, the Court finds no genuine issue of material fact concerning when the cause of action accrued. The Carnie Defendants failed to provide any evidence that the Receiver discovered or should have discovered the fraudulent nature of

the transfers *and the resultant damages* prior to February 4, 2004. Instead, the Carnie Defendants merely make conclusory assertions regarding when the Receiver knew of the facts giving rise to the claims against them. Under the summary judgment standard, these conclusory assertions are insufficient. Therefore, the Receiver timely filed suit against the Carnie Defendants as a matter of law.

**E. Danesi Defendants' Affirmative Defense-Laches**

The Receiver has moved for summary judgment on the Danesi Defendants' laches defense. He argues that there is no evidence from which the Danesi Defendants can prove that he "unreasonably[ ] or inexcusably delayed in filing this lawsuit."Without citing any evidence, the Danesi Defendants claim, in response, that "[m]aterial fact issues are present at all levels of this case ... [and][t]he Receiver should not obtain relief due to his unreasonable delay in asserting a claim."

In Washington, as in most jurisdictions, the equitable doctrine of laches may bar suit when a claimant "unreasonably and inexcusably" delays in filing suit. *See Edison Oyster Co. v. Pioneer Oyster Co.,* 22 Wash.2d 616, 157 P.2d 302 (Wash.1945). To properly invoke the doctrine of laches, a defendant must prove that (1) the plaintiff had knowledge of or could have discovered the facts constituting the cause of action; (2) the plaintiff delayed filing the claim for an unreasonable period of time; and (3) the defendant was damaged by the delay. *In re Marriage of Capetillo,* 85 Wash.App. 311, 932 P.2d 691, 695 (Wash.Ct.App.1997). The party invoking the doctrine of laches bears the burden of proof. *Rutter v. Rutter's Estate,* 59 Wash.2d 781, 370 P.2d 862 (Wash.1962).

The Danesi Defendants have failed to present any evidence that the Receiver unreasonably or inexcusably delayed in filing suit. As has already been established in this opinion, the Receiver analyzed thousands of documents to determine where the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)

**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))**

money that had been invested into the PILP and RDI programs had gone. Only after conducting those analyses could the Receiver know who to sue to recover the lost money and for how much. Moreover, the Danesi Defendants have not shown how they would be prejudiced if the Court were to permit this action to proceed. The Court finds no genuine issue of material fact regarding the Danesi Defendants' defense of laches. Therefore, their laches defense fails as a matter of law.

### F. Carnie Defendants' Affirmative Defenses

In addition to their claims that the statute of limitations bars the Receiver's suit, the Carnie Defendants asserted several affirmative defenses: waiver, estoppel, ratification, fraudulent inducement, negligence, offset proportionate responsibility, and absence of a necessary party. However, the Carnie Defendants presented no arguments and no supporting evidence on these claims in their summary judgment pleadings. Because the burden of proof is on them to demonstrate that no genuine issue of material fact exists and they are entitled to judgment as a matter of law on their affirmative defenses, these defenses fail as a matter of law.

### III. CONCLUSION

**\*20** The Court therefore enters the following rulings:

#### A.

With respect to Plaintiff's motion for partial summary judgment against Richard Danesi and Ai-Ki International Establishment (Dkt. No. 159), the Court **GRANTS** Warfield's motion for partial summary judgment on his claim under the Uniform Fraudulent Transfer Act, on the issue of limitations, and in opposition to Defendants' other affirmative defenses. Accordingly, the Court enters the following rulings:

1. All Receivership Entities from which Defendants received assets were operated as a fraudulent Ponzi scheme, insolvent from inception;

2. Defendants failed to transfer reasonably equivalent value in good faith to any Receivership Entity in exchange for the assets received from Receivership Entities;

3. The transfers Defendants received from the Receivership Entities were fraudulent transfers;

4. Defendants Danesi and Ai-Ki received, jointly and severally, transfers from the Receivership Entities in the amount of $300,000;

5. Defendant Danesi, individually, received additional transfers from the Receivership Entities in the net amount of $1,500,015.50, rendering Danesi liable in the total amount of $1,800,015.50;

6. Limitations on the Receiver's claims against Danesi and Ai-Ki did not begin to run until at least March 18, 2004, because of adverse domination, fraudulent concealment, and the discovery rule; and

7. No evidence supports Defendants' affirmative defense of laches.

#### B.

With respect to Plaintiff's motion for partial summary judgment against George and Deanna Carnie (individually and d/b/a Aruca, Inc.) and Lorie and Randy Sandaine (Dkt. No. 224), the Court **GRANTS** Warfield's motion for partial summary judgment on his claim under the Uniform Fraudulent Transfer Act, on the issue of limitations, and in opposition to Defendants' other affirmative defenses. The Court **DENIES** Defendants George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine's motion for summary judgment.

Accordingly, the Court enters the following rulings:

1. All Receivership Entities from which Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.))

received assets were operated as a fraudulent Ponzi scheme, insolvent from inception;

2. Defendants failed to transfer reasonably equivalent value in good faith to any Receivership Entity in exchange for the assets received from Receivership Entities;

3. The transfers Defendants received from the Receivership Entities were fraudulent transfers;

4. All transfers made to Aruca by Receivership Entities were fraudulent transfers;

5. Defendants George Carnie and Deanna Carnie received, jointly and severally, transfers from the Receivership Entities in the net amount of $1,117,761.33;

6. Defendants Lorie Sandaine and Randy Sandaine received, jointly and severally, transfers from the Receivership Entities in the net amount of $184,000;

7. Limitations on the Receiver's claims did not begin to run until at least February 4, 2004, for George and Deanna Carnie and March 18, 2004, for Lorie and Randy Sandaine because of adverse domination, fraudulent concealment, and the discovery rule; and

**\*21** 8. No evidence supports the Defendants' affirmative defenses of waiver, estoppel, ratification, fraudulent inducement, offset, proportionate responsibility premised on in pari delicto, negligence, and failure to join a necessary party.

**IT IS SO ORDERED.**

N.D.Tex.,2007.
Warfield v. Carnie
Not Reported in F.Supp.2d, 2007 WL 1112591 (N.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

C

Stenger v. World Harvest Church, Inc.
N.D.Ga.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Georgia, Atlanta
Division.
Phillip S. STENGER, not in his individual capacity
but as the court-appointed receiver for the assets of
Charles Richard Homa, Michael Gause, D. Dean
Pearson, and various related entities, Plaintiff,
v.
WORLD HARVEST CHURCH, INC., a Georgia
non-profit corporation, Defendant.
**No. Civ.A.1:04CV00151-RW.**

March 31, 2006.

Douglas W. Van Essen, Kay Griffith Hammond,
Lee T. Silver, Lewis G. Mosburg, Jr., Stenger &
Stenger, Grand Rapids, MI, Gregory J. Digel, Susan
Eichler Edlein, Sara Lynn Doyle, Holland &
Knight, Atlanta, GA, for Plaintiff.
Andrew John Ekonomou, Kirby Glenn Atkinson,
Paul Edwin Nystrom, III, Ekonomou Atkinson &
Lambros, LLC, Atlanta, GA, Jay Alan Sekulow,
Stuart Jonathan Roth, American Center for Law and
Justice, Washington, DC, for Defendant.

*ORDER*

STORY, J.
**\*1** This action comes before the Court on cross-
motions for summary judgment [67, 78], Defend-
ant's Motion to Strike and Objection to Affidavits
[82], and Defendant's Motion for Leave to File
Third-Party Complaint [110].[FN1] The Court has re-
viewed the record, and now enters the following
Order.

> FN1. Defendant's Motion for Leave to File
> Third-Party Complaint [110] appears twice
> on the docket. The Clerk is DIRECTED to
> remove the second entry [111] from the
> pending motions list.

**Background**

**I. The History of the Cash 4 Titles "Alleged"[FN2]
Ponzi Scheme**

> FN2. Defendant has denied, often with
> little, if any, countervailing evidentiary
> support, most of the statements in
> Plaintiff's Statement of Undisputed Materi-
> al Facts. Indeed, many of their responses to
> Plaintiff's Statement read more like hyper-
> technical discovery objections than the
> good-faith admissions or denials contem-
> plated by the local rules. In any event, due
> to the myriad denials, even respecting the
> basic factual history leading up to this suit,
> the Court here does not purport to set forth
> only those facts the parties agree are
> "undisputed," but simply lays out
> Plaintiff's allegations to assist the reader in
> understanding this controversy's storied
> background. Plainly, the Court makes no
> "findings" in this Order, and nothing in
> this Background should be read as indicat-
> ing the finding of any fact. The Court takes
> up in its Discussion those purported factual
> disputes that either one or both of the
> parties contend are genuine and material to
> the resolution of their cross-motions for
> summary judgment.

This action arises out of what has come to be
known as an elaborate Ponzi scheme[FN3] overseen
by Charles Richard Homa, Michael E. Gause, and
D. Dean Pearson (the "Receivership Subjects").
These individuals are alleged to have induced oth-
ers to invest hundreds of millions of dollars in an
enterprise known as Cash 4 Titles ("C4T"), which
purported to provide capital to consumer lending
companies. In reality, Plaintiff alleges, the contri-
butions of newer investors were used to pay
"profits" to older investors, and were appropriated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

and used by the Receivership Subjects for their own purposes.

> FN3. A Ponzi scheme, see *In re Ponzi*, 15 F.2d 113 (D.Mass.1926), is
>
>> a pyramid-type investment scheme where investors are paid profits from newly attracted investors promised large returns on their principal investments. Typically it is not supported by any underlying business venture. An investor that does receive money is not receiving income on his or her investment, but merely a return of his or her own principal, or that of another investor. More and more investors are solicited in order that the investors at the top of the pyramid can be compensated. Usually the pyramid collapses, the majority of investors never receive any profits, losing their principal investment as well.
>
> *In re Fin. Federated Title & Trust, Inc.,* 309 F.3d 1325, 1327 n. 2 (11th Cir.2002).

According to Plaintiff, in October of 1999, the Securities and Exchange Commission (the "SEC") filed suit against Mr. Homa, Mr. Gause, and Mr. Pearson, as well as various related entities, in the United States District Court for the Northern District of Illinois in connection with their participation in the C4T scheme. Ultimately, the SEC action concluded with the defendants consenting to pay civil disgorgement. Mr. Gause, in particular, agreed to make disgorgement in the amount of $193,242,353.80. In three orders entered between November of 1999 and September of 2000, moreover, the Illinois Court appointed Plaintiff as a receiver to marshal and conserve the assets of Mr. Homa, Mr. Gause, and Mr. Pearson, as well as various entities affiliated with these individuals and the C4T enterprise (including, among others, Sunset Financial Services, LLC, C4T Management, Inc., T/P Funding Services, Inc., "and affiliated entities

of the foregoing," referred to herein collectively as the "C4T Entities").*See* Pl.'s Mot. for Summ. J. at Ex. A ¶ 1, Exs. B-C; *see also*SEC v. Homa, No. 99 C 6895, 2004 WL 1093492, at *1 (N.D.Ill. May 13, 2004) ("On November 2, 1999, Mr. Phil Stenger was appointed receiver of the assets of Homa, Sunset Financial Services, LLC, C4T Management, Inc., T/P Funding Services, Inc. and the affiliated entities of the foregoing.... The Receiver's general mandate is to marshal C4T related assets for the benefit of investors.").

In early 2001, Mr. Gause pled guilty to securities fraud before the United States District Court for the Southern District of New York in connection with his involvement in the C4T enterprise, and is presently serving time in prison. Mr. Homa pled guilty to similar charges, but has now completed his prison term.

## II. Defendant World Harvest Church

A substantial portion of the funds allegedly generated by the C4T Ponzi scheme are alleged to have found their way into the hands of Defendant World Harvest Church. Mr. Gause, in particular,[FN4] is alleged to have given, or caused, through various affiliated entities (including, e.g., the Gause Foundation, Offshore Title Investments, JC Ministries, and Unique Projects, referred to herein collectively as the "Gause Affiliated Entities"), to be given, $1,808,400.00 [FN5] to Defendant. (*See* Pl.'s Mot. for Summ. J. [67] at Ex. AA ¶¶ 19-22 [hereinafter "Second Kahlberg Aff."].)

> FN4. In his Complaint, Plaintiff challenges not just the donations made to Defendant by Mr. Gause and the Gause Affiliated Entities, but also those made by Mr. Pearson and his wife, who are alleged to have fraudulently conveyed approximately $70,000 to Defendant. The Motion for Summary Judgment, however, only appears to seek relief *vis-a-vis* the substantially larger sums contributed by Mr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 3
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

Gause and affiliated entities.

FN5. Defendant's pastor, Mirek Hufton, submitted an affidavit enumerating contributions by Mr. Gause and affiliated entities that, when totaled by the Court, amount to $1,774,826.00. It has not raised the discrepancy in its papers, however, and has offered no evidence rebutting Mr. Kahlberg's $1,808,400.00 figure.

*2 Plaintiff initiated suit against Defendant for fraudulent conveyance and unjust enrichment in the United States District Court for the Northern District of Illinois. *SeeStenger v. World Harvest Church,* Case No. 02 C 8036 (N.D. Ill. filed Nov. 6, 2002). That suit was dismissed for lack of personal jurisdiction, however, by an order of the Illinois Court dated August 29, 2003. *SeeStenger v. World Harvest Church,* Case No. 02 C 8036, 2003 WL 22048047 (N.D.Ill. Aug.29, 2003). Within six months of that dismissal, on January 21, 2004, Plaintiff initiated the instant action asserting like claims. Both parties have now moved for summary judgment. Defendant has additionally moved to strike certain affidavits Plaintiff offered in support of his motion for summary judgment and for leave to file a third-party complaint against its insurance company.

Discussion

The Court begins by considering the parties' cross-motions for summary judgment. It then turns to Defendant's Motion to Strike and Objection to Affidavits [82] and Motion for Leave to File Third-Party Complaint [110].

I. Cross-Motions for Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any mater-

ial fact and that the moving party is entitled to judgment as a matter of law."FED. R. CIV. P. 56(c)."The moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." ' *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1259 (11th Cir.2004) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The applicable substantive law identifies which facts are material. *Id.* at 248.A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. *Id.* An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.*Id.* at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir.2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."*Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))."If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."*Anderson,* 477 U.S. at 249-50 (internal citations omitted); *see alsoMatsushita,* 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c),

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))

the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts.").

**\*3** Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issue of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."*Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 538-39 (5th Cir.2004).

### A. Unjust Enrichment Claim

Although hardly the predominant focus of the parties' papers, the Court begins by addressing Plaintiff's claim for unjust enrichment. In the broadest sense, "[t]he theory of unjust enrichment[,]" under Georgia law, "is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay."*Morris v. Britt,* 275 Ga.App. 293, 620 S.E.2d 422, 424 (Ga.Ct.App.2005) (quoting *Hollifield v. Monte Vista Biblical Gardens, Inc.,* 251 Ga.App. 124, 553 S.E.2d 662, 669 (Ga.Ct.App.2001)). To apply, however, "the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost."*Id.* That is, "[e]ven where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, *as between the two persons,* it is unjust for him to retain it."*Stoker v. Bellemeade, LLC,* 272 Ga.App. 817, 615 S.E.2d 1, 5 (Ga.Ct.App.2005) (emphasis supplied).

The facts of this case, simply stated, do not fit neatly into the unjust enrichment theory. Defendant took the proffered sums from Gause and related entities as tithes or gifts. There is no evidence that Gause or the conferring entities acted with any expectation that Defendant assumed or would bear

some correlative obligation in accepting the monies. *Cf.Morris,* 620 S.E.2d at 424;*Hollifield,* 553 S.E.2d at 670. And, evaluated only "as between" Gause and the Gause Affiliated Entities on the one hand, and Defendant on the other, the Court would have great difficulty finding that Defendant's retention of the gifts would be unjust. *Cf.Stoker,* 615 S.E.2d at 5. Rather, the injustice that flows from Defendant's retention of the funds in this case arises, if at all, due to the fact that the funds were conveyed to Defendant fraudulently-either as gifts when the transferor was insolvent, or in an effort to defraud creditors when Defendant was on notice of that intention. *See*O.C.G.A. § 18-2-22(2) & (3) (repealed 2002). Suit for fraudulent conveyance, rather than for unjust enrichment, is the proper vehicle to seek redress for such an evil. Accordingly, insofar as Defendant seeks summary judgment on this claim, its motion will be granted. Plaintiff's motion, to the extent it seeks judgment in his favor, will be denied.

### B. Fraudulent Conveyance

Plaintiff claims that the transfers made to Defendant by Mr. Gause and the Gause Affiliated Entities were fraudulent within the meaning of Georgia's now repealed fraudulent conveyance statute, O.C.G.A. § 18-2-22 (repealed 2002). That statute, in force at the time the challenged conveyances were made, provided:

**\*4** The following acts by debtors shall be fraudulent in law against creditors and others [FN6] and as to them shall be null and void:

> FN6. The "and others" language, in the view of this Court, precludes any argument that suit under O.C.G.A. § 18-2-22 may be brought only by "creditors," and instead opens up the possibility for claims by litigants such as Plaintiff. *See also*Stenger v. Rogers, No. 1:03-CV-1292-JEC, 2006 WL 449151, at \*7-\*12 (N.D.Ga. Feb.22, 2006)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 5
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

(entertaining claim brought by Plaintiff against recipients of transfers from Mr. Homa under O.C.G.A. § 18-2-22).

...

(2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid; and

(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

O.C.G.A. § 18-2-22 (repealed 2002). Defendant contends that the claims fail, not only for want of admissible evidentiary support, but because they are untimely and because the fraudulent conveyance statute, as applied to a church, violates the Free Exercise Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment.

The Court addresses the merits of the parties' respective contentions below. Before doing so, however, it takes the opportunity to clarify the theory that underlies a receiver's suit for fraudulent conveyance *vis-a-vis* a collapsed Ponzi scheme. An appreciation of that theory is necessary for the principled resolution of the parties' claims and defenses.

*1. The Nature of a Receiver Suit to Recover Funds Fraudulently Conveyed in a Ponzi Scheme*

A review of the parties' papers reveals an underlying disagreement, and, perhaps, an understandable confusion, about the nature of a suit by a receiver, such as Plaintiff, to recover funds conveyed by participants engaged in an unlawful enterprise. For its

part, Defendant acknowledges the "settled [rule] that an equity receiver has the power to bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme."*Obermaier v. Arnett*, No. 2:02CV111FTM29DNF, 2002 WL 31654535, at *3 (M.D.Fla. Nov.20, 2002) (citing *Commodity Futures Trading Comm'n v. Am. Commodity Group Corp.*, 753 F.2d 862, 866 n. 6 (11th Cir.1984); *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477 (10th Cir.1983)). It nevertheless contends that the claims at issue here are, in reality, being asserted on behalf of the C4T investors, not any entity in receivership, and that Plaintiff consequently lacks standing to pursue them. Plaintiff counters that the order appointing him as a receiver gave him dominion over the property of Mr. Gause, including his interests in the Gause Affiliated Entities that transferred funds to Defendant, and that such control over the "Receivership Property" confers standing to prosecute the instant claims. In the view of the Court, both parties' arguments reflect a certain misapprehension regarding the theory that underlies a receiver's ability to recover funds that originated from the illegal operations of a collapsed Ponzi scheme.

*5 The seminal case in this area of the law is *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995). The *Scholes* action involved a Ponzi scheme operated by Michael Douglas, who, through several corporations and partnerships, falsely represented to prospective investors that, were they to invest in the enterprise, their funds would be used to purchase and trade commodities, and that they would enjoy an extraordinary rate of return. *See*56 F.3d at 752. Instead, as is characteristic of a Ponzi scheme, most of the investor's funds went to pay the unachievable returns Douglas had promised on the investment, and, to the extent not so directed, were misappropriated for Douglas's own ends. Eventually, the scheme collapsed, Douglas pled guilty to fraud, and a receiver was appointed to collect the assets of Douglas and the entities involved in the Ponzi scheme for the benefit of the defrauded investors.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

The *Scholes* action itself arose out of the receiver's efforts to recover assets from Douglas's ex-wife, from one profitable investor, and from several religious groups, to whom Douglas and the entities in receivership had transferred investor funds.

In rejecting an argument by the defendants that the receiver was in no position to bring claims on behalf of the investors, the Seventh Circuit acknowledged that "a receiver does not have standing to sue on behalf of the creditors of the entity in receivership[,]" but rather, "may sue only to redress injuries *to* the entity in receivership[.]"*Id.* at 753 (emphasis supplied). The Court went on to explain, however, that the principle did not undercut the viability of the claims before it. The entities at issue, "no more Douglas's evil zombies[,]" were *themselves* entitled to recover those funds Douglas had caused them to waste. *Id.* at 754.Judge Posner, writing for the panel, reasoned:

The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. They received money from unsuspecting, if perhaps greedy and foolish, investors. That money should have been used for the stated purpose of the corporations' sale of interests in the [investment vehicles], which was to trade commodities. Instead Douglas caused the corporations to pay out the money they received to himself, his ex-wife, his favorite charities, and an investor.... In the case of the ex-wife, the money went from the corporations first to Douglas and then from him to her, but we cannot see what difference that should make....

The three sets of transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations. As sole shareholder, Douglas could lawfully have ratified the diversion of corporate assets to noncorporate purposes-but only if creditors were not harmed. [Cit.] Creditors were harmed...."It was not within the power of the shareholders to legalize this waste to the detriment of others."[Cit.]

*6 Though injured by Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. The rule is that the maker of the fraudulent conveyance and all those in privity with him-which certainly includes the corporations-are bound by it. [Cit.] But the reason, of course, as the cases just cited make clear, is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene.... Freed from [Douglas's] spell the [corporations] became entitled to the return of the moneys-for the benefit not of Douglas but of innocent investors-that Douglas had made the corporations divert to unauthorized purposes.

*Id.* at 753-54.Similar reasoning has found favor in other jurisdictions, including within this Circuit. *See, e.g.,Obermaier,* 2002 WL 31654535, at *3 (collecting cases).

As the Court evaluates the viability of Plaintiff's fraudulent conveyance claim, then, it does so with the understanding that Plaintiff brings suit, not as an individual or as a representative of the defrauded investors in the C4T scheme, but rather, "standing in the shoes," so to speak, of those persons and entities in receivership-the Receivership Subjects and, more importantly, the C4T Entities. It is from that vantage point that the Court must evaluate the claims and defenses presented in this case.

### 2. *Statute of Limitations Defense*

The limitations period applicable to Plaintiff's claims under O.C.G.A. § 18-2-22, the parties agree, is four years from the date the action accrued. *SeeIn re Dulock,* 282 B.R. 54, 59 (Bankr.N.D.Ga.2002) (citing O.C.G.A. § 9-3-32). Defendant argues that,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))

because this suit was not initiated until January 2004, and because the last challenged transfer took place in 1999, Plaintiff's claims are time-barred. Plaintiff responds by arguing that this is a renewal action within the meaning of O.C.G.A. § 9-2-61(a), and thus, is deemed to have been filed on November 6, 2002-the date suit was initially brought against Defendant in the United States District Court for the Northern District of Illinois. He further contends that, in any event, the claims here did not "accrue" until after he was appointed as receiver, and *he* discovered, or reasonably should have discovered, the existence of the allegedly fraudulent transfers. Due to the complexity of the account structures employed by Mr. Gause and the C4T Entities, he states that he could not have, and in fact, did not uncover these transfers until late 2000, and that the instant suit is therefore timely.

The Court begins by evaluating Plaintiff's position that this is a renewal action within the meaning of O.C.G.A. § 9-2-61(a). It then turns to consider on what date the instant action can fairly be understood to have accrued. Ultimately, it finds that Plaintiff's claims are timely asserted.

a. *This action was properly renewed*

**\*7** In Georgia,

When any case has been commenced in either a state or federal court within the applicable statute of limitations and the plaintiff discontinues or dismisses the same, it may be recommenced in a court of this state or in a federal court either within the original applicable period of limitations or within six months after the discontinuance or dismissal, whichever is later....

O.C.G.A. § 9-2-61(a)."A properly filed renewal action stands on the same footing as the original action with respect to statutes of limitation. [Cit.] Accordingly, if a renewal action is properly filed within six months after dismissal of the original action, it remains viable even though the statute of limita-

tion may have expired."*Blackwell v. Goodwin,* 236 Ga.App. 861, 513 S.E.2d 542, 544 (Ga.Ct.App.1999).

Here, Defendant claims that Plaintiff cannot avail himself of the renewal statute, and thus, cannot claim a November 6, 2002 filing date, because the original suit was "void." *SeeHobbs v. Arthur,* 264 Ga. 359, 444 S.E.2d 322, 323 (Ga.1994) (renewal statute does not apply to void cases). It cites two bases for this proposition. First, Defendant claims that service of process was never perfected in the Illinois action. *Seeid.*("The original suit is void if service was never perfected, since the filing of a complaint without perfecting service does not constitute a pending suit."). Second, it argues that renewal is not available because the Illinois action was dismissed by the court, not the Plaintiff. *Seeid.*("A suit is also void and incapable or renewal under O.C.G.A. § 9-2-61(a) if there has been a judicial determination that dismissal is authorized."). The Court finds neither argument persuasive.

As to the first cited ground, lack of service, the record makes clear that service *was* personally effected on Defendant's registered agent on December 16, 2002. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. [103] at Ex. F.) There is no basis in the record for concluding that such service was imperfect under Federal Rule of Civil Procedure 4(h).*See*FED. R. CIV. P. 4(h)(1) ( "Unless otherwise provided by federal law, service upon a domestic or foreign corporation ... shall be effected ... by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process...."). Defendant's reliance on the Illinois District Court's Order to argue otherwise, moreover, is misplaced. *SeeStenger v. World Harvest Church, Inc.,* No. 02 C 8036, 2003 WL 22048047 (N.D.Ill. Aug.29, 2003). While that decision held that service was insufficient to establish personal jurisdiction over Defendant under Rule 4(k), *see*FED. R. CIV. P. 4(k) (providing that "[s]ervice of a summons ... is effective to establish

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

jurisdiction over the person of a defendant ... when authorized by a statute of the United States"), it did not go so far as to hold that the underlying service of process on Defendant was itself entirely ineffectual. *Seeid.*The fact that such service was insufficient to vest the Illinois Court with jurisdiction over Defendant is of no consequence to the renewal analysis. *See, e.g.,Hudson v. Mehaffey,* 239 Ga.App. 705, 521 S.E.2d 838, 839 (Ga.Ct.App.1999) ("To constitute a 'valid action,' the complaint must be served personally on the defendant."); *see alsoChance v. Planters Rural Tele. Cooperative, Inc.,* 219 Ga. 1, 131 S.E.2d 541, 544 (Ga.1963) (stating that renewal is available where original suit was dismissed for lack of personal jurisdiction over defendant); *Weddington v. Kumar,* 149 Ga.App. 857, 256 S.E.2d 141, 142 (Ga.Ct.App.1979) (same).

**\*8** Likewise, the fact that the Illinois action was dismissed by the court, rather than by Plaintiff on his own motion, does not foreclose the possibility of renewal. While the language of the statute itself, admittedly, might suggest a contrary result, the Georgia courts have long held that involuntary dismissal, other than on the merits, poses no bar to the invocation of O.C.G.A. § 9-2-61(a).*SeeHobbs,* 444 S.E.2d at 323 ("The renewal statute is remedial in nature; it is construed liberally to allow renewal where a suit is disposed of on any ground not affecting its merits."); *Chance,* 131 S.E.2d at 544 (" 'Where the plaintiff begins an action in a court of this state having jurisdiction of the subject-matter, and, after the bar of the statute has attached, the same is dismissed because of a ruling indicating that the court has no jurisdiction of the person, such action may be renewed within six months in another court of this state having jurisdiction of the person and the subject[-]matter." ') (quoting *Atlanta, K. & N. Ry. Co. v. Wilson,* 119 Ga. 781, 47 S.E. 366 (Ga.1904)); *Kimball v. KGB Transp.,* 241 Ga.App. 511, 527 S.E.2d 233, 234 (Ga.Ct.App.1999) ("Although the statute states that it applies where a plaintiff has dismissed an action, we have held that it applies to voluntary or involuntary dismissals where the merits were not adjudic-

ated."); *Owens v. Hewell,* 222 Ga.App. 563, 474 S.E.2d 740, 741 (Ga.Ct.App.1996) ( "O.C.G.A. § 9-2-61 applies to involuntary, as well as voluntary dismissals, where the merits of the case are not adjudicated."); *Brooks v. Douglas,* 154 Ga.App. 54, 267 S.E.2d 495, 497 (Ga.Ct.App.1980) (holding likewise); *accordLau v. Klinger,* 46 F.Supp.2d 1377, 1383 (S.D.Ga.1999) ("Because the legislature intended this statute as 'remedial,' courts have liberally construed it to apply also in cases where the court rather than the plaintiff dismisses the case when the merits are not adjudicated....").*But cf.Oduok v. Phillips,* 154 Fed. Appx. 878, 881 (11th Cir.2005) ("[B]y its plain terms, the Georgia renewal statute does not apply because the federal claims in Oduok's 2000 action were dismissed on the merits *by the district court,* not Oduok as O.C.G.A. § 9-2-61(a) requires.") (emphasis in original).

Simply stated, this action was properly "renewed" within the meaning of O.C.G.A. § 9-2-61(a). Pursuant to the Georgia Code, it is to be treated, for statute of limitations purposes, as if suit had been filed on November 6, 2002.

**b.** *Claims did not accrue until appointment of Plaintiff as receiver*

The next task for the Court in evaluating whether this action was timely filed is to determine when Plaintiff's claims accrued. Because the applicable statute of limitations is four years from the date of accrual, *seeIn re Dulock,* 282 B.R. at 59 (citing O.C.G.A. § 9-3-32), the claims must have accrued no earlier than November of 1998 to be timely.

According to Defendant, even if this lawsuit is treated as a renewal action, only claims challenging the transfers made during 1999 are tenable. Suit attacking the contributions made between 1994 and 1998, it argues, are beyond the reach of this Court. The Court disagrees.

**\*9** The statute of limitations applicable to Plaintiff's claims for fraudulent conveyance did not com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

mence until the fraudulent transfers were or should reasonably have been discovered. *SeeJones v. Spindel,* 239 Ga. 68, 235 S.E.2d 486, 487 (Ga.1977); *cf. alsoDenham v. Shellman Grain Elevator, Inc.,* 123 Ga.App. 569, 181 S.E.2d 894, 896-97 (Ga.Ct.App.1971) (holding likewise).

To be sure, the focus in applying the discovery rule in this case is on the C4T Entities in receivership, whose funds were allegedly misappropriated by Mr. Gause and the Gause Affiliated Entities for impermissible ends. *See, e.g.,Wuliger v. Christie,* 310 F.Supp.2d 897, 908 (N.D.Ohio 2004) (applying principle that " '[a] receiver stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted" ' to determine timeliness of action) (quoting *Armstrong v. McAlpin,* 699 F.2d 79, 89 (2d Cir.1983)). And, typically, the knowledge of Mr. Gause of his allegedly illegitimate transfers could be imputed to the entities for purposes of ascertaining the date of actual or reasonable "discovery." *See, e.g.,Stein Steel & Supply Co. v. Franco,* 148 Ga.App. 186, 251 S.E.2d 74, 75 (Ga.Ct.App.1978) ("knowledge of officers of a corporation is knowledge to that corporation and the corporation is bound thereby").

Nevertheless, here, the fact that Mr. Gause was acting to achieve his own purposes, adverse to the interests of these entities, precludes such imputation during the tenure of his (and his co-conspirators') dominion over them. *See, e.g.,Am. Standard Credit, Inc. v. Nat'l Cement Co.,* 643 F.2d 248, 271 (5th Cir. April 20, 1981) (describing adverse interest exception to the rule of imputation as "well established"); FN7 *In re Plaza Mortgage & Fin. Corp.,* 187 B.R. 37, 45 n. 6 (Bankr.N.D.Ga.1995) ("The adverse interest exception is an exception to the general rule that a corporation is charged with constructive knowledge of all material facts of which its officers or agents acquire knowledge. Where an officer or agent is engaged in a scheme to defraud a corporation, the presumption that knowledge held by the agent was disclosed to the [corporation] fails

because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose.") (internal quotations omitted); *Peoples Bank of Glennville v. Burkhalter,* 179 Ga. 863, 177 S.E. 708 (Ga.1934) ("The cashier of a bank is generally the active hand in the conduct of its business as a bank; and knowledge of the cashier is imputed to the bank, except where he is acting in a dual capacity and his individual interest is adverse to the interest of the bank."). Rather, the C4T Entities are not charged with discovery of Mr. Gause's unlawful transfers until such time as he and his co-conspirators were ousted from control, and Plaintiff was appointed as receiver, or, conceivably, at some time after that appointment when Plaintiff's review of the entities' records should have alerted him to these acts of malfeasance. *SeeHunt v. Am. Bank & Trust Co. of Baton Rouge,* 783 F.2d 1011, 1013 (11th Cir.1986), *aff'g*606 F.Supp. 1348, 1354-59 (N.D.Ala.1985) (so holding) (applying Florida law); *In re Blackburn,* 209 B.R. 4, 9-13 (Bankr.M.D.Fla.1997) (holding likewise).

> FN7. The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

*10 In the instant case, Plaintiff was appointed as receiver for the C4T Entities on November 2, 1999. (*See* Pl.'s Mot. for Summ. J. [67] at Ex. A.) Because this action was initiated, for purposes of the statute of limitations inquiry, on November 6, 2002-comfortably within the applicable four year limitations period-his claims are timely. Insofar as Defendant seeks summary judgment on the basis of its statute of limitations defense, its motion will be denied.

### 3. *First Amendment Challenge*

Before turning to the merits of Plaintiff's fraudulent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 10
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

conveyance claim, the Court considers, briefly, Defendant's contention that the statute giving rise to that cause of action (at least insofar as it applies to transfers made by an insolvent party without valuable consideration) offends the Free Exercise Clause of the United States Constitution. It is Defendant's position that the law is not "generally applicable" within the meaning of *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), in that it has a disproportionate impact on churches, which receive the bulk of their funding from tithes and offerings.

This argument is neither novel nor persuasive. The statute at issue draws no distinction between religious and non-religious bodies, and Defendant has pointed to nothing in its legislative history or application to indicate an even masked hostility to religious institutions. *Cf., e.g.,In re Newman,* 203 B.R. 468, 474-75 (N.D.Kan.1996) (upholding 11 U.S.C. § 548(a)(2) against similar attack). To the extent that, as Defendant argues, application of the fraudulent conveyance statute to "wholly innocent religious organizations" reflects a poor policy decision, that is a matter better left for resolution by the Georgia legislature than by this Court. *Scholes,* 56 F.3d at 761.

### 4. Merits of Fraudulent Conveyance Claim

Having rejected Defendant's First Amendment and statute of limitations challenges, the Court must address the merits of Plaintiff's fraudulent conveyance claims. For the reasons that follow, it concludes that Plaintiff is entitled, as a matter of law, to judgment in his favor under O.C.G.A. § 18-2-22(3), which deems fraudulent "[e]very voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance."[FN8]

> FN8. Because it finds the conveyances fraudulent under subsection (3) of the statute, the Court need not consider whether

the transfers would also be actionable under subsection (2).

#### a. *The C4T Entities were insolvent*

First, a review of the record establishes that the C4T Entities, at the time Mr. Gause and the affiliated entities appropriated and transferred funds to Defendant, were insolvent. "By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one."*In re Indep. Clearing House Co.,* 77 B.R. 843, 871 (Bankr.N.D.Utah 1987); *accordIn re Ramirez Rodriguez,* 209 B.R. 424, 430-31 (S.D.Tex.1997) ("The promised rate of return renders a Ponzi scheme operator insolvent from the scheme's inception, because the returns exceed any legitimate investments."); *Stenger,* 2006 WL 449151, at *7 ("a Ponzi scheme is insolvent from day one"); *see alsoIn re Fin. Federated Title & Trust,* 309 F.3d 1325, 1332 (11th Cir.2002) (acknowledging principle).

**\*11** Defendant, for its part, does not take issue with this principle, but instead argues, first, that the materials in the record fail to establish that the C4T Entities were engaged in a Ponzi scheme, and, second, that there has been no showing that Mr. Gause and the Gause Affiliated Entities were themselves insolvent at the time the challenged transfers were made. The Court addresses each argument below.

#### (i) *The record supports the C4T Entities' insolvency*

As an initial matter, the record in this case is ripe with evidence demonstrating that the C4T Entities were embroiled in an elaborate Ponzi scheme. Without going through the entirety of Plaintiff's evidence in this regard, the Court observes that, if nothing else, the affidavit of H. Jonathan Kahlberg, Plaintiff's forensic accounting expert, and the guilty plea of Mr. Gause, are sufficient to establish that the C4T Entities operated as such a scheme, and were necessarily insolvent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

**(a) The Kahlberg Affidavit**

Mr. Kahlberg is a forensic accountant employed by Ernst & Young (London) LLP with several years of forensic accounting experience. (See Pl.'s Mot. for Summ. J. [67], Ex. AA, at Ex. 1 ¶¶ 3, 6 [hereinafter "First Kahlberg Aff."].) He was retained by Plaintiff in 2000 to provide forensic accounting services in this and related cases. (Id. at ¶ 6.) Mr. Kahlberg has testified that, in that capacity, he "reviewed the financial records of Cash 4 Titles related companies and its affiliated marketers, including but not limited to, bank statements and accounting records, located in the United States, Cayman Islands and the Commonwealth of Dominica, as well as other jurisdictions[.]"(Id. at ¶ 15.)He also claims to have reviewed databases "populated with bank transaction details for the accounts relating to the C4T Scheme in the U.S.... and in the Cayman Islands...."(Id. at ¶¶ 16-18.)Critically, Mr. Kahlberg testifies that, based on his review of "[t]he admissions of Gause and Homa that Cash 4 Titles was a Ponzi Scheme[,]" his "review of the Cash 4 Titles records in the Cayman Islands [which] identified new investor money [that] was used to pay returns to old investors[,] and ... [a] comparison of the interest paid to investors from Cash 4 Titles as compared to the combined net income earned by all the Cash 4 Titles stores[,]""[i]t is [his] conclusion that new investor money was used to pay returns to old investors in the Cash 4 Titles scheme and was therefore a Ponzi Scheme."(Id. at ¶ 76.).

Affidavits such as this have routinely been admitted to demonstrate that an enterprise operated as a Ponzi scheme and was consequently insolvent. See, e.g.,In re Lake Country Invs., 255 B.R. 588, 595-96 (Bankr.N.D.Idaho 2000) (expert affidavit sufficient); In re Ramirez Rodriguez, 209 B.R. at 431 (expert affidavit sufficient); In re Colonial Realty Co., 209 B.R. 819, 821-22 (Bankr.D.Conn.1997) (expert affidavit sufficient); In re Taubman, 160 B.R. 964, 976-80 (Bankr.S.D.Ohio 1993) (expert affidavit sufficient); In re Int'l Loan Network, Inc., 160 B.R. 1, 7-10 (Bankr.D.D.C.1993) (expert affi-

davit and prior judicial decisions sufficient). Defendant nevertheless objects to the affidavit on several grounds. After carefully considering these objections, the Court is unpersuaded that consideration of Mr. Kahlberg's testimony would be improper.

**\*12** First, Defendant's argument that the affidavit is not made on Mr. Kahlberg's "personal knowledge" is without merit. Personal knowledge, as innumerable decisions from the federal courts make clear, can be gleaned from a review of records pertinent to a given case. See, e.g.,Schwimmer v. Kaladjian, 988 F.Supp. 631, 642 (S.D.N.Y.1997) (doctor's affidavit, based on review of patient's medical records, was "sufficient to meet the personal knowledge requirement of Rule 56(e)"); see alsoBaker v. Veneman, 256 F.Supp.2d 999, 1005 (E.D.Mo.2003) ("It appears to the Court that Mr. Arnold based his Declaration upon his review of the loan files and his experience as a Farm Loan Manager. His statements are therefore based upon his personal knowledge and are not inadmissible hearsay. The Court does not believe the statements in Mr. Arnold's Declaration are improper under Rule 56(e), and for these reasons, the Court will deny the Motion to Strike."); Beaver v. Howard Miller Clock Co., 852 F.Supp. 631, 634 (W.D.Mich.1994) (expert affidavit sufficient when stated that opinions based on review of materials generated by discovery); Washington Cent. R.R. Co. v. Nat'l Mediation Bd., 830 F.Supp. 1343, 1353 (E.D.Wash.1993) ("Based on personal knowledge of the files and records, a declarant may testify to acts that she or he did not personally observe but which are described in the record, including requests or statements by third persons made to someone other than the declarant."); Vote v. United States, 753 F.Supp. 866, 868 (D.Nev.1990) (IRS agent's affidavit "complie[d] with Rule 56(e) in that it [was] based upon her personal familiarity with plaintiff's case and her review of plaintiff's file").

Further, the Court perceives no failing in the materials and statements upon which Mr. Kahlberg re-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)    Page 12

(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))

lied. Initially, there can be no dispute (and, certainly, Defendant has offered nothing to create one) that the information upon which Mr. Kahlberg purports to base his conclusion is of the type reasonably relied on by professionals in his field. *See, e.g.,Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir.1988) (accountant reasonably relied upon financial records and interviews with employees to determine solvency of corporation); *In re Colonial Realty Co.*, 209 B.R. at 821-22 (financial records and interviews with employees were reasonably relied on by accountant in determining whether business operated as Ponzi scheme and was insolvent); *In re Taubman*, 160 B.R. at 964 (expert reasonably relied on statements by employees in concluding enterprise operated as Ponzi scheme and was insolvent); *In re Int'l Loan Network, Inc.*, 160 B.R. at 6 (accountant reasonably relied on financial records, interviews with employees, and testimony of agents in ascertaining whether business operated as Ponzi scheme). What is more, the fact that his conclusion was predicated in part on "hearsay" poses no obstacle to the Court's consideration of his conclusion. *See, e.g.,In re Taubman*, 160 B.R. at 976-77 ("Therefore, as long as ... facts or data are of the type reasonably relied upon by experts, they may include hearsay or other inadmissible evidence.").

*13 In light of the foregoing, moreover, the Court declines Defendant's invitation to strike Mr. Kahlberg's testimony because, at the conclusion of the affidavit, he states that, "The statements contained in this affidavit are true and accurate to the best of my information, knowledge, and belief."(*See* First Kahlberg Aff. ¶ 78.) To be sure, a witness who avers a particular fact based on no more than their "information and belief" fails to assist a litigant in either securing or avoiding summary judgment. *SeePace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir.2002) (reiterating that information and belief is not equivalent to personal knowledge). Indeed, if, for example, the pertinent portion of Mr. Kahlberg's affidavit instead read, "It is my belief that new investor money was used to pay returns to

old investors in the Cash 4 Titles scheme and was therefore a Ponzi Scheme[,]" the Court would be constrained to disregard his statement. *Pace*, 283 F.3d at 1278-79. But his affidavit does not say that. Rather, it provides:

> It is my conclusion that new investor money was used to pay returns to old investors in the Cash 4 Titles scheme and was therefore a Ponzi Scheme. *This conclusion is based on the following:*
>
> 1. The admissions of Gause and Homa that Cash 4 Titles was a Ponzi Scheme;
>
> 2. My review of the Cash 4 Titles records in the Cayman Islands identified new investor money was used to pay returns to old investors; and
>
> 3. A comparison of the interest paid to investors from Cash 4 Titles as compared to the combined net income earned by all the Cash 4 Titles stores.

*See* First Kahlberg Aff. ¶ 76 (emphasis supplied). The concluding language of his affidavit, which alludes to "information" and "belief," while perhaps unfortunate, does not require the Court to disregard this testimony-the foundation of Mr. Kahlberg's personal knowledge respecting the nature of the C4T enterprise is more than clear.

Likewise, Mr. Kahlberg's failure to attach to his affidavit the myriad volumes of documents he relied upon in familiarizing himself with the C4T scheme does not persuade the Court that striking his testimony would be proper. Defendant has not alleged that it was precluded from obtaining and reviewing such documentation during discovery,[FN9] or otherwise demonstrated any prejudice from the omission. *Cf.In re Lake Country Invs.*, 255 B.R. at 596 (stating that expert could review materials not before the court in opining as to existence of Ponzi scheme, and noting that aggrieved litigant should seek to remedy inadequate disclosures through Rule 56(f) motion). The argument that failure to attach such documents renders an affidavit inherently infirm and unworthy of consideration has found little

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 13
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

favor with the courts where, as here, the "refer[enced]" papers are voluminous and complex accounting records, and are cited only as the basis for an expert's acquisition of personal knowledge, rather than offered (in unauthenticated form) for independent consideration by the court. *See, e.g.,id.;In re Colonial Realty Co.,* 209 B.R. at 822 (rejecting argument that court could not consider uncontradicted expert affidavit over objection that the affidavit was "based on hearsay and documentary evidence that the defendant has had no opportunity to review"); *cf. alsoIn re Int'l Loan Network, Inc.,* 160 B.R. at 6 (considering expert affidavit where materials upon which he relied were not in the record, but rather, were of the type represented in "sample" provided to the court); FED.R.EVID. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court *may* order that they be produced in court.") (emphasis supplied).

> FN9. Notably, in his Response to Defendant's Motion for Leave to File Third-Party Complaint, Plaintiff, through counsel, represents that he produced to Defendant well over 6,000 pages of documents, filling ten 4 binders. (*See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Leave to File Third-Party Compl. [112] at 2.)

**\*14** In sum, while perhaps not the paragon of Rule 56(e)'s form requirements, Mr. Kahlberg's affidavit is sufficient to provide *some* evidence that the C4T Entities and the Receivership Subjects were participants in a Ponzi scheme, and were insolvent as a matter of law. Standing unrebutted, the Court perceives no reason to cast aside such testimony in its consideration of the parties' cross-motions for summary judgment.

*(b) The Gause plea*

Even putting the Kahlberg affidavit aside, the Court finds the transcript of Mr. Gause's guilty plea (not to mention those of his compatriots) sufficient to establish the nature of the C4T enterprise as a Ponzi scheme. The record before the Court shows that, on March 2, 2001, Mr. Gause was called before Judge John G. Koeltl of the United States District Court for the Southern District of New York, took an oath, and pled guilty to charges of, *inter alia,* securities fraud and money laundering. (*See* Pl.'s Mot. for Summ. J. [67] Ex. I, at pp. 1, 4, 9-19, 40-41.)The transcript was certified as a true and correct copy by the deputy clerk on October 1, 2003. (*Seeid.* at 43.)In the course of tendering his plea, Mr. Gause represented to the court: (i) that he solicited money for the Cash 4 Titles enterprise, informing prospective investors that they would receive impressive rates of return, (*id.* at 28); (ii) that he "caused money received from the settled securities to [be used to] make interest payments due on the existing securities from the people, and ... knew that the investors were not told everything about the company at that time[,]"(*id.* at 29-30); (iii) that he "did not tell [investors] at that time their monies would be used to go into Cash 4 Titles, and in essence, [that he] used new money to pay off old investors[,]"(*id.* at 30); and (iv) that the "monies [received from investors] never got to the company[,] ... [but] were used to pay off older investors."(*Id.*) Such testimony paints the picture of a textbook Ponzi scheme, *seeIn re Fin. Federated Title & Trust,* 309 F.3d at 1327 n. 2, and Defendant's argument that it should be ignored by the Court in ascertaining whether the C4T Entities operated such a scheme is unpersuasive. *See, e.g.,Beiswenger Enters. Corp. v. Carletta,* 46 F.Supp.2d 1297, 1299 (M.D.Fla.1999) ("Trial testimony, even when from a proceeding in which the parties, subject matter, and counsel are not the same can be used because it is sworn testimony which is at least as reliable as that found in affidavits."); *accordWilliams v. Vasquez,* 62 Fed. Appx. 686, 692 (7th Cir.2003) (collecting cases, held, "along with other courts, we have recognized that transcripts of testimony may be considered in support of, or op-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 14
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

position to, a motion for summary judgment").

Simply stated, the evidence before the Court amply demonstrates what numerous other courts have recognized, and what Defendant has not even attempted to contradict: the C4T Entities were embroiled in a massive Ponzi scheme, and were necessarily insolvent. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1350 (11th Cir.2003) (describing Cash 4 Titles as "a Ponzi scheme [that] involved the sale of securities of corporations formed for the purpose of making high-interest loans to members of the public, who would pledge their automobile titles as collateral"); *SEC v. Homa,* 17 Fed. Appx. 441, 443-44 (7th Cir.2001) (describing nature of C4T Ponzi scheme); *Stenger,* 2006 WL 449151, at *1 (discussing C4T Ponzi scheme in suit brought by Plaintiff against Homa's ex-wife for fraudulent conveyance under Georgia law); *SEC v. Homa,* No. 99 C 6895, 2004 WL 1093492, at *1 (N.D.Ill. May 13, 2004) ("From at least 1995 through October 1999, until he was arrested by the FBI, prosecuted criminally by the United States Attorney's Office, and civilly sued by the Securities and Exchange Commission ('SEC'), Charles Richard Homa ('Homa'), with the assistance of Michael E. Gause ('Gause'), developed and operated one of the largest Ponzi schemes in United States history, using a variety of businesses supposedly associated with an automobile title lending business called 'Cash 4 Titles' or 'C4T.'"); *SEC v. Homa,* No. 99 C 6895, 2004 WL 725256, at *1 (N.D.Ill. March 31, 2004) ("The Securities and Exchange Commission ('SEC') brought this action against Charles Richard Homa and other defendants as a result of their involvement in one of the largest Ponzi schemes in U.S. history."); *Stenger v. Leadenhall Bank & Trust Co.,* No. 02 C 8655, 2004 WL 609795, at *2 (N.D.Ill. Mar.23, 2004) ("Homa, Gause, and Denson created a complicated maze of Cayman Islands and Bahamian companies and corresponding Leadenhall bank accounts, including Morningstar, to be used in receiving investor funds and facilitating inter-bank transfers to assist Gause, Homa, and downline marketers in avoiding the scrutiny of United States reg-

ulators while at the same assisting in the perpetuation of a[C4T] Ponzi scheme."); *Stenger v. World Harvest Church, Inc.,* No. 02 C 8036, 2003 WL 22048047, at *1 (N.D.Ill. Aug.29, 2003) ("Between 1996 and October 1999, Homa, Gause and Pearson ('the Receivership Subjects') engaged in an elaborate scheme, fraudulently inducing investors to purchase interests in an enterprise called Cash 4 Titles ('C4T') whose ostensible purpose was to provide capital to consumer lending companies. The enterprise was not profitable, and as in the classic 'Ponzi' scheme, the contributions of later investors were used to pay off earlier investors. The Receivership Subjects also diverted significant amounts of the investors' funds for their personal use and for the benefit of their friends and associates. All told, they defrauded some 2,400 investors out of an excess of $200 million."). Defendant's argument to the contrary lacks merit.

#### (ii) *Intermediaries' receipt of funds does not undermine claim*

**\*15** Defendant next argues that Plaintiff's fraudulent conveyance claim cannot succeed because there is no evidence that Mr. Gause and the Gause Affiliated Entities which directly made contributions to Defendant were insolvent. The Court is unpersuaded.

The use of intermediaries to transfer funds from a Ponzi scheme to a defendant-recipient does not undermine the viability of a fraudulent conveyance claim. *See, e.g.,Scholes,* 56 F.3d at 754 ("In the case of the ex-wife, the money went from the corporations first to Douglas and then from him to her, but we cannot see what difference that should make...."). In this case, moreover, the record does not reveal any source of income attributable to the Gause family or their affiliated entities during the relevant time period other than that associated with the C4T Ponzi scheme. (*See* Pl.'s Mot. for Summ. J. [67], Ex. Y, at 8-10, 17-18, 68; Second Kahlberg Aff. ¶¶ 56-58, 61.) In the absence of any showing that the contributions at issue arose from some

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

source other than the insolvent C4T Entities, the label of insolvency necessarily attaches to the intermediate recipients/transferors as well. *SeeStenger,* 2006 WL 449151, at *7 (applying O.C.G.A. § 18-2-22(3) to case involving C4T Entities and Mr. Homa, relied on principle that "a Ponzi scheme is insolvent from day one" to conclude that Mr. Homa was himself insolvent at time of challenged transfers).

What is more, even if the Court were to assume (i) that the fraudulent transfer statute required a showing of fraud *vis-a-vis* each "link" in the conveyance from an entity to a defendant-recipient, and (ii) that subsection (3) of the statute was inapplicable to transfers made directly to Mr. Gause, because he provided some "valuable consideration" to the C4T Entities in the form of legitimate services, the record would continue to sustain Plaintiff's claim. That initial transfer of funds from the C4T Entities to Mr. Gause was itself fraudulent under subsection (2) of the statute, which deems unlawful "[e]very conveyance of ... personal estate ... made with intention to delay or defraud creditors, where such intention is known to the taking party [.]"O.C.G.A. § 18-2(2) (repealed 2002). The C4T Entities' intention to defraud creditors can be inferred from the mere fact that they were operating as a Ponzi scheme. *Cf.,e.g.,In re Mark Benskin & Co.,* 161 B.R. 644, 650 (Bankr.W.D.Tenn.1993) (applying 11 U.S.C. § 548, observed, "[T]he statutory language makes it plain that one can infer an intent to defraud from the mere fact that Debtors were operating a Ponzi scheme.") (internal quotations and citations omitted); *In re Indep. Clearing House Co.,* 77 B.R. at 860-61 ("Although the question of the debtors' intent would ordinarily present a factual question, we conclude that, from the undisputed evidence in the record, only one inference is possible-namely, that the debtors had the intent to hinder, delay or defraud creditors. The trustee's undisputed evidence is that the debtors were engaged in a Ponzi scheme and therefore must have known that undertakers at the end of the line would lose their money. That is the only evidence there is. We

conclude that it was sufficient to establish, as a matter of law, the debtors' actual intent to hinder, delay or defraud creditors within the meaning of section 548(a)(1).""). Mr. Gause, moreover, admitted that the C4T Entities were engaged in a Ponzi scheme, and, consequently, that intention is attributable to him as well. (*See* Pl.'s Mot. for Summ. J. [67] Ex. I, at pp. 28-30.)

**\*16** In light of the foregoing, the Court finds it all but inconsequential that the C4T Entities' funds found their way into the coffers of Defendant only through the filter of Mr. Gause and entities affiliated with him. That additional layer of financial maneuvering does not pose an obstacle to Plaintiff's success here.

b. *The transfers were not for "valuable consideration"*

The record likewise supports the conclusion that the transfers were not made for "valuable consideration" within the meaning of O.C.G.A. § 18-2-22(3). Defendant took the tainted funds as tithes and offerings, in the nature of charitable contributions. *SeeUnited States v. Am. Bar Endowment,* 477 U.S. 105, 118, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986) ("The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration."); *Scholes,* 56 F.3d at 759 (discussing allegedly fraudulent conveyances to religious organizations, stated: "If one thing is clear, it is that a gift to a charity (to anyone, for the matter) is not in exchange for full in the sense of commensurate consideration. Otherwise it would not be a gift, but an exchange.").

Defendant, plainly, engaged in no valuable exchange with the C4T Entities or the Gause Affiliated Entities that facilitated the contributions. Those actors, which the law perceives as distinct from Mr. Gause, derived no benefit from the Church.

Furthermore, even respecting Mr. Gause and his

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))

wife, the benefits Defendant purports to have be-stowed on its parishioners in connection with the contributions are not cognizable as "valuable consideration" under the law. *See* O.C.G.A. § 18-2-22(3) (repealed 2002) (defining concept of fraudulent conveyance in terms of absence of "valuable consideration"); O.C.G.A. § 13-3-41 ("Considerations are distinguished into 'good' and 'valuable.' A good consideration is such as is founded on natural duty and affection or on a strong moral obligation. A valuable consideration is founded on money or something convertible into money or having a value in money, except marriage, which is a valuable consideration."); *United States v. Reid,* 127 F.Supp.2d 1361, 1368-69 (S.D.Ga.2000) (in Georgia, transfer lacks valuable consideration if is "not founded on money, or something convertible into money, or having a value in money[,]" including, *e.g.,* "love and affection") (internal quotations omitted). Indeed, when pressed to define the consideration the Church gave to the Gauses in exchange for their contributions, Pastor Hufton himself did not purport to identify any reciprocal benefit having monetary value, but rather, candidly explained that the "benefit" inuring to the Gauses "is not tangible in the kingdom of the world but it's tangible to God." *See* Hufton Dep. [85]. [FN10] Any tangible benefits accepted by the Gauses in connection with their membership in the Church, moreover, such as counseling, worship services, literature, and communal meals, do not appear to have been "bargained for" exchanges *vis-a-vis* the contributions made to Defendant, but instead were benefits bestowed by the Church on all its members. *See* O.C.G.A. § 13-3-42 (consideration contemplates bargained for exchange); Hufton Aff. [79] at ¶ 5 ("World Harvest expends all tithes, charitable donations and gifts in the operation of the church, including providing for worship services, religious instruction, spiritual counseling, recreational programs and facilities, transportation, speakers, books and literature, communal meals, facilities, utilities, electronic and audio-visual equipment, liability insurance support of missions and construction and maintenance of its church facilities."). Simply put,

the Gauses, while perhaps deriving some spiritual benefit for their contributions, did not receive anything Georgia law recognizes as "valuable consideration" within the meaning of the fraudulent conveyance statute.

> FN10. The Court, to be sure, does not diminish in any way the intangible "value" a donor receives in making contributions to a house of worship. The fraudulent conveyance statute, however, speaks in terms of "valuable consideration"-a legal concept that does not embrace purely spiritual benefits. To the extent Defendant relies on *In re Moses,* 59 B.R. 815 (N.D.Ga.1986) (holding that $4,700 in contributions made to church were "property" and of "reasonably equivalent value," sufficient to defeat claim under 11 U.S.C. § 548, where debtors received 80 to 100 hours of counseling and attended at least three religious services a week, and offerings were used to pay operating expenses of church), to support a different result, the Court finds the decision factually distinguishable, and, ultimately, unpersuasive in the context of a fraudulent conveyance challenge made pursuant to O.C.G.A. § 18-2-22.

**\*17** In summary, Plaintiff has demonstrated that the conveyances made to Defendant originated, and were facilitated, by insolvent persons and entities, and were not made for "valuable consideration." No genuine issue of fact exists, and Plaintiff is entitled to summary judgment on his fraudulent conveyance claim as a matter of law.

## II. Defendant's Motion to Strike

Defendant has moved to strike the affidavits submitted in support of Plaintiff's Motion for Summary Judgment, at least insofar as those affidavits reflect testimony that the C4T Entities operated as a Ponzi scheme. Because the Court has already rejected Defendant's argument *vis-a-vis* the First Kahlberg Af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 17
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

fidavit, and because, even without the challenged affidavits, the record adequately supports the conclusion that the Entities and the Receivership Subjects were engaged in such a scheme, the Court need not consider the matter further. Defendant's Motion to Strike and Objection to Affidavits [82] is DENIED.

### III. Defendant's Motion for Leave to File Third-Party Complaint

The final motion pending before the Court is Defendant's Motion for Leave to File Third-Party Complaint [110]. In that motion, Defendant asks the Court to permit it to file third-party claims against GuideOne Mutual Insurance Company ("GuideOne") for breach of contract, bad faith, and stubborn litigiousness. It claims that GuideOne provided it with commercial general liability insurance during all times relevant to this lawsuit, and that GuideOne undertook the defense of this matter (and provided substantial legal assistance over the course of eleven months) without a reservation of rights. Defendant states that, notwithstanding this undertaking, GuideOne recently informed it that the insurance company would neither indemnify nor continue to defend it in this action, and abandoned the defense of this matter in February of 2005. It is Defendant's position that GuideOne, due to its defense of the action without the reservation of rights, is estopped from denying coverage, and that the insurance company is consequently liable to Defendant under the aforementioned theories of relief.

"The grant of leave to file a complaint in impleader is within the sound discretion of [the] court."*Greene Line Mfg. Corp. v. Fibreboard Corp.,* 130 F.R.D. 397, 399 (N.D.Ind.1990).

In determining the propriety of an impleader request, this court must look at whether the plaintiff or potential third-party defendant will suffer prejudice, whether the impleaded claim will complicate matters at the time of trial, whether the third-party claim has merit and whether granting leave to im-

plead will impose significant additional costs on the parties.

*Id.* After considering the matter, the Court declines to exercise its discretion in favor of permitting Defendant's third-party claims to proceed here.

Succinctly stated, this matter has been proceeding, in one forum or another, for almost four years. Discovery has concluded, the parties have cross-moved for summary judgment, and, by virtue of this Order, Plaintiff's claims (or at least, the substantial bulk of them) have been resolved. The Court struggles to see how allowing Defendant to assert third-party claims now would serve judicial economy or efficiency.

**\*18** Defendant insists that discovery and resolution of its claims *vis-a-vis* GuideOne could proceed expeditiously, as its success on the proposed third-party claims is all but a foregone conclusion. That may be the case. It if is, then Defendant is of course free to initiate a separate action, and move for judgment on the pleadings or summary judgment promptly after the commencement of litigation. *See*Fed.R.Civ.P. 12(c) & 56(a). It may be, however, that GuideOne intends to put up a substantial defense to Defendant's claims-a defense that involves complex factual issues. Without having heard from GuideOne, the Court is in no position to make an informed judgment on the issue, but, in any event, does not believe Plaintiff should be forced to bear the risk of having resolution of this already protracted litigation further delayed. Defendant's Motion for Leave to File Third-Party Complaint [110] is DENIED.

### Conclusion

Defendant's Motion for Leave to File Third-Party Complaint [110] appears twice on the docket. The Clerk is DIRECTED to remove the second entry [111] from the pending motions list.

Defendant's Motion to Strike and Objection to Affidavits [82] and Motion for Leave to File Third-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 18
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.))**

Party Complaint [110] are DENIED. The parties cross-motions for summary judgment [67, 78] are GRANTED in part and DENIED in part. Defendant is entitled to judgment as a matter of law on Plaintiff's unjust enrichment claim, but Plaintiff is entitled to summary judgment on his claim that Defendant received $1,808,400 in fraudulent transfers from Mr. Gause and the Gause Affiliated Entities.

From the Court's review of the record, it appears that the only further matters to be resolved in this controversy, apart from the issue of costs and fees (which should be presented pursuant to the Local Rules of this Court), are as follows:

(1) the disposition of Plaintiff's claims with respect to conveyances Mr. Pearson allegedly made, or caused to be made, to Defendant (the "Pearson Conveyances"); and

(2) in the event Plaintiff elects not to proceed to trial on his claims involving the Pearson Conveyances, but instead chooses to either settle such claims or voluntarily dismiss them,

(a) what relief, other than or in lieu of a money judgment, Plaintiff is entitled to as a consequence of prevailing on his fraudulent conveyance claim, and

(b) to the extent Plaintiff seeks only the entry of a money judgment, the amount of any judgment to be entered against Defendant, inclusive of interest.

Plaintiff is DIRECTED to notify the Court and opposing counsel, by no later than ten (10) days after the date appearing on this Order, whether or not he intends to take Defendant to trial on the claims involving the Pearson Conveyances. In the event he intends to do so, then the parties shall have thirty (30) days after the date such notice is given to submit their LR 16.4, NDGa proposed Consolidated Pretrial Order. Conversely, in the event Plaintiff does not intend to proceed to trial, Plaintiff is DIRECTED to make a written submission respecting the matters identified in subparagraph (2) above by

no later than thirty (30) days after filing the requested notice. Defendant shall then have twenty (20) days within which to file any response.

**\*19** SO ORDERED.

N.D.Ga.,2006.
Stenger v. World Harvest Church, Inc.
Not Reported in F.Supp.2d, 2006 WL 870310 (N.D.Ga.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.